**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**JAMES BENJAMIN, ET AL.**                 :

                                      :

                **Plaintiffs,**      :

                                        :      **75 Civ. 3073 (HB)**

        - against -             :

                                        :         <u>**OPINION**</u>

**MARTIN F. HORN, ET AL.,**          :

                                        :

                **Defendants.**    :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

      Defendants, the City of New York and the Department of Corrections, et al. (collectively the "Department" or "DOC"), move, pursuant to the Prison Litigation Reform Act ("PLRA"), to terminate the December 22, 2004 Amended Heat Order on extreme temperature conditions in correctional facilities operated by the Defendants. Plaintiffs, pre-trial detainees, object to the termination of the Order, and instead, ask this Court to extend the Order at least until the end of this year. For the reasons discussed below, I agree with the Plaintiffs and decline to terminate the Amended Order at this time.

## I.      PROCEDURAL BACKGROUND

      Pre-trial detainees in various New York City jails brought seven related class action lawsuits against the City of New York ("City"), particularly the DOC, which alleged the conditions of their confinement violated their constitutional rights. Plaintiffs and the City entered into several consent decrees in 1978-79. The consent decrees were consolidated for enforcement before Judge Morris E. Lasker. Both parties agreed to the creation of an independent monitoring agency, the Office of Compliance Consultants ("OCC"), which occurred pursuant to Judge Lasker's Order in 1982. Since then, OCC has monitored compliance with the consent decrees.

      Following a May 2000 hearing, this Court issued the April 26, 2001 Order where some of the Defendants' practices concerning environmental health in various correctional facilities were held unconstitutional, among them the extreme temperature conditions encountered in some facilities from time to time. In July 2003, Dr. Susi Vassallo was retained to provide expertise on issues associated with heat-related illness. As a result of her report and other information

supplied by the parties and OCC, this Court, on July 26, 2004, entered an Order that addressed the potential risk to inmates from extreme temperature conditions and obliged the DOC to take certain precautions, triggered by the outside temperature having reached 85°F (sometimes "high heat days").

The July 26, 2004 "Heat Order" provided for automatic termination on October 15, 2005 if "OCC does not find any evidence of current and ongoing constitutional violations of plaintiffs' federal rights." At the Department's behest, this Order was subsequently amended in a December 22, 2004 Order ("Amended Heat Order"). The automatic termination provision did not change.

Due to DOC's failure to provide contemporaneous records during the summer of 2005, the automatic termination provision was extended, by Order of October 14, 2005 to December 1, 2005, further extended by Order of November 29, 2005 to December 31, 2005, and finally, by Order of December 22, 2005 "until the date of the Court's decision." Defendants have now moved this Court to terminate the Amended Heat Order.

## II.    STANDARD OF REVIEW

The Prison Litigation Reform Act ("PLRA") provides that prospective relief with respect to prison conditions shall be terminated, upon motion of any party, *inter alia*, two years after the date the court granted or approved the prospective relief. 18 U.S.C. § 3626(b)(1)(i). Any party is permitted to seek termination of a consent decree in advance of the timeframe provided in the PLRA. 18 U.S.C. § 3626(b)(4). But a Court shall not terminate a consent decree if it finds that "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

## III.    DISCUSSION

Defendants submit that they are in substantial compliance with the requirements of the Amended Heat Order and thus, this Court should terminate the consent decree as it relates to extreme temperature conditions in the following facilities: Adolescent Reception & Detention Center ("ARDC"), Bernard B. Kerik Center ("BBKC"), George Motchan Detention Center ("GMDC"), George R. Vierno Center ("GRVC"), Anna M. Kross Center ("AMKC"), and Rose M. Singer Center ("RMSC"). OCC and plaintiffs object to the termination of my Order, and instead, recommend that I extend it. After a review of the evidence, I find that there is sufficient

evidence of noncompliance to warrant an extension of the Heat Order.

## A. Extension of Heat Order

OCC has provided this Court with documentation that demonstrates that the DOC has failed the substantial compliance test in connection with several of the provisions in the Amended Heat Order. Specifically, OCC found that, to a greater or lesser extent, that the DOC: 1) failed to house heat-sensitive inmates appropriately, 2) did not have functional air-conditioning in housing units designated heat-sensitive, 3) failed to provide this Court with a ventilation plan for the punitive segregation areas, and 4) has not confirmed that cool showers are available in all of the housing units as required by the Heat Order. Each of these violations will be addressed below.

### 1. Housing Heat-Sensitive Inmates

OCC selected, at random, a sample of 271 inmates from a list of over 1,000 heat-sensitive inmates and monitored the DOC's compliance. If the DOC failed to house any heat-sensitive inmate in heat-sensitive housing units[1] (sometimes "air-conditioned housing units") for even one day when the temperature was higher than 85°F, that was considered a violation of the Heat Order. OCC's analysis of the 271 heat-sensitive inmates revealed that the Department failed to house 98 heat-sensitive inmates in heat-sensitive housing as required by the Amended Heat Order, a non-compliance rate of 36%. OCC REPORT at 1-2 (Mar. 21, 2006). I find that this percentage fails to meet the substantial compliance test under the PLRA.

The 98 inmates the DOC failed to house in heat-sensitive housing units breakdown as follows. In 11 instances, DOC either admitted or provided no explanation for their failure to house heat-sensitive inmates pursuant to the Order, in one instance, DOC could not locate records associated with the inmate, and in another instance, the DOC was still, at the time of OCC's last report, investigating their failure to transfer one heat-sensitive inmate to a heat-sensitive unit. OCC REPORT at 1 (Mar. 21, 2006). Further violations of the Amended Heat Order included: 1) 9 instances where DOC gave no reason for the failure, 2) 26 instances where DOC refused to place heat-sensitive inmates in designated heat-sensitive housing units because a DOC-created exception to the Order prevented such placement, 3) 37 instances where a heat-sensitive inmate refused transfer to a heat-sensitive housing unit, and 4) 13 instances where heat-sensitive inmates were kept in receiving rooms on high heat days rather than heat-sensitive

---

[1] All heat-sensitive housing units are air-conditioned.

housing units.  See Id.; See also Letter from Nicole Austin, OCC Deputy Director to John Doyle, OCC Director at 1 (Apr. 20, 2006).

Under the Order, none of the above are permissible reasons for DOC's failure to place those inmates in heat-sensitive, air-conditioned housing units.

Twenty-six of the 98 inmates were not housed in heat-sensitive units because the DOC placed these inmates in categories that DOC felt excused compliance with the Order.  The categories included (the number of inmates so designated is included in parentheses): administrative segregation[2] (2), detoxification housing[3] (2), mental observation[4] (4), punitive segregation[5] (9), protective custody[6] (5), gay housing (3), and security override[7] (1).  It is uncontested that these inmates were properly designated as heat-sensitive.  There was no authority, with the possible exception of those housed in punitive segregation, for the DOC to refuse heat-sensitive housing to these inmates.  The Amended Heat Order provided that "to the extent that DOC is unable to provide prisoners held in punitive segregation housing ("CPSU") with every measure to increase inmate safety during hot weather," other measures should be taken.  Amended Heat Order ¶ 8 (Dec. 22, 2004).  Even if the nine heat-sensitive inmates in punitive segregation are excluded from the total number of 98 cases where there was a failure to obey the Order, the result would be a noncompliance rate of 33%, reduced only 3% from 36% -- too high to meet the substantial compliance standard under the PLRA.

Thirty-seven out of the 98 heat-sensitive inmates were not transferred because the DOC allowed these inmates to refuse transfer to heat-designated units.  DOC's self-created, unilateral waiver system is in further violation of the Amended Heat Order.

Thirteen out of the 98 heat-sensitive inmates were subjected to temperatures in excess of 85°F, some of them for up to *six days* in BBKC receiving rooms.  On many of those days,

---

[2] Inmates housed in administrative segregation must be separated from the general population as a result of a Court or Department Order.

[3] Inmates housed in detoxification housing are designated "detox" pursuant to orders from medical personnel.

[4] Inmates housed in mental observation are either designated by medical personnel, ordered placed on "Suicide Watch" pending evaluation, or ordered placed on mental observation pursuant to Article 730 of the New York Criminal Law Procedure Law.

[5] Inmates housed in punitive segregation have violated department or institutional rules.

[6] Inmates housed in gay housing have requested this designation or have been designated by either the institution or a court order as requiring protective custody.

[7] There is no such category under the Department's policy.  There is a category called administrative override, where the appropriate DOC personnel could initiate non-standard directives, which include the movement of inmates.

temperatures were in the 90s, and even reached a high of 100ºF.  The Heat Order mandates that heat-sensitive inmates be placed in air-conditioned housing no more than eight hours after heat-sensitive designation.  The Amended Heat Order provides in relevant part:

> **ORDERED**, that the New York City Department of Health and Mental Hygiene, or its vendor (collectively, "DOHMH") will continue to use its heat screening form during the initial medical intake exam for all new inmates and where one or more of the conditions set out in the fifth ordered paragraph exist:

> a. where temperatures exceed 85ºF at the time of the intake exam or are forecast to do so within 48 hours thereafter, will immediately place the inmate in air conditioned housing; and

> b. where the temperature is below 85ºF at in-take and is not forecast to reach 85ºF within the following 48 hours, will flag the file so that air conditioned housing will be provided as soon as possible after the temperature reaches 85ºF in the area occupied by the affected inmate; and

> When an inmate needs to be placed in air conditioned housing under the circumstances described in subparagraph a or b, such housing will be provided <u>within two hours</u> when it is available within the same jail in which the inmate is being housed and <u>within eight hours</u> when it requires that the inmate be transferred to another jail.

Amended Heat Order ¶ 3 (Dec. 22, 2004).

In sum, in many of the circumstances where DOC was non-compliant, it appears that DOC decided to unilaterally create exceptions to the Heat Order, without notice to the Court – to say nothing of permission.  In my Order, only the Department of Health and Mental Hygiene ("DOHMH") was given limited authority, which, to date, has not been used, to add or delete medical conditions from the list that triggers an inmate's heat-sensitive designation.  Amended Heat Order ¶ 6 (Dec. 22, 2004) ("DOHMH may, in the future, add or delete other conditions from this list to identify inmates for air-conditioned housing as they are determined to be medically warranted, upon prior notification to OCC, plaintiffs' counsel and DOC.").

## 2. *Air-Conditioning in Heat-Sensitive Housing Units*

Further, it appears that some facilities designated as heat-sensitive did not have functional air-conditioning units last summer.  OCC raised concerns about the following units: BBKC, Rikers modular units, and the Sprung housing areas.  All of these units are designated heat-sensitive housing units because they are supposed to be entirely air-conditioned.  Thus,

allegations that the temperature readings may exceed 85ºF in these units must be taken seriously by this Court.

BBKC has been designated by the Department as one of its primary heat-sensitive housing units. BBKC consists of two vertical towers, the North Tower and the South Tower. Each tower has two air-conditioning units each, responsible for cooling the entire facility. It is uncontested that one air-conditioning unit (also known as a "chiller") in the South Tower does not work at all. See, e.g., Erik Berliner Decl. ("Berliner Decl.") ¶ 23. It is also undisputed that at times last summer, there was no air-conditioning in the South Tower because the only functioning chiller failed to work. See Email from Bridget Byrnes, Acting OCC Deputy Director, to Florence Hutner, DOC General Counsel, *Heat Sensitive Housing (BBKC)* (August 1, 2005); See also Letter from David Goldfarb, City of New York Law Department, to John Doyle, OCC Director (Aug. 15, 2005); Berliner Decl. ¶ 24.

To their credit, DOC installed a new chiller in the South Tower last fall. Berliner Decl. ¶ 23. But, if this chiller malfunctions, there will again be no air-conditioning in the South Tower this summer. Although DOC asserts that they have a contingency plan with regard to transfer of heat-sensitive inmates in the event the air-conditioning fails again this summer, neither this Court nor OCC has seen it.

Notwithstanding the above, DOC claims that during the times when the air conditioning was not functional in the South Tower, heat-sensitive inmates were not at risk because the inside temperature never exceeded 85ºF.[8] Berliner Decl. ¶ 24. This may be true, but in light of confirmed allegations that temperature readings were falsified by BBKC personnel last summer, this assertion is of some concern. See Letter from Nicole Austin, OCC Deputy Director to Hon. Harold Baer, Jr. at 1 (Mar. 21, 2006) ("But by virtue of the existence of these falsified reports, I am forced to question the integrity of the data on the whole that has been submitted to OCC by BBKC."); See also Letter from Florence Hutner, General Counsel of DOC to Hon. Harold Baer, Jr. at 1 (Apr. 21, 2006) ("Our investigation has confirmed that on six days when the outside temperature exceed 85 degrees, incorrect numbers were made on temperature reports that were provided to OCC and DOC Assistant Commissioner Feeney.").

Furthermore, temperature readings provided by DOC to OCC last summer indicate that

---

[8] The Department does not contest that the outside temperature was 92º, thus, the provisions of the Amended Heat Order were applicable.

air-conditioned housing units appeared uncharacteristically warm on several days last summer. In fact, the indoor temperatures in these facilities were at or exceeded 80ºF.  <u>See</u> Letter from Legal Aid Society to the Honorable Harold Baer, Jr. at Appendix A (Feb. 10, 2006).  These abnormally high indoor temperatures suggest that air-conditioning in these buildings may not have functioned properly, yet heat-sensitive inmates were still housed in these areas.

Clearly, the purpose of heat-sensitive housing is rendered moot if the temperatures in heat-sensitive units exceed 80ºF and inmates at risk for heat-related illness are placed in these facilities.  The evidence submitted by OCC suggests that this may be a concern with regard to DOC's implementation of the Amended Heat Order.  Thus, on this ground too, I find it necessary to extend the Amended Heat Order to give DOC an opportunity to substantially comply with the terms of the Order and avoid a reoccurrence of these problems this year.

*3.  Ventilation Plan in Punitive Segregation Areas*

The December 22, 2004 Amended Heat Order provided that DOC would present a plan to provide adequate ventilation and cooling in punitive segregation areas to OCC, LAS, and this Court within 60 days.  Amended Heat Order ¶ 8 (Dec. 22, 2004).  This has yet to happen.

Punitive segregation prisoners are locked in their cells 23 hours per day without adequate ventilation and with solid, unvented doors on each cell.  Due to the security concerns with regard to these inmates, this Court allowed DOC to satisfy separate requirements for this population on the condition that the Department provide the Court with a plan to adequately address the ventilation and cooling problems in the punitive segregation area.  To date, no plan has been submitted to this Court.  In fact, the only progress made since I issued the Amended Heat Order one and a half years ago has been the selection of ventilation experts by both sides to look at the issue.

This Court acknowledges the difficult task at hand here and appreciates the Department's attempts to craft a solution.  But good faith promises do not solve the problem nor put the Department in compliance with the Heat Order.

*4. Lack of Cool Showers*

Finally, LAS alleges that the Department fails to provide cool showers to inmates during warm weather as required by the Amended Heat Order.  Amended Heat Order ¶ 2 (requiring the Department to "encourage inmates to take cool showers periodically").  DOC informed OCC in the summer of 2003 that the showers in approximately 99 housing units are fixed at a certain

high temperature. In those units, it is impossible to adjust the temperature to permit an inmate to take a cool shower. Letter from John A. Horwitz, OCC Director, to Hon. Harold Baer, Jr. at 2 (Aug. 12, 2003).

This issue still appears to be an open item, notwithstanding DOC's protestations otherwise. DOC informed this Court during a hearing held in chambers on February 14, 2006 that the problem with regard to provision for cool showers in the 99 housing units referred to above has been fixed. See Status Conference at 17:6-7 (Feb. 14, 2006) (DOC General Counsel, Florence Hutner, stating with regard to the cool shower water issue that "in fact, your Honor, the problem has been fixed. Legal Aid was misinformed."). However, the Department has yet to disclose to OCC where the units are, despite requests to do so. In fact, the Department may not have even disclosed to OCC which units they were talking about to begin with, so they and OCC might confirm. During the same hearing, DOC General Counsel, Florence Hutner stated that "in the last 24 or 36 hours, what I have been able to ascertain is that at least 76 of those housing areas have one shower that is designated to be changed to a cooler temperature during the hot months, and that has been happening. And I'm not saying that it doesn't happen in the other areas, if they're even still open; I just haven't been able to confirm either way with regard to the other areas." Id. at 27:2-9. Consequently, OCC could not and has not been able to verify that the issue is, as DOC claims, now moot.

This problem simply evidences another concern with immediate termination.

**B. Other Concerns**

Courts have discretion to modify injunctive orders depending on the circumstances. See, e.g., Benjamin v. Jacobson, 172 F.3d 144, 161-62 (2d Cir. 1999). For example, modification may be appropriate to "ensure full compliance with the original decree." Juan F. by and through Lynch v. Weicker, 37 F.3d 874, 879 (2d Cir. 1994). The Amended Order itself states that "this order shall be subject to review and to further order of this Court." Amended Heat Order ¶ 9 (Dec. 22, 2004).

*1. Inmate Population Covered by the Heat Order*

This Court recognizes that DOC security concerns are and must be a major consideration, thus, it is permissible for DOC to not transfer a heat-sensitive inmate who is either in protective custody or punitive segregation because in those instances, the security risk may be paramount. However, it does not appear that DOC should fail to transfer a properly designated heat-sensitive

inmate that falls under the other three categories (administrative segregation, detoxification housing, mental observation), especially since there is heat-sensitive housing units in each of those areas.  <u>See</u> Letter from Nicole Austin, OCC Deputy Director to John Doyle, OCC Director (Apr. 20, 2006).

*2. Refusal/Waiver of Heat-Sensitive Housing*

The Heat Order did not allow heat-sensitive inmates to refuse transfer to heat-sensitive housing.  DOC argues that in their view, transfer to a heat-sensitive housing area is analogous to medical treatment, not a security-based directive of the Department where the inmate is given no choice in the matter.  Berliner Decl. ¶ 18.  Further, the Department also accurately notes that forced transfer of inmates to heat-sensitive housing areas may require the use of force, which would not be in the inmate's best interest nor support the principle underlying the Order to protect the inmate's health.  <u>Id.</u>  Now that the issue has been raised, I find it is reasonable for DOC to permit competent inmates to give informed consent to refuse transfer to heat-sensitive housing.

DOC has proposed the following procedure to assure that any refusal of heat-sensitive housing is informed and not coerced.  The heat-sensitive inmate will be seen at the health clinic, counseled by medical staff with regard to the risks of refusal, then given the DOHMH informed consent form to sign.  Berliner Decl. ¶¶ 19-20.  OCC is currently in discussion with DOC to finalize this procedure.  This Court would require that all informed consent forms be available to the inmate in both English and Spanish, and read aloud to the inmate in both languages.

*3. Tracking Heat-Sensitive Inmates*

It appears that under the current system, Department staff, and sometimes inmates, do not know if they have been designated heat-sensitive at intake.  OCC R<span></span>EPORT at 8 (Oct. 13, 2005) ("The inmates did not have white Movement Cards and Floor/Cell Locator Cards, and reported that they were unaware of their heat-sensitive designation.  The staff interviewed was also unaware of the inmates' heat-sensitive designation.").  OCC's recommendation, which seems reasonable to me, is for DOC to provide white movement and floor/cell locator cards to all inmates upon designation as heat-sensitive.  It is unnecessary to provide the white locator cards to inmates that refuse transfer to heat-sensitive housing, pursuant to the informed consent procedure outlined above.

## 4. OCC Monitoring

Lastly, the Amended Order did not include any details with regard to how OCC would monitor the Department's compliance with this Order. Amended Heat Order ¶ 9 (Dec. 22, 2004). Some guidelines are needed in this area.

The Department should create lists of heat-sensitive inmates directly from the *Notification of Patient Need for Housing* forms (hereinafter "CHS 205 Form"), which are the forms generated by DOHMH that notifies the Department that a patient has been designated heat-sensitive and needs air-conditioned housing. Currently, the Department creates heat-sensitive lists from the information entered by facility staff into logbooks. This process unnecessarily introduces error into the process.

Second, DOC, and/or the DOHMH, should include the time of heat-sensitive designation on all CHS 205 Forms and fax those forms immediately to OCC. Hard copies of these forms should be mailed, or delivered, in bulk, weekly, to OCC's office.

Third, if inmates refuse transfer to heat-sensitive housing, signed, informed consent forms should be faxed to OCC within 24 hours after the inmate has signed the form.

Fourth, in order to confirm that all 99 housing units can now provide cool showers to inmates as required by the Heat Order, DOC should immediately verify with the Court, OCC and LAS, that all units throughout Rikers have at least one shower that can provide cool showers to inmates and if that cannot be confirmed, DOC should provide to all parties the location of all housing units that do not have this capability as of May 17, 2006.

Parties should settle proposed orders that incorporate the concerns raised in this Opinion and submit them to the Court at noon within eight days from the date hereof.

**New York, New York**
**May 11, 2006**

U.S.D.J.

10