UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JAMES BENJAMIN, et al.,                          :
                                                 :     75 Civ. 3073 (HB)
                    Plaintiffs,                  :
                                                 :     **OPINION & ORDER**
       -against-                                 :
                                                 :
MARTIN HORN, et al.,                             :
                                                 :
                    Defendants.                  :
                                                 :
------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

This decision involves several of numerous orders by this Court stemming from the consent decree that since 1978 has regulated conditions in the New York City jails. The defendants—the City of New York and the Department of Correction ("DOC"), *et al.*—move, pursuant to the Prison Litigation Reform Act, to terminate this Court's orders dated May 31, 2006 and May 31, 2007 (the "Heat Orders"). The Heat Orders govern the treatment of inmates designated by the DOC medical staff as "heat sensitive" and in need of air conditioning during the hottest days of summer, when the temperature rises to 85°F and above. The DOC claims that it has achieved substantial compliance with the Heat Orders and that further monitoring by the Office of Compliance Consultants ("OCC") with respect to those Orders is unnecessary.

The DOC's motion to terminate the Heat Orders is opposed both by the OCC, the independent and neutral monitor that since 1982 has reported to the Court on the DOC's compliance with the consent decree, and by the plaintiffs, a class of pre-trial detainees at the New York City jails. For the reasons set forth below, the DOC's motion to terminate the Heat Orders is denied and the Heat Orders are modified as provided herein. Plaintiffs' and the OCC's request that Dr. Susi Vassallo review various revocations of heat-sensitive status is denied.

## I. BACKGROUND

A short history of the *Benjamin* consent decree and the Heat Orders' place in its penumbra may assist the reader in understanding this Court's decision.[1] The consent decree was

---

[1] Portions of the historical background are excerpted from my recent article in the *New York Law School Law Review*. *See* The Honorable Harold Baer, Jr. with Arminda Bepko, *A Necessary and Proper Role for*

1

the culmination of a class action lawsuit initiated in June 1975 by the Legal Aid Society of New York (the "LAS") against the City of New York (the "City") on behalf of all pre-trial detainees at the House of Detention for Men on Riker's Island, and was later consolidated with several actions involving other New York City detention facilities.[2] The complaint alleged that the conditions under which the detainees were held were "constitutionally impermissible." *Benjamin v. Malcolm*, 495 F. Supp. 1357, 1359 (S.D.N.Y. 1980). Following a trial that began in 1976, a detailed fifty-page consent decree was signed by the participants, which covered all of the City's jails. *See Benjamin v. Malcom*, 803 F.2d 46, 48 (2d Cir. 1986). In the spring of 1979, Judge Morris Lasker approved and entered the Partial Final Judgment by Consent that initiated an association between the federal judiciary and the DOC that would span four decades, six mayors, sixteen commissioners of corrections, two federal district court judges and frequently the Second Circuit Court of Appeals.

Judge Lasker's June 1982 Order created the OCC, which was designed to be neither a creature of the Court, the City, nor the DOC. The OCC's budget is paid by the City. The OCC drafts periodic reports to the Court that concern various areas of prospective relief that this Court has upheld pursuant to the consent decree, including environmental health, which encompasses extreme heat and cold, as well as sanitary conditions, ventilation and lighting.[3] Over the years, the OCC has been instrumental in assisting the parties to work out many disputes informally without depending on the Court for resolution.

A. **The Heat Orders**

Defendants move to terminate this Court's orders dated May 31, 2006 and May 31, 2007, relating to heat-sensitive inmates. As these were part of a series of heat orders, some background is presented. In July 2003, Dr. Susi Vassallo was retained to provide expertise on issues associated with heat-related illness. As a result of her report and other information supplied by the parties and the OCC, this Court, on July 26, 2004, entered its first order that

---

*Federal Courts in Prison Reform: The Benjamin v. Malcolm Consent Decrees*, 52 N.Y.L. Sch. L. Rev. 3 (2007-2008).

[2] *Forts v. Malcolm*, 156 F.R.D. 561 (New York City Correctional Institute for Women), *Ambrose v. Malcolm*, 156 F.R.D. 561 (Bronx House of Detention for Men), *Maldonado v. Ciuros*, 156 F.R.D. 561 (Adolescent Reception and Detention Center), *Detainees of the Brooklyn House of Detention for Men v. Malcolm*, 156 F.R.D. 561, *Detainees of the Queens House of Detention for Men v. Malcolm*, 156 F.R.D. 561, *Rosenthal v. Malcolm*, 156 F.R.D. 561 (Adult Mental Health Center on Rikers Island). The cases were consolidated in 1982. *Benjamin v. Fraser*, 343 F.3d 35, 40 (2d Cir. 2003).

addressed the potential risk to certain inmates from extreme temperature conditions and obliged the DOC to take certain precautions, triggered when the temperature reached 85°F.[4] *Benjamin*, No. 75 Civ. 3073, 2006 U.S. Dist. LEXIS 30211, at *2 (S.D.N.Y. May 18, 2006). The order provided for automatic termination on October 15, 2005 if the "OCC does not find any evidence of current and ongoing constitutional violations . . . ." *Id.* at *3. At the DOC's behest, this order was subsequently amended by a December 22, 2004 order, which, *inter alia*, listed those specific medical conditions that would render the detainee "heat-sensitive." *Benjamin v. Fraser*, No. 75 Civ. 3703, Order (S.D.N.Y. Dec. 22, 2004).

Due to the DOC's failure to provide contemporaneous records during the summer of 2005, the automatic termination provision was extended by Order of October 14, 2005 to December 1, 2005, further extended by Order of November 29, 2005 to December 31, 2005 and, finally, by Order of December 22, 2005, extended until such time as this Court decides that termination is proper. *Benjamin*, 2006 U.S. Dist. LEXIS 30211, at *3.

### 1. *May 2006 Heat Order*

The May 31, 2006 Heat Order, one of the Heat Orders that the DOC now moves to terminate, stemmed from an opinion earlier that month which found Defendants to be non-compliant with the December 2004 order. The May 2006 Heat Order directs the DOC to place any inmate who is designated heat-sensitive during his or her intake medical examination "immediately" in air-conditioned housing if the temperature exceeds 85°F at the time of the intake exam or is forecast to occur within forty-eight hours thereafter. Otherwise, the DOC must provide air-conditioned housing to the heat-sensitive inmate "as soon as possible" after the temperature reaches 85°F in the area occupied by him or her. *Benjamin*, No. 75 Civ. 3073, Order (S.D.N.Y. May 31, 2006) ("May 2006 Heat Order") ¶ 2(a)-(b). The transfer to air-conditioned housing must not exceed two hours when the transfer is within the same jail and must not exceed eight hours when the transfer is to another facility. *Id.* ¶ 2. An inmate may refuse to be placed in air-conditioned housing by signing a refusal form, but only so long as he or she is mentally competent, receives counseling from DOC medical staff about the risks associated with non-air-conditioned housing and the refusal form sets forth those risks. *Id.* ¶ 3.

---

[3] The Second Circuit agreed with this Court that the OCC is not a special master under the Prison Litigation Reform Act (the "PLRA"), 18 U.S.C. § 3626 (1996).
[4] The "outside temperature" represents the temperature measured at LaGuardia airport by the National Climatic Data Center (U.S. Department of Commerce).

The May 2006 Heat Order enumerates the conditions that make an inmate heat-sensitive: the patient receives lithium, has Parkinson's disease, requires infirmary care, is sixty-five years of age or older, has a documented history of hospitalization for heatstroke, receives one or more identified drugs that raise the risk of heat-related illness, has Type I or Type II diabetes and is sixty years of age or older, appears confused, has dementia, suicidal tendencies, depression or mental retardation or has a history of congestive heart failure or myocardial infarction. *Id.* ¶ 4. The Department of Health and Mental Hygiene may add or delete a medical condition from this list if medically warranted, upon prior notification to the OCC and the parties. *Id.* ¶ 5.

Punitive segregation inmates need not be placed in air-conditioned housing if the DOC determines that to do so would jeopardize security or safety. *Id.* ¶ 2(c). If the ambient temperature exceeds 85°F in punitive segregation housing, the DOC must provide extra water and ice to inmates at every meal and must monitor heat-sensitive inmates to determine if any experiences extreme weakness, headaches, lethargy, profuse sweating, vomiting or confusion. If so, the DOC must provide prompt medical attention. *Id.* ¶ 6.

To ensure adequate monitoring by the OCC, the May 2006 Heat Order requires the DOC to create lists of heat-sensitive inmates directly from the Notification of Patient Need for Housing forms ("designation forms") and to supply those forms daily to the OCC, which may be by fax with hard copies provided in bulk weekly. The DOC must transmit to the OCC any refusal form signed by a heat-sensitive inmate within twenty-four hours after signing. *Id.* ¶ 8(a)-(c).

### 2. *May 2007 Heat Orders*

Following the OCC's report that the DOC failed to provide documentation on a daily basis, this Court issued an order on May 31, 2007 noting that this was a "substantial . . . failure of compliance." *Benjamin*, No. 75 Civ. 3073, Order (May 31, 2007) ("May 2007 Heat Order"). The May 2007 Heat Order emphasizes that on any day when the temperature exceeds 85°F or is forecast to exceed 85°F within the following forty-eight hours, Defendants must "immediately remove any heat-sensitive inmate who is placed in an air-conditioned housing area where the air-conditioning units have failed and shall immediately relocate such heat-sensitive inmates to housing areas with working air-conditioning." *Id.* Most importantly, the May 2007 Heat Order imposes on Defendants fines for non-compliance based on documentation provided to the Court by the OCC. *Id.* Defendants must pay to any heat-sensitive inmate who is held in any area

where the temperature reaches or exceeds 85°F $20 per hour (or fraction thereof), increasing to $50 per hour after twenty-four hours, and $100 per hour after forty-eight hours. *Id.*

**B.     Procedural History**

On September 27, 2007, the OCC reported that Defendants' compliance with the Heat Orders during the summer of 2007 was 52% ("Sept. 2007 Report").  On October 22, 2007, Defendants opposed the OCC's analysis and moved to terminate the Heat Orders, claiming substantial compliance.  On December 19, 2007, the OCC responded to Defendants' arguments, and on February 29, 2008, submitted a final report ("Feb. 2008 Report"), which includes a supplemental review of some inmates who were designated heat-sensitive in August 2007, for whom the OCC found a 32% compliance rate.  Following the filing of additional briefs and declarations by both Plaintiffs and Defendants, this Court heard oral argument on April 16, 2008.

## II. STANDARD OF REVIEW

Pursuant to the Prison Litigation Reform Act (the "PLRA"), a federal court may not approve prospective relief unless the relief is (1) narrowly drawn, (2) reaches no further than needed to correct the infringement and (3) provides the least intrusive means to correct the violation.  18 U.S.C. § 3626(a)(1)(A) (1996).  The court must give substantial weight to any adverse impact on public safety or on the operation of a criminal justice system.  *Id.*  Termination of an order granting prospective relief is not appropriate if a court finds that "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." § 3626(b)(3).

## III. DISCUSSION

There exists sufficient evidence of noncompliance to warrant keeping the Heat Orders in place until this Court determines that termination is proper.  As Defendants seem to have made strides toward substantial compliance, I am hopeful termination will be appropriate next year.

**A.     OCC Reports on the DOC's Compliance**

The OCC's September 2007 Report found 52% compliance from May 15 to August 30, 2007, with respect to 253 heat-sensitive inmates.  During this period, forty-four high heat days occurred.  Sept. 2007 Report at 2.  The OCC concluded that, although "inmates in general spent less time in non air-conditioned areas than those monitored in previous years," the transfer of heat-sensitive inmates to air-conditioned locations remained a "major" obstacle.  *Id.* at 23.

5

After the DOC criticized the OCC for concentrating on the first half of the summer, the OCC analyzed 129 additional inmates housed in the Anna M. Kross Center ("AMKC") who were designated heat-sensitive during August 2007. In its February 2008 Report the OCC reports only 32% compliance with respect to this group. Feb. 2008 Report at 6.

The OCC based its findings of 52% compliance (system-wide from May 15 to August 30, 2007) and 32% compliance (at AMKC in August) on a couple assumptions that merit discussion. To calculate compliance rates, the OCC divided the number of inmates whose rights were *not* violated (the numerator) by the total number of inmates who OCC claimed were subject to the Heat Orders (the denominator). From the denominator, the OCC excluded several categories of inmates who do, in fact, fall within the Orders' scope: (1) heat-sensitive inmates who did not experience any days where temperatures reached 85°F, (2) heat-sensitive inmates who refused air-conditioned housing and (3) inmates whose heat-sensitive designations were revoked by DOC medical staff "shortly" after designation. Sept. 2007 Report at 3. Contrary to the OCC's assumption, the Heat Orders do regulate the treatment of these inmates, even if only for a short time in the case of those whose status is revoked soon after designation, and thus the OCC should consider them when calculating compliance.

The OCC properly excluded from the analysis: (1) sentenced inmates, who are not members of the *Benjamin* class, (2) inmates who had "no public record" and (3) inmates for whom the DOC allegedly did not provide sufficient information for the OCC to make a proper assessment.[5] *Id.*

For its September 2007 Report, after excluding the categories of inmates described above, the OCC was left with 253 heat-sensitive inmates who it, albeit incorrectly, understood to be subject to the Heat Orders. Of these 253 inmates, the OCC found that 132 did not have their federal rights violated. Of the 121 inmates whose rights were violated, eighty-one had general housing violations, seventeen had intra-facility transfer violations, ten had inter-facility transfer violations, and thirteen had punitive segregation housing violations. *Id.* For its February 2008 Report, after, albeit incorrectly, excluding the categories of inmates described above, the OCC

---

[5] Defendants claim that they for the most part provided complete designation forms to the OCC. Berliner Decl. ¶¶ 13-14. The OCC, however, reports eighty instances where it did not receive a designation form, or the form that was provided lacked a date or time of designation. Feb. 2008 Report at 44. The OCC must bring such instances to Defendants' attention in a timelier manner so that it can obtain complete forms.

6

was left with eighty-two heat-sensitive inmates who it understood to be subject to the Heat Orders, of which the OCC found that fifty-six inmates had their rights violated.

**B.      Counting the Heat-Sensitive Inmates**

The parties radically disagree about the total number of designation forms that the DOC provided to the OCC.  The OCC and Plaintiffs claim that the OCC received designation forms relating to approximately 700 inmates who were designated heat-sensitive between May 15 and August 31, 2007.  Feb. 2008 Report at 48.  The DOC, however, claims that it sent 2,958 heat-sensitive designation forms to the OCC.  Berliner Reply Decl. ¶ 3.  The OCC argues that, while the DOC sent it more forms than the 700 heat-sensitive inmates that it counted, the forms or folders in excess of 700 were either duplicates, or reflected multiple designations of the same inmate, or actually indicated that an individual was *not* heat-sensitive, or were refusal or revocation forms and not designation forms, or were empty folders.  Indeed, Erik Berliner, the DOC Assistant Commissioner for Health Affairs, Data Management and Forensic Services ("Berliner"), admitted that "the confusion might have been caused by the fact that medical staff at that time had been directed to complete CHS 205 forms [*i.e.*, designation forms] for *all* admitted inmates."  Berliner Decl. ¶ 19 n. 6 (emphasis added).  This would obviously result in forms for inmates who were not actually heat-sensitive.

Plaintiffs argue that the OCC's total of 700 heat-sensitive inmates is in line with previous years' counts.  In early 2006 Florence Hutner, the DOC General Counsel, reported that 1,078 inmates were designated heat-sensitive between May 1 and October 31, 2005, an average of about 180 per month.  Feb. 14, 2006 Conference Tr. 9.  The OCC's count of 700 inmates who were designated heat-sensitive during the three-and-a-half month period between May 15 and August 31, 2007 amounts to an average of 200 per month.  Defendants' alleged 2,958 designations would yield an average of 845 designations per month, more than four and a half times the designations per month in 2005.  Defendants explain that in 2005 they were only beginning to evaluate heat-sensitivity and that they now, more accurately, designate a higher number of inmates.  Nevertheless, it seems unlikely that the average number of designations would skyrocket to this degree.

The DOC concedes that of some of the alleged 2,958 designations were for the same inmates, as, for example, when an inmate is released but then returns to custody following a second arrest, and that the number includes approximately 100 female sentenced inmates who

are not members of the *Benjamin* class and not subject to the Heat Orders. Berliner Reply Decl. ¶ 3. Moreover, Dr. Jason Hershberger, the Assistant Commissioner of Correctional Health Services ("CHS") for Defendant Department of Health and Mental Hygiene, conceded that

> there were some instances where the medical copy of form CHS 205 [*i.e.*, the designation form] included notations to show that the patient was not heat sensitive, such as a large N/A or large X across the form. CHS instructed its clinicians to immediately terminate such a practice and to ensure that forms be provided to DOC and OCC solely for patients who were in fact designated as heat sensitive.

Decl. of Hershberger ¶ 11 (Mar. 24, 2008) ("Hershberger Decl.").

The DOC provided this Court with eleven boxes containing the designation forms that they claim to have sent to the OCC. While it would be an inefficient use of judicial resources to duplicate the OCC's, Plaintiffs' and Defendants' efforts by examining and analyzing all the forms in these eleven boxes, a review of one box reveals approximately 253 folders, each labeled with a different inmate's name, in alphabetical order, with no empty folders. As each box appears to contain a similar number of folders, Defendants may well be correct that more than 2,700 folders exist (253 folders multiplied by 11 boxes equals 2,783). This Court cannot determine whether all these folders were supplied to the OCC, or, even if they were, whether the OCC is correct that more than 2,000 of these folders contain duplicates or multiple designations for the same inmates, reflect individuals who were never heat-sensitive, are empty, or are refusal or revocation forms and not designation forms. After the OCC reviewed the eleven boxes during the briefing for the motion, the OCC reported that "[i]n addition to folders that were empty or did not contain [designation] forms many folders were duplicated within and across facilities. Further the boxes contain documents for hundreds of inmates who were designated in 2006 or in the earlier months of 2007 or who were sentenced at the time of designation and cannot be classified as 'Benjamin class members.'" Feb. 2008 Report at 51.

Such an extreme disagreement over what should be a simple question—how many inmates were designated heat-sensitive—is reason enough to keep the Heat Orders in place. Regardless of whether the fault for the evident breakdown in communication rests with the OCC or Defendants, no one is able to make a proper assessment of Defendants' compliance when the parties report such vastly different numbers. Without an accurate assessment, it would be imprudent for this Court to terminate the Heat Orders.

This Court's May 18, 2006 Opinion and Order instructed the DOC to create lists of heat-sensitive inmates directly from the designation forms. The DOC has failed to comply with this instruction and is directed to provide accurate and non-duplicative lists to the OCC during the summer of 2008. Relying on the OCC to create such lists itself based on information from Defendants' computerized daily Inmate Information System ("IIS") is not sufficient.

**C.     Measuring the Defendants' Compliance**

Of the 700 heat-sensitive inmates for whom the OCC claims it received forms, the OCC monitored 515 inmates due to its limited resources. These 515 inmates were the result of a more or less random process, which involved the OCC compiling, in no particular order, all the forms received in a month, then working its way down the stack. *See* Decl. of Dale Wilker n. 2 (Apr. 7, 2008) ("Wilker Decl."). After excluding, albeit sometimes erroneously, the inmates in the categories described above, the OCC was left with 253 heat-sensitive inmates who it believed to be subject to the Heat Orders. The OCC found that 121 inmates' rights under the Heat Orders were violated, yielding a compliance rate of 52%. Of these 121 inmates, Defendants admitted only that fifty-six experienced Heat Order violations. Berliner Decl. ¶ 6. Fifty-six violations yields a compliance rate of slightly less than 78%.[6] This is not substantial compliance. Considering only those violations to which Defendants admit, I cannot terminate the Heat Orders.

The DOC claims that it was in 99% compliance with the housing requirement, 94% compliance with the transfer compliance ("excluding minimal overages of under four hours over goal") and 85% overall compliance for inter- and intra-facility transfers. Berliner Reply Decl. ¶ 6. These percentages, however, are based on Defendants' alleged 2,958 heat-sensitive designations. In a separate line of reasoning, Defendants claim that they achieved 89% total compliance, based on the 515 inmates whose forms the OCC reviewed. Berliner Decl. ¶ 6. Either way, Defendants' logic is faulty because Defendants' admission of fifty-six violations is based solely on the 121 violations reported by the OCC and does not reflect a review of any inmates in categories that were excluded from the OCC's analysis. Therefore, the number of violations admitted by Defendants must be weighed against the 253 inmates whom the OCC understood to have been subject to the Heat Orders. The OCC's finding of 121 inmates whose

---

[6] 253 total inmates minus 56 inmates whose rights were violated equals 197. 197 divided by 253 equals approximately 77.87%.

rights were violated yields a compliance rate of 52%, or 132 (i.e., 253 minus 121) divided by 253, and the Defendants' admitted fifty-six inmates whose rights were violated yields a compliance rate of slightly less than 78%, or 197 (i.e., 253 minus 56) divided by 253.

The Court agrees with Plaintiffs and the OCC that compliance should be measured in terms of the total number of *inmates* who are subject to the Heat Orders, and not the total number of designations, as one inmate may be designated more than once. The Heat Orders protect heat-sensitive inmates regardless of the number of times they are so designated. The proper method is to determine how many inmates experienced a violation of the Heat Orders, then divide that number by the total number of inmates who were entitled to the Heat Orders' protections.

D.     **Violations Reported by the OCC**

1.     *General Housing Violations*

The OCC reported eighty-one general housing violations in its September 2007 Report. These included instances where the DOC failed to move a heat-sensitive inmate to air-conditioned housing when the outside temperature exceeded 85°F, reaching over 90°F in some cases. The DOC argues that in at least some cases this failure did not violate the Heat Orders because the *inside* temperature in the inmate's area was under 85°F, even without air-conditioning. The OCC and Plaintiffs are correct: the outside temperature, and not the inside temperature, triggers the obligation to move an inmate to air-conditioned housing. The May 2006 Heat Order required the DOC to transfer a heat-sensitive inmate to air-conditioned housing "immediately" upon designation if the *outside* temperature exceeds 85°F or is forecast to do so within forty-eight hours, and otherwise to transfer the heat-sensitive inmate to air-conditioned housing as soon as possible when the *inside* temperature in the area occupied by him or her reaches 85°F. However, the May 2007 Heat Order established that the outside temperature determines Defendants' duty to transfer a heat-sensitive inmate to air-conditioned housing in all circumstances. That Order provides that "defendants shall not house any inmate who is 'heat-sensitive' . . . in any housing area that lacks working air-conditioning at any time on any day when the temperature exceeds 85 degrees F. or is forecast to exceed 85 degrees F. within the next 48 hours ('high heat day')." A temperature "forecast" clearly refers to the outside, and not the inside, temperature. Therefore, Defendants must ensure that heat-sensitive inmates are housed in an air-conditioned area on any day when the outside temperature exceeds 85°F or is

forecast to do so within the following forty-eight hours, even if the inside temperature within a non-air-conditioned area remains below 85°F. *See* Sept. 2007 Report at 11-12.

Defendants argue that this Court should ignore some of the housing violations because they were only "minor" or did not represent a "systemic" problem. For example, Berliner contends that one inmate, "although potentially mis-housed, was not subjected to extreme temperatures," although he was housed in non-air-conditioned housing for five consecutive days when outside temperatures reached 85°F. Berliner Decl. ¶¶ 24, 27. Other inmates "were only minimally mis-housed . . . ." *Id.* ¶ 24. Defendants' papers are replete with arguments that the Heat Orders should be terminated because most violations were only "minor." I disagree.

Defendants attribute other violations to a period in late May 2007 when the AMKC's heat-sensitive program "broke down," and they argue these do "not represent a systemic problem." *Id.* ¶¶ 27, 29. Specifically, while the software used at that facility was being re-programmed to repair the IIS, "several inmates were mis-housed in AMKC . . . . in part due to staff confusion about the need to transfer certain mental observation inmates . . . ." *Id.* ¶ 9. Berliner explained that once he became aware of the problem in early June, he instructed the facility to house heat-sensitive inmates in air-conditioned housing pursuant to the Heat Orders. *Id.* While the troubles of AMKC during May 2007 appear to have been resolved, they should not be overlooked when assessing Defendants' compliance. Even non-systemic violations militate in favor of keeping the Heat Orders in place.

   *2.  Air Conditioning Failures*

Several of the general housing violations reported by the OCC were the result of air-conditioning failures. Sept. 2007 Report at 14. The May 2007 Heat Order requires that on high heat days, "defendants shall *immediately* remove any heat-sensitive inmate who is placed in an air-conditioned housing area where the air-conditioning units have failed and shall immediately relocate such heat-sensitive inmates to housing areas with working air-conditioning." The OCC found that some heat-sensitive inmates were not transferred to an area with working air-conditioning after their air-conditioner became inoperative. In some of these cases, the inside temperature where the air-conditioner failed remained in the low 80s, even though outside temperatures rose above 85°F. Sept. 2007 Report at 14; Feb. 2008 Report at 30-31. Contrary to Defendants' arguments, these instances constituted violations of the Heat Orders. As this Court made clear in its May 18, 2006 Heat Order Opinion, "the purpose of heat-sensitive housing is

11

rendered moot if the temperatures in heat-sensitive units exceed 80°F and inmates at risk for heat-related illness are placed in these facilities." *Benjamin v. Horn*, No. 75 Civ. 3073, at 7 (S.D.N.Y. May 18, 2006). Defendants assert that on very hot days their air-conditioners are too weak to cool the inside temperature below 80°F. *See* Decl. of Patricia Feeney, Assistant Commissioner for Environmental Health of the DOC ¶ 11 (Mar. 24, 2008) ("Feeney Decl."). While this Court recognizes that it may therefore be impossible in limited circumstances to bring ambient temperatures down to a safe level for heat-sensitive inmates, this is nevertheless a violation. It should be noted that perfect compliance will not be necessary to terminate the Heat Orders.

Defendants argue that in at least some cases the OCC's temperature readings were inaccurately high, while the OCC complains that the DOC's temperature readings were taken at cooler parts of the day. *See, e.g.*, Feb. 2008 Report at 31. Defendants further argue that some of the areas for which the OCC reported an air-conditioning failure were not ever supposed to be air-conditioned in the first place, while the OCC and Plaintiffs contend that the lists of air-conditioned housing areas provided to them by Defendants—and on which the OCC based its assessment—were incorrect. *See* Berliner Reply Decl. ¶ 9 (citing Wilker Decl. n. 19); Oral Argument Tr. 16:23-25, 34:4-5, 10-14. These disagreements are, again, reason enough to keep the Heat Orders in place. Adequate monitoring of Defendants' compliance with the Heat Orders cannot take place unless the parties can agree on which areas do and do not have air conditioners and unless temperature readings are taken during midday by all concerned.

       3.     *Transfer Violations*

The OCC reported that seventeen inmates waited longer than the maximum two hours permitted by the Heat Orders for an intra-facility transfer to air-conditioned housing. Sept. 2007 Report at 3. The DOC admits to four of these violations, but notes that one transfer took place "only minimally" over the limit. Berliner Decl. ¶ 17. With regard to inter-facility transfers, the OCC reported that ten inmates waited longer than the maximum eight hours. The DOC, however, asserts that at least three of these inmates were properly housed, and that the OCC should not have counted as violations instances where an inmate refused air-conditioned housing on the day of his designation, or where a violation was "minimal" because only two days with temperatures over 85°F occurred before an inmate refused air-conditioned housing. The DOC claims that its heat-sensitive designation of a third inmate was made erroneously, *i.e.*, the inmate

was not heat-sensitive, and thus no transfer was required, that other forms were written inaccurately, and that transfers were not adequately updated in the IIS when in fact these transfers were timely. *See* Berliner Decl. ¶¶ 18-20, 23. The key here and a major problem throughout is that Defendants are obligated to maintain accurate records so that the OCC can adequately fulfill its monitoring function.

More persuasive is Defendants' explanation that in some cases it was impossible to move an inmate to air-conditioned housing within the allotted time frame because for a portion of the time the inmate was still undergoing the required intake procedures. Berliner explained that

> all inmates are screened for potential heat sensitivity. This screening may occur at any point during the medical exam, *which can take up to four hours by contract but often exceeds that* in facilities that manage a sicker population, such as AMKC and RMSC. The clinician signs the form and affixes the date and time at which he or she made the designation; however, the forms are not and cannot be presented to DOC until the completion of the entire examination, which includes the remainder of the history and physical exam, an electrocardiogram (if indicated), urinalysis, blood draw, the ordering of appropriate lab work, a mental health evaluation (if necessary), the prescription of necessary medications and the administration of any required "bridge" doses of medication to tide the inmate over to the filling of the new prescription.

Berliner Reply Decl. ¶ 8. *See also* Hershberger Decl. ¶ 2 (detailing numerous medical diagnostic and other procedures that might take place after an inmate's heat-sensitive designation). If an inmate is designated heat-sensitive at the beginning of a medical exam that requires four hours or more, it could be impossible for the DOC to place the inmate in air-conditioned housing within the time frames required by the Heat Orders. Therefore, the Heat Orders are hereby modified to "start the clock" for an inmate's transfer at the moment the inmate returns from the medical examination to the intake area. As the medical examination area is air-conditioned, a heat-sensitive inmate will not be at risk if the transfer "start time" begins upon return to the intake area. The designation form will begin the start time from when the detainee is released from the medical examination.

### 4. *Punitive Segregation Violations*

Punitive segregation inmates need not be placed in air-conditioned housing if the DOC determines that to do so would jeopardize security or safety, but if the ambient temperature exceeds 85°F inmates must be provided with extra water and ice at every meal. In its September 2007 Report, the OCC reported that thirteen heat-sensitive inmates were housed in punitive segregation areas where temperatures exceeded 85°F. Sept. 2007 Report at 3. Defendants

explain that two of these inmates were housed in non-air-conditioned punitive segregation areas because they posed security risks. Berliner Decl. ¶¶ 39-40. One inmate, for example, received the security designation of "CMC MAX" as a result of his criminal charges for second-degree assault and second-degree attempted murder and his behavior in New York Police Department custody, "when he attacked a police officer with the hospital bedrail to which he was shackled." *Id.* ¶ 28. While Defendants must make every effort to place such inmates in air-conditioned housing, the safety of other inmates and DOC staff could necessitate, in some instances, a heat-sensitive inmate's placement in non-air-conditioned housing as prescribed in the May 2006 Heat Order.

Based on a review of Defendants' own logbooks for the Central Punitive Segregation Unit ("CPSU")[7], ice or water was not reliably provided. This constitutes a violation of the Heat Orders, the security issue aside. For example, the OCC determined that the highest temperature recorded within any facility during the summer of 2007 was 95°F in CPSU 4 South on July 10, 2007 at approximately 1:15 p.m. The OCC reviewed the DOC's logbooks for that day and found that no ameliorative measures were taken in that area, although ice and, in one instance, water, were provided in other areas of the CPSU. Sept. 2007 Report at 16.

Defendants deny that they failed to provide ice or chilled beverages to inmates in punitive segregation. *See* Decl. of William Thomas, Warden of OBCC ¶ 2 (Oct. 22, 2007) ("Thomas Decl."). Thomas reports that he examined temperature readings, kitchen procedures and housing area logbooks and interviewed correction officers and captains who were posted in the CPSU during the summer of 2007, that his staff interviewed inmates housed in CPSU who had been there during the summer, and that his integrity control officer reviewed video camera footage from the summer. Thomas Decl. ¶ 3. Thomas claims that any failure reflected in the logbooks was a record-keeping error, as his research revealed that ice or chilled water or juice was "delivered consistently during high heat days." *Id.*

The provision of ice and chilled beverages to heat-sensitive inmates who must be denied air-conditioning due to their security risk is extremely important. So long as Defendants are subject to monitoring for their compliance with the Heat Orders, they must ensure that all staff keep accurate records. The OCC, however, should also work more closely with the DOC to

---

[7] The CPSU, part of the Otis Bantum Correctional Center ("OBCC"), is a complex of eight housing areas with a total inmate population of approximately 385 pre-trial detainees who are segregated as a sanction for an infraction of DOC rules. Decl. of William Thomas, Warden of OBCC ¶ 1 (Oct. 22, 2007).

14

ensure that the OCC is making an accurate assessment. *See* Thomas Decl. ¶ 11 ("I do not know why OCC chose to rely exclusively on logbook entries without investigating the issue further. I would have been happy to assist them in their review had they come to see my staff or me.").

Finally, it should be noted that at the time of the OCC's reports, air-conditioned housing was not available for female inmates in punitive segregation housing. *See* Feb. 2008 Report at 40. Fortunately, in a letter dated June 2, 2008, the DOC's counsel notified this Court that as of May 30, 2008, the punitive segregation housing areas in the women's facility are air-conditioned. Letter from Chlarens Orsland (June 2, 2008).

5. *Refusal of Transfer Forms*

The OCC did not consider inmates' refusals to transfer to air-conditioned housing when it calculated Defendants' compliance rate. However, the OCC did review and report on refusal forms signed by forty-one inmates and found that "some" of these forms did not comply with the Heat Orders. Sept. 2007 Report at 6. For example, the OCC reported that four inmates' refusal forms did not refer to the requisite explanation of risks resulting from an absence of air-conditioning, as required by the May 2006 Heat Order. *Id.* at 7. Other forms lacked a *specific* identification of risks, and, therefore, inmates who retained a copy of such forms "do not have a documented point of reference if they were to experience heat-related symptoms." *Id.* at 7-8.

The above violations, problems with reporting and miscommunications among the parties provide sufficient evidence of a "current and ongoing violation of the Federal right" for which prospective relief remains necessary. *See* 18 U.S.C. § 3626(b)(3). Termination of the Heat Orders is therefore not appropriate at this time.

E. **Revocation of Heat-Sensitive Status**

In its September 2007 Report, the OCC alleged that at the beginning of the summer of 2007 it received a "surge" of notices that the DOC had revoked certain inmates' heat-sensitive status. Sept. 2007 Report at 20. In some cases, the OCC claimed, inmates had their heat-sensitive designation revoked only a day or two after the initial designation. *Id.* at 21. Upon the OCC's request, this Court ordered Dr. Vassallo to review heat-sensitive revocations that took place within forty-eight hours after the initial designation. As it turned out, no such revocations took place, and both the OCC and, seemingly, Defendants had misunderstood the records. Nevertheless, the OCC remained concerned and, at the request of Plaintiffs' counsel, moved this

Court for an order instructing Dr. Vassallo to review *all* of Defendants' records for heat-sensitive revocations from 2007. *Id.* at 22.

This Court finds, however, that such an order could not be narrowly drawn or provide the least intrusive means to correct any violation, as required by the PLRA. Since the Heat Orders will remain in place for now, the least intrusive means to address the OCC's concern will be, going forward, for the OCC to seek from Defendants an explanation for any revocations that appear problematic and only thereafter to bring to the Court's attention any revocations that remain troublesome.

Moreover, I am persuaded by Dr. Hershberger's detailed declaration in which he describes a number of temporary conditions that require a heat-sensitive designation that could be revoked soon thereafter, when the condition no longer exists, *e.g.*, the patient is taking one medication but later is prescribed a new one, the patient requires infirmary care for a finite period, or the patient appears confused, depressed or has suicidal tendencies for a finite period. Decl. of Jason Hershberger ¶ 10 (Oct. 22, 2007).

Finally, if they have not done so already, Defendants must create a special form that is signed by a member of the DOC medical staff when an inmate's heat-sensitive status is revoked. It appears that the DOC had been using the heat-sensitive *designation* form to reflect revocations of heat-sensitive status, which understandably caused the OCC some confusion. *See* Hershberger Decl. ¶ 12 ("I anticipate that CHS will implement the new revocation form by May, 2008.").

**F.     Fines**

The May 2007 Heat Order requires Defendants to pay a fine to each heat-sensitive inmate who is held for any length of time in any area where the temperature reaches or exceeds 85°F, in the amount of $20 per hour (or any fraction thereof), increasing to $50 per hour (or fraction thereof) after twenty-four hours, and $100 per hour (or fraction thereof) after forty-eight hours. The OCC assessed such fines only in its February 2008 Report, and only for twenty-two inmates of the 177 total inmates who the OCC found to have had their rights violated. Feb. 2008 Report at 42-43. The evident problems with recordkeeping by the Defendants and with communications between the OCC and the DOC, as described above, belie the certainty required by the Court to initiate any fines for this past year. In the future the OCC must ensure that its list of inmates who are owed fines is complete, and the Court shall assess such fines as appropriate.

# IV. MODIFICATION OF THE HEAT ORDERS

Courts have discretion to modify injunctive orders depending on the circumstances. *See, e.g., Benjamin v. Jacobson*, 172 F.3d 144, 161-62 (2d Cir. 1999). For example, modification may be appropriate to "ensure full compliance with the original decree." *Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994).

Most importantly, the IIS must be updated, and used correctly, to produce accurate reports of the number of inmates who are designated heat-sensitive. At the end of the summer of 2008 the DOC should produce a list of all detainees who were designated as heat-sensitive and who were in DOC custody for any duration of time during the months of April through September, the list must not contain any inmate's name more than once, and the list must exclude any inmate who was sentenced prior to April. The IIS must also produce an accurate summary of each heat-sensitive inmate, including the following: (1) whether the inmate refused to be transferred to air-conditioned housing, and when; (2) whether the inmate's heat-sensitive designation was revoked, and when and why; (3) where the inmate was housed at all times while he or she was designated heat-sensitive; and (4) how long it took to transfer him or her to air-conditioned housing. This Court is frankly perplexed as to why Defendants' computer system was not capable of producing such a simple summary for the summer of 2007. This would have obviated the time and effort—funded by taxpayers—spent by the parties, the OCC and the Court in attempting to count the total number of heat-sensitive inmates.

Both the OCC and Plaintiffs have made several recommendations. First, Plaintiffs ask this Court to require Defendants, whenever temperatures exceed 85°F or are forecast to do so within forty-eight hours, to ask any inmates who refused air-conditioning whether they have changed their minds and would now like to move to air-conditioned housing. Pls.' Br. 10. Plaintiffs' request is denied as it is neither narrowly drawn nor the least intrusive means to correct the violations. Under the *status quo*, any heat-sensitive inmate who has refused air-conditioning may ask at any time to be transferred, and Defendants must then place him or her in air-conditioned housing, provided that he or she is still designated as heat-sensitive.

Plaintiffs request that Defendants be required to explain to every heat-sensitive inmate why he or she is heat-sensitive, concretely describe the risks resulting from the condition and explain that those risks would be significantly reduced in air-conditioned housing, and that such an explanation be documented. *Id.* at 10-11. Plaintiffs' request would expand slightly on the

requirements of the May 2006 Heat Order, which provides that an explanation of risks must be presented only to heat-sensitive detainees who refuse air-conditioned housing, and not all those who are designated as heat-sensitive. However, the May 2006 Heat Order as currently written is sufficient to ensure that all detainees who are designated as heat-sensitive but who refuse air-conditioned housing are adequately informed of the risks of non-air-conditioned housing, so long as the Defendants abide by it. As the Plaintiffs' recommendation to expand on the May 2006 Heat Order would reach further than needed, the Plaintiffs' recommendation is denied.

Third, Plaintiffs ask that whenever Defendants place a heat-sensitive inmate in non-air-conditioned punitive segregation housing, they be required to make an individualized written determination that articulates the specific security risk posed by that individual. *Id.* at 11. As the women's punitive segregation unit is now air-conditioned and Defendants already provide some air-conditioned punitive segregation housing for men, such a requirement should not be burdensome, and this Court therefore adopts Plaintiffs' recommendation.

Fourth, Plaintiffs request that Defendants be required to inform the OCC whenever any heat-sensitive inmate is removed from air-conditioned housing, explain why and identify the person who has directed or authorized the removal. *Id.* The OCC already can access a heat-sensitive inmate's whereabouts on the IIS and can ask Defendants why any particular inmate is removed from air-conditioned housing—and then report any failure to respond in its report to the Court. Therefore, Plaintiffs' request is not narrowly drawn and must be denied. The OCC raises a related concern with regard to the IIS feature that is supposed to provide an alert whenever a heat-sensitive inmate is transferred to a non-air-conditioned area. The OCC claims that the IIS does not always provide the alert because IIS users can override it merely by placing a period in the "override reason" field on the computer screen. Feb. 2008 Report at 60. Defendants are therefore ordered to ensure that the "override reason" field contains a reasonable explanation.

Fifth, Plaintiffs request that the OCC be directed to submit its compliance report to the Court by January 15, 2009, rather than October 2008. *Id.* at 12. This request is granted, as the additional time will permit the OCC to prepare a more complete and articulate report.

The OCC requests that Defendants provide it with a copy of each inmate's QINQ or QHIN record from the IIS, which indicates whether an inmate has been sentenced, discharged or undergone a similar change in status. *Id.* As it appears that these reports can be easily printed from the IIS, and that they will provide all parties with a better sense of how many *Benjamin*

undergone a similar change in status. *Id.* As it appears that these reports can be easily printed from the IIS, and that they will provide all parties with a better sense of how many *Benjamin* class members have been designated heat-sensitive, this recommendation is adopted. The OCC's request that such forms also be provided to Plaintiffs' counsel, however, is denied, as this would be duplicative and create an unnecessary burden. The OCC may make and deliver copies to Plaintiffs' counsel upon Plaintiffs' counsel's request. *See id.* at 61.

Finally, the OCC's request that Defendants cease to provide hard copies of forms to it unless specifically requested is denied. While the OCC was evidently confused when forms were both sent by fax and delivered in hard copy, requiring both methods ensures that the OCC receives all records. *See id.*

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to terminate the Heat Orders is DENIED, and the Heat Orders shall remain in effect, with the modifications provided in this Order, until this Court, hopefully in the not too distant future, finds termination proper. The parties shall settle proposed orders on notice by June 30, 2008.

Last, it should be emphasized that while the parties and the OCC have focused largely on the summer months, the Heat Orders are in place year-round until they are terminated.

IT IS SO ORDERED.
New York, New York
June ___, 2008

_____
U.S.D.J.

19