UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JAMES BENJAMIN, et al.,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　　75 Civ. 3073 (HB)
　　　　　　　　Plaintiffs,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　　**OPINION & ORDER**
　　-against-　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
MARTIN HORN, et al.,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Defendants.　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

　　On April 26, 2001, this Court issued an order (the "Environmental Order") that directed the City of New York and the Department of Corrections ("Department") to take specific actions to remedy violations of federal law in fourteen New York City jails[1] ("prospective relief") and directed the Office of Compliance Consultants ("OCC") to monitor certain aspects of such relief. On March 14, 2008, Plaintiffs, a class of pre-trial detainees at the New York City jails, moved the Court to enforce the Environmental Order and to impose further prospective relief with respect to sanitary conditions. Defendants cross-moved to terminate certain provisions of the Order. The Court reserved decision pending the completion of (1) a report by OCC's expert on the cleanliness of the jails' medical clinics; (2) OCC's final report on environmental conditions during the first third of this year; and (3) an attempt by the parties to reach an agreement on certain issues relating to food storage containers and mattresses.

　　OCC's sanitation expert, Robert W. Powitz ("Powitz"), conducted an environmental health and safety evaluation of several of the jails' medical clinics and infirmaries on May 28, 2008, and reported his findings on June 19, 2008. On July 7, 2008, OCC submitted its final report on environmental conditions from January through April 2008. Finally, the parties agreed to a conditional termination of the Environmental Order's food storage and mattress provisions

---

[1] Adolescent Reception and Detention Center ("ARDC"); Anna M. Kross Center ("AMKC"); George Motchan Detention Center ("GMDC"); Rose M. Singer Center ("RMSC"); James A. Thomas Center ("JATC"); George R. Vierno Center ("GRVC"); North Infirmary Command ("NIC"); Otis Bantum Correctional Center ("OBCC"); Manhattan Detention Center ("MDC"); Brooklyn House of Detention ("BKHD"); Queens Detention Center ("QHD"); West Facility ("West"); Vernon C. Bain Center ("VCBC"); and Bronx Detention Center ("BXHD").

but disagreed on the circumstances under which such provisions could be reinstated. On August 28, 2008, this Court issued an order terminating the food storage and mattress provisions, but permitting Plaintiffs to move to reinstate them if OCC finds, six months hence, that Defendants have failed to achieve at least a 90% level of compliance in each jail facility.

For the reasons discussed below, Plaintiffs' motion for further relief is denied, and Defendants' motion for termination is granted. However, Plaintiffs, OCC, and OCC's sanitation expert may inspect the jails, accompanied by Department personnel, in or about April 2009 and no later than April 10, 2009. At that time, if conditions encompassed by the April 26, 2001 Environmental Order are shown again to exist, this Court will reinstate any provision that meets the need-narrowness-intrusiveness test; this is applicable to every paragraph terminated herein.

## I. BACKGROUND

For a short history of the *Benjamin* consent decrees entered into by the parties in 1979, the reader may refer to this Court's most recent decision in this case. *See Benjamin v. Horn*, 2008 WL 2462027 (S.D.N.Y. June 18, 2008). In 2000 Defendants moved to terminate the environmental health provisions of the consent decrees. After several days of hearings on the matter in May of that year, this Court partially granted Defendants' termination motion. *See Benjamin v. Fraser*, 161 F. Supp. 2d 151 (S.D.N.Y. 2001); *Benjamin v. Fraser*, 2001 WL 282705 (S.D.N.Y. Mar. 22, 2001). The Environmental Order, issued April 26, 2001, provided prospective relief for the constitutional violations that remained ongoing.

Upon the parties' motions for reconsideration, this Court made additional, provision-by-provision determinations that the Environmental Order was necessary, narrowly drawn, and no more intrusive than necessary to correct the violation of a federal right, as required by the Prison Litigation Reform Act ("PLRA"). *See Benjamin v. Fraser*, 156 F. Supp. 2d 333 (S.D.N.Y. 2001). The Court of Appeals for the Second Circuit affirmed this Court's opinions and order, except for several provisions that are not at issue here. *See Benjamin v. Fraser*, 343 F.3d 35, 57 (2d Cir. 2003).

Here, Defendants move to terminate paragraphs 11, 13, 14, and 19 of the Environmental Order and the related inspection and monitoring provisions of paragraphs 3-6, 8, and 14. These provisions are described in detail *infra*. In short:

- Paragraph 11 pertains to the cleaning and sanitizing of shower facilities, janitor closets, laundry areas, toilets, washbasins, sinks, and other sanitation facilities in common areas,

living areas, cells, mattresses, and cleaning implements and the ventilation and provision of janitor closets at AMKC (except for the medical areas), ARDC, BKHD, BXHD, GMDC, GRVC, JATC, MDC, NIC, OBCC, QHD, RMSC, VCBC, and West;

- Paragraph 13 governs the provision of food storage containers to detainees at all facilities;
- Paragraph 14 relates to temperatures and temperature monitoring at AMKC, ARDC, BKHD, GMDC, GRVC, JATC, NIC, QHD, OBCC, and RMSC; and
- Paragraph 19 concerns the cleaning and sanitation of the clinic and infirmary areas at NIC, GMDC, and RMSC.

Defendants seek the termination of the related inspection and monitoring provisions. Specifically, paragraphs 3 to 5 require Defendants to employ in each affected jail Environmental Health Officers ("EHOs") and Public Health Sanitarians ("Sanitarians") who must submit reports to Area Captains; paragraph 6 requires the Department of Health of the City of New York to inspect each jail at least once every month and to submit reports to OCC; paragraph 8 requires OCC to submit reports on environmental conditions in January, May, and September of each year; and paragraph 14 sets forth the temperature monitoring program conducted by OCC.

Plaintiffs request the imposition of additional requirements relating to cleaning and sanitizing procedures; the testing of chemical sanitizer; the painting of janitor closets and wall-floor junctions; equipment storage, lighting, and ventilation in janitor closets; surface structure defects; vermin control; lighting; and ventilation.

## II. STANDARD OF REVIEW

With the PLRA, Congress sought, among other things, to curtail federal courts' long-term involvement in prison reform and to halt courts from providing more than the constitutional minimum necessary to remedy a violation of a federal right. *See* H. R. Rep. Nos. 104-21, at 24 n.2, & 104-378, at 166 (1995). The PLRA forbids a federal court from approving prospective relief unless the court finds that such relief (1) is narrowly drawn, (2) reaches no further than needed to correct the infringement, and (3) provides the least intrusive means to correct the violation. 18 U.S.C. § 3626(a)(1)(A) (1996). This is referred to as the "need-narrowness-intrusiveness" test. *See, e.g.*, *Benjamin*, 343 F.3d at 41 n.3. The court must give substantial weight to any adverse impact on public safety or on the operation of a criminal justice system. *Id.*

Prospective relief is "terminable" upon the motion of any party two years after the date the court granted the relief or one year after the date the court denied a prior motion to terminate such relief. 18 U.S.C. § 3626(b)(1)(A). Here, the Environmental Order is plainly "terminable" under this timetable. However, the PLRA prohibits the court from terminating any prospective relief that "remains necessary to correct a current and ongoing violation of the Federal right" and otherwise meets the need-narrowness-intrusiveness test. 18 U.S.C. § 3626(b)(3).

The majority of courts that have considered the issue have held that, upon a termination motion, the plaintiffs bear the burden of showing that the relief meets the need-narrowness-intrusiveness test. *See, e.g.*, *Guajardo v. Texas Dept. of Criminal Justice*, 363 F.3d 392, 395-96 (5th Cir. 2004) (once the defendant has established the requisite one- or two-year passage of time as set forth in § 3626(b)(1)(iii), "[a]s held by most courts, the burden of proof then shifts to the prisoners to demonstrate ongoing violations and that the relief is narrowly drawn"); *Hadix v. Johnson*, 367 F.3d 513, 515 (6th Cir. 2004); *Imprisoned Citizens Union v. Shapp*, 11 F. Supp. 2d 586, 604 (E.D. Pa. 1998), *aff'd sub nom. Imprisoned Citizens Union v. Ridge*, 169 F.3d 178 (3d Cir. 1999) (holding PLRA not unconstitutional for placing burden for proving ongoing violations on prisoners).[2]

While the Second Circuit has not decided which side bears the burden of proof on a motion to terminate prospective relief, this Court will follow the weight of authority among other circuits, which allocate the burden to the plaintiffs. The PLRA itself supports this position by providing that relief is "terminable" after the requisite passage of time, *unless* the relief meets the need-narrowness-intrusiveness test. Before the relief is "terminable," *i.e.*, prior to the expiration of two years after the court's imposition of such relief or one year after the court's denial of a prior termination motion, the PLRA permits any party to seek termination "to the extent that . . . termination would otherwise be legally permissible." 18 U.S.C. § 3626(b)(4). A reasonable construction of the statute could hold that prior to the relief becoming "terminable," the party seeking termination shoulders the burden of proof, but once such relief becomes "terminable," it

---

[2] *But see Gilmore v. California,* 220 F.3d 987, 1007-08 (9th Cir. 2000) ("[T]he party seeking to terminate the prospective relief bears the burden of proving, with 'careful application of law to fact,' that the relief ordered exceeds the constitutional minimum."); *Jones'El v. Schneiter*, No. 00-C-421-C, 2006 WL 2168682, at *6 (W.D. Wis. July 31, 2006) ("It is defendants who argue in favor of terminating the decree; . . . they will bear the burden . . . .").

4

is the plaintiffs' burden to prove need-narrowness-intrusiveness.[3]

Here, because the relief is "terminable" within the meaning of the PLRA, Plaintiffs shoulder the burden of proving that the relevant provisions of the Environmental Order pass the need-narrowness-intrusiveness test.

Because Plaintiffs are pretrial detainees, this Court reviews the conditions of their confinement under the Due Process Clause of the Fourteenth Amendment, which sets a more stringent standard than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Benjamin*, 343 F.3d at 49 (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n.16 (1979)). "This is because '[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime,' and thus, under the Due Process Clause, may not be punished in any manner—neither cruelly and unusually nor otherwise." 343 F.3d at 49-50 (quoting *Bell,* 441 U.S. at 536).

With respect to environmental conditions in this context, the Supreme Court has observed that

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause.

*DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 199-200 (1989) (citation omitted). *See also County of Sacramento v. Lewis,* 523 U.S. 833, 851-52 (1998).

Plaintiffs must show the deprivation of a basic human need, such as reasonable safety, and to this end they must show "actual or imminent harm." *See Lewis v. Casey,* 518 U.S. 343, 350 (1996); *Benjamin*, 343 F.3d at 51 n.17. "A court is under the obligation to examine the *actual effect* of challenged conditions upon the well-being of the prisoners." *Rhodes v. Chapman,* 452 U.S. 337, 367 (1981) (Brennan, J., *concurring*). However, pretrial detainees need not show a deliberate indifference or wantonness on the part of prison officials, or that officials knew of and disregarded an excessive risk to an inmate's health or safety. *Benjamin*, 343 F.3d at 51.

---

[3] *See* Shima Baradaran-Robison, *Kaleidoscopic Consent Decrees*, 2003 B.Y.U. L. Rev. 1333, 1353 (2003); Theodore K. Cheng, *Invading an Article III Court's Inherent Equitable Powers*, 56 Wash. & Lee L. Rev. 969, 1016 (1999).

## III. DISCUSSION

### A. Defendants' Motion to Terminate

#### 1. *Paragraph 11—Sanitation*

Paragraph 11 of the Environmental Order was intended to correct the unsanitary conditions that the Court described in its 2001 opinions. The Court assessed, *inter alia*, Defendants' compliance with Directive 3901 of the consent decree, which required that detainee work crews sweep and wash the common areas of housing areas three times a day, that fixtures be cleaned and sanitized one to three times a day, and that other areas be cleaned every two weeks.

This Court concluded "that the *cumulative* evidence of soiled light shields, dirty or clogged ventilation registers, vermin activity, mildewed and decrepit bathroom and shower areas, clogged toilets, dirty janitor closets, shortages of laundry detergent, and dirty prison cells *in combination* constitutes a clear deprivation of adequate sanitation in the Department's jails." *Benjamin*, 161 F. Supp. 2d at 180 (emphasis added). One basis for this conclusion was "a number of sanitation problems" highlighted by the Department's own Assistant Commissioner for Environmental Health, Patricia Feeney ("Feeney"), in her April 2000 report. *Id.* These problems "fell far below constitutional minimums." *Benjamin*, 156 F. Supp. 2d at 345.

Paragraph 11 of the Environmental Order requires shower facilities, janitor closets, laundry areas, and toilets, washbasins, sinks, and other personal hygiene and sanitation facilities, such as urinals and infant changing tables, in common areas throughout the institution to be thoroughly cleaned and sanitized at least once daily and more often if necessary. ¶ 11(a). Every living area must be "thoroughly cleaned and sanitized each week." ¶ 11(c). Each housing area must have an adequately ventilated janitor closet equipped with an adequate supply of cleaning implements and a sink, or accessibility to a sink. ¶ 11(f). Cleaning implements must be cleaned thoroughly after each use and stored in a clean, adequately ventilated place. ¶ 11(g).[4]

Plaintiffs argue that the unsanitary conditions that existed in 2001 are ongoing and these provisions should be enforced. The applicable test is not whether the Department adhered to the required cleaning protocol, "but whether the Department's facilities are so lacking in adequate sanitation as to be violative of the constitution." *See Benjamin*, 161 F. Supp. 2d at 179.

---

[4] This opinion considers ¶ 11(b) separately, *infra*. ¶ 11(e) is not *sub judice* at this time because it concerns only the sanitation of mattresses, which is the subject of the recent order mentioned *supra*.

Plaintiffs rely primarily on the March 2006 and July 2007 reports[5] by Eugene B. Pepper, OCC's sanitation expert, and OCC's progress report for the period of September to December 2007. However, this Court must focus on conditions that existed as of April 14, 2008, when Defendants moved for termination. *See Benjamin*, 343 F.3d at 57. These conditions are most recently described in OCC's report for January through April 2008 ("OCC's Report"),[6] and, with respect to medical areas, Powitz's report dated June 19, 2008 ("Powitz Report"). This Court may also take into consideration "bona fide steps that prison officials are taking to alleviate poor prison conditions." 343 F.3d at 57 (quoting *Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir. 1982); citing *Helling v. McKinney,* 509 U.S. 25, 36-37 (1993)).

      a.    **OCC's Report**

OCC reported that during February 2008 Defendants failed to comply adequately with paragraph 11(a) because, while there was improvement over prior periods, the jails demonstrated an "unacceptable" level of compliance in twenty-eight of the thirty-nine bathroom/shower areas that OCC inspected—about a 28% rate of compliance.[7] OCC's Report at 2. OCC assessed whether the surfaces (*i.e.*, walls, floor, ceiling) and fixtures (*e.g.*, toilet, sink) in the bathroom/shower areas were "clean," "slightly dirty," "dirty," or "excessively dirty," using the nomenclature and definitions adopted by the Department.[8] The eleven bathroom/shower areas that OCC found to be "acceptable" had surfaces and fixtures that were mostly or all "clean" or "slightly dirty." *Id.* at 4. The remaining twenty-eight areas had mostly "dirty" surfaces or at least one "excessively dirty" surface. *Id.* at 5-6. A typical "unacceptable" bathroom/shower area is characterized as follows:

> GMDC 4 Main A (15-Feb-08): Bathroom floor clean; shower floor *excessively dirty* with dirt, mildew and soap scum; shower drains rusted and *dirty* with soap scum (and mop strings). Bathroom walls slightly dirty w/dirt; shower walls

---

[5] Eugene Pepper, Sanitation Inspections for New York City Jail Facilities at Rikers Island (Mar. 3, 2006) ("Pepper 2006"), Ex. 2 to Pls.' Mot.; Eugene Pepper, 2007 Environmental Health Inspections for New York City Jail Facilities at Rikers Island (July 20, 2007) ("Pepper 2007"), Ex. 1 to Pls.' Mot.

[6] The OCC submitted a draft of its report to the Court on May 12, 2008, but the report was not final until July 8, 2008, when OCC responded to the parties' comments on the draft report.

[7] OCC inspected bathroom/shower areas in AMKC, GMDC, RMSC, and RNDC.

[8] "Clean" means that there is no visible accumulation of dirt, dust, grime, mildew, or soap scum. "Slightly dirty" means that 10% or less of the total surface has visible dust, dirt, grime, mildew, and/or soap scum. "Dirty" means that 11-50% of the surface has visible dust, dirt, grime, mildew, and/or soap scum. "Excessively dirty" means that 51% or more of the surface has an accumulation of visible dust, dirt, grime, mildew, and/or soap scum. OCC's Report at 3.

> *excessively dirty* with soap scum and mildew; shower faucets slightly dirty with soap scum; window(s) slightly dirty with dirt. Bathroom ceiling rusted; shower ceiling slightly dirty with soap scum. Bathroom ventilation registers clean; shower ventilation registers clean. Bathroom light fixture clean; shower light fixture(s) rusted. Toilet clean; sink slightly dirty w/soap scum. Rusted radiator slightly dirty with dirt.

*Id.* at 9 (emphasis added).

According to OCC, Defendants also failed to comply with paragraph 11(c), which concerns the cleanliness of living areas. OCC found that only nine, or approximately 23%, of the thirty-nine living areas that it inspected showed an acceptable level of sanitation, although an additional three areas in RNDC were close to acceptable.[9] *Id.* at 13. The housing areas that OCC characterized as "acceptable" had surfaces (*e.g.*, floors, walls, tables, light fixtures) that were mostly clean or slightly dirty, while those that OCC found to be non-compliant had a substantial amount of dirty or excessively dirty surfaces.[10] *Id.* at 13-15.

OCC further concluded that the janitor closets demonstrated a low rate of compliance, finding that twelve, or approximately 46%, of the twenty-six closets that it inspected violated the cleaning and sanitizing requirements of paragraph 11(a) of the Environmental Order. *Id*. With respect to paragraph 11(f), which requires each janitor closet to be adequately ventilated, OCC reported that no ventilation registers existed in nineteen, or approximately 73%, of these twenty-six closets. *Id.* at 11-13. (It is conceivable, however, that a closet could lack a ventilation register and still be "adequately ventilated," and so the utility of this finding is uncertain.) Paragraph 11(f) requires each janitor closet to be equipped with a sink or be accessible to a sink. OCC found that of the twenty-six closets, twenty, or approximately 77%, did not have a sink. *Id.* at 11-13. However, OCC did not report whether the closets were accessible to a sink.

Cleaning implements stored in the janitor closets were mostly dirty and ran afoul of paragraph 11(g), according to OCC: in fifteen, or approximately 58%, of the twenty-six closets, cleaning implements were either dirty or excessively dirty. *Id.* at 11-13.

---

[9] RNDC Mod 4 Upper South, RNDC Mod 4 Upper North, and RNDC Mod 4 Lower North.

[10] For example, OCC described AMKC Quad Upper 19, which it inspected on February 7, 2008, as follows: "*Common Area* – floor dirty w/dirt; walls dirty w/dirt; ceiling dirty w/dirt and food splotches; light fixtures dirty w/dirt. *Dayroom* – tables excessively dirty w/ food splotches; chairs excessively dirty w/ dirt; walls dirty w/dirt and adhesive; floor littered with paper and bed sheets; ceiling dirty w/ dirt and food splotches; light fixtures dirty w/dirt; ventilation registers excessively dirty w/dust and dirt; windows excessively dirty w/dirt, dust, leaves, and vines. *Bathroom/shower area* – dirty or excessively dirty. *Janitor closet* – slightly dirty." OCC's Report at 17.

### b. Pepper's 2007 Report

Unsanitary conditions were reported in the July 20, 2007 report by OCC's expert, Eugene B. Pepper ("Pepper"), who inspected seven jail facilities[11] between May 21 and 25, 2007. Much of Pepper's report concerns structural deficiencies, such as missing wall and floor tiles, and the control of vermin, which exceed the scope of the Environmental Order as it now stands.

Pepper found that, overall, Defendants had made progress in providing cleaning and sanitizing equipment, assigning staff to sanitation inspections, putting policies and training procedures in place, painting damaged areas, and making some structural repairs to shower and dormitory areas. Pepper 2007 at 3-4. However, in his "professional opinion," the bathroom, shower areas, and janitor closets were not being thoroughly cleaned and sanitized at least once daily, in violation of paragraph 11(a) of the Environmental Order, the living areas were not being thoroughly cleaned and sanitized on a weekly basis, in violation of paragraph 11(c), cells were not being thoroughly cleaned and sanitized upon becoming vacant, in violation of paragraph 11(d), and cleaning implements were not being cleaned thoroughly after each use, nor being stored in a clean, adequately ventilated place, in violation of paragraph 11(g). *Id.*, App.

While the sanitation in RMSC had improved the most, OBCC and GVC had remained the same since 2006, and GMDC, RNDC, AMKC, and NIC had "in general deteriorated in sanitation . . . ." *Id.* Pepper observed that black mold, while still significant, was less of a problem in shower areas but had not improved in janitor closets and bathroom areas. *Id.*

Plaintiffs cite most frequently Pepper's finding that

> heavy soil accumulations at wall and floor junctions or at the junction of the floor and a piece of equipment, soap scum or film buildup in showers, dried soil accumulations on walls and floors especially around toilets and urinals, black mold growths and mold/algae growths in urinals are all evidence of a failure to properly wash surfaces with soap and water and then apply sanitizer.

*Id.* at 5.

Pepper attributed these problems to the lack of visibility created by dark paint at wall-floor junctures and in janitor closets and to the work crews' failure to dry-mop or sweep surfaces before washing them and their failure to use sanitizer after washing—failures which he reports to have observed in action. *Id.* at 4-5.

In janitor closets, Pepper found that cleaning equipment generally was not cleaned after

---

[11] Pepper inspected OBCC, NIC, RMSC, GMDC, RNDC, AMKC, and GRVC.

each use; that low light levels in the closets made it difficult to clean; that closet walls and floors had dried soil, dirt and soap accumulations; that most closets did not have utensil storage facilities; that cleaning utensils were stored improperly; and that most janitor closets had no forced ventilation, resulting in moisture that contributed to black mold growth. *Id.* at 6.

In Pepper's numerous photographs, some bathrooms, showers, living areas, and janitor closets appear quite clean, but other areas display splotches of color which, for the most part, this Court is unable to identify as mold, soil, dirt, mildew, soap scum, stains, rust, or mere discolorations.[12] However, in many cases, it is impossible to determine whether the discolorations are the result of a breakdown in cleaning or whether they would exist in spite of the most rigorous sanitation. Thus, while illustrative, the photos have limited value and must be read together with the narrative reports.

### c. **Defendants Argue Conditions Are Sanitary**

Defendants argue that paragraph 11 should be terminated because the Department's own inspectors have observed overwhelmingly sanitary conditions. Between July 2007 and March 2008, the Department's Sanitarians made 3,469 inspections of common bathroom/shower areas and found that 94% were sanitary. Feeney Decl. ¶ 15. To reach this conclusion, the Department used its "TEAMS" rating system. The Department's Sanitarians, under the supervision of EHOs, assess the cleanliness of each surface and fixture in a given area, and then assign a numerical rating from one to four based on the total number of dirty surfaces or fixtures. An area is considered sanitary if it receives a rating of one or two.[13]

Put another way, the Department's internal inspections found that, 94% of the time, a bathroom/shower area either had no dirt whatsoever or had only one to three surfaces that were

---

[12] Photographs of the following areas strike this Court as having a substantial amount of such "splotches": the showers in GMDC Seven Top B Side, GRVC 11A Upper and 11b Lower, NIC Five South, RNDC 5 Upper North and Lower Dorm, and RMSC Building 15; the steel shower door frame in OBCC Four Southwest; the janitor closet in AMKC Quad 13 Lower; the bathrooms in GMDC Mod 2 Upper A and 2 Main B and RNDC Mod 8 North; the urinals in RNDC Mod 3 Upper South, a ventilation register in the bathroom in RNDC Mod 3 Upper South; the "[t]ypical inmate cell" in RNDC 5 Upper North; and a cell in RNDC Six Lower South. Pepper 2007 at AMKC Photo 28; GMDC Photos 4, 14 & 24; GRVC Photos 8 & 9; NIC Photo 7; OBCC Photo 3; RNDC Photos 3, 6, 7, 28-30, 38-40, 52, 58-60; RMSC Photo 3.

[13] To rate a bathroom/shower area, the Sanitarians, like OCC, first determine whether each surface and fixture is "clean" (no visible accumulation of dirt), "slightly dirty" (10% or less covered in dirt), "dirty" (11-50% covered in dirt), or "excessively dirty" (more than 50% covered in dirt). Then they assign a numerical rating. "One" means all surfaces are clean, "two" means one to three surfaces are slightly dirty, "three" means more than three surfaces are slightly dirty or one to three surfaces are dirty, and "four" means more than four surfaces are dirty or at least one surface is excessively dirty.

10% or less covered with dirt. Only one bathroom/shower received the lowest rating, and most of the bathroom/showers that were rated "two" or "three" had only one deficiency. *Id.* This degree of cleanliness would, without doubt, be enough to terminate the Environmental Order's provisions on common bathroom and shower areas.

The matter is complicated, however, by the dramatic divergence in observations between the Department, on the one hand, and OCC and Pepper, on the other. As described *supra*, in February 2008 OCC found that only eleven, or approximately 28%, of the thirty-nine bathroom/shower areas that it inspected had acceptable sanitary conditions. Within a week of OCC's inspection, neither an EHO nor a Sanitarian from the Department cited a single sanitation issue in any of the eight bathroom/shower areas in AMKC that OCC categorized as unacceptably dirty. *See* Vela Decl. ¶ 14, App. V1; OCC's Report at 12.

The observational disparities extend beyond bathrooms and showers. For example, in February 2008 the Department's Sanitarians found that 98.2% of 285 janitor closets housed clean equipment and that 88% of those closets had no sanitation problem. Feeney Decl. ¶ 38. During the same month, OCC found that, of the twenty-six closets that it inspected, approximately 58% had dirty cleaning implements and approximately 46% failed to comply with the cleaning and sanitizing requirements of the Environmental Order. OCC's Report at 11-13.

Each party has expended considerable effort trying to account for these disparities by elaborating a complicated taxonomy of dirt. Unfortunately, semantic and methodological differences fail to explain the divergence of conclusions. For example, Defendants claim that OCC's findings are unreliable because OCC refuses to use the Department's "TEAMS" ratings of one to four. However, had OCC applied the rating system, it would have found a *greater* number of unsanitary bathroom/showers.[14] Defendants also assert that OCC "double-cited" deficiencies by, for example, noting that lights and vents were dirty when these should have been counted as part of the ceiling.[15] *See* Feeney Reply Decl. ¶ 21. This also fails to account for the difference in conclusions because where OCC found that a portion of a surface was dirty, most often other entire surfaces were, too. Similarly, OCC's conclusions have remained substantially

---

[14] An entire bathroom/shower area can receive a TEAMS rating of three, which is unacceptable, if dirt covers only 11% of one surface area. This was the case in some bathroom/showers that OCC nevertheless counted as "acceptable" areas. *See* OCC's Report at 4-5.

[15] That is, if a Department Sanitarian finds that the only sanitation deficiency on a ceiling is "excessively dirty" vents, the ceiling's designation is "slightly dirty" because the vents comprise less than 10% of the overall ceiling surface. Feeney Reply Decl. ¶ 9.

11

the same even if OCC had not considered soap scum and mildew as "dirt."[16]

More to the point is Defendants' claim that the sanitation deficiencies noted by OCC and Pepper were merely the result of bad timing, *i.e.*, that the cleaning crew fixed the problem later in the day, after OCC or Pepper left. *See, e.g.*, Feeney Decl. ¶ 19. While this would be too great a coincidence in all cases, the timing of inspections may explain some of the deficiencies noted by OCC and Pepper.

Defendants also argue that Pepper failed to describe accurately the conditions at the time of his inspection and that Feeney, who accompanied him, observed overall sanitary conditions. *See id.* For example, Pepper reported that vacant cells were not being cleaned pursuant to the Environmental Order. Feeney asserts, to the contrary, that the inspection team visited approximately ninety-five areas undergoing various stages of sanitation and only one vacant cell was observed to be incorrectly cleaned. Feeney reports that "most staff and inmates answered sanitation procedure questions properly during the tour." *Id.* ¶ 27.

Further, Defendants claim that the Department quickly and appropriately solves sanitation problems on its own. For example, during the Sanitarians' regular monthly inspection of seventy-three bathroom/shower areas in AMKC in July 2007, they found that approximately 73% had an unacceptable rating of three or four. Feeney Reply Decl. ¶ 14. *See also* Tr. 26:8-10, 26:24-27:3. The Department took extensive remedial actions, including increased supervisory inspections by Feeney herself and Department-wide training on cleaning and sanitizing in 124 housing areas, including AMKC. Consequently, most recently all shower/common bathroom areas in AMKC received only high ratings of one or two, according to Feeney. *Id.*

Defendants argue that the Department's reports are more reliable than OCC's or Pepper's because the EHOs and Sanitarians "inspect jails every day, culminating in detailed, weekly reports, [which are] far more timely indicators of jail conditions, are generated by staff that is better trained than OCC's inspectors, and are conducted within the context of a Quality Assurance program to ensure accurate reporting." Defs.' Reply at 3 n.2; *see* Feeney Reply Decl. ¶¶ 15-21. The weekly reports amounted to approximately 20,000 pages over the past two years. Tr. 27:23-25. The "quality assurance program" requires an EHO to double-check the Sanitarian's findings on the day of the Sanitarian's inspection. Defs.' Reply at 7. Feeney

---

[16] For example, while OCC reported that the walls of the bathroom/shower in AMKC Quad L 17 were "excessively dirty with mildew and soap scum," it also found that other surfaces were "dirty" with dirt and grime, and thus the area was unacceptable. OCC's Report at 5.

compares the Sanitarians' reports for areas that she visits with her own findings. Sanitarians are rotated among housing areas. If the overall findings of the new Sanitarian are different from the prior regime, supervisory inspections are conducted to ensure that the reports reflect actual conditions. Feeney Reply Decl. ¶ 18. Each large facility has two full-time captains who are EHOs, in addition to the six or seven full-time Sanitarians on staff. Tr. 33:14-16, 20-24. A strict training regimen is in place; as just one example, sanitation training tapes are shown to cleaning personnel at all roll calls quarterly. Feeney Decl. ¶ 25.

Defendants' inspection results are corroborated by the New York City Department of Health and Mental Health ("DOHMH"), which is not a party to this aspect of the *Benjamin* litigation. The DOHMH, in fact, cites *fewer* sanitation deficiencies than the Department's own staff. *See* Feeney Reply Decl. ¶ 26.

### d. Paragraph 11 Is Terminated

Although OCC and Pepper have documented some dirt in the jails, Plaintiffs have not carried their burden of showing an ongoing violation of their constitutional rights. Indeed, the *cumulative* evidence of "decrepit" conditions noted by this Court in 2001 no longer appears to exist. *See Benjamin*, 161 F. Supp. 2d at 180 (emphasis added). This Court's findings in 2001 were based in part on the "number of sanitation problems" highlighted by Feeney herself, who now demonstrates that she and her staff mostly observe sanitary conditions.

Plaintiffs have failed to prove that the conditions observed by OCC and Pepper will cause them imminent and substantial harm. *See Benjamin*, 343 F.3d at 53 (vacating this Court's requirement that inmates' heads be spaced six feet apart while sleeping because, "[a]ssuming it could be demonstrated that forcing a detainee to sleep too close to another violated due process, this demonstration would require a showing of actual or imminent substantial harm"). Plaintiffs have presented no evidence that sanitary conditions, either singly or cumulatively, will cause detainees any harm.

Plaintiffs have not provided any reasonable justification for why this Court should give greater weight to OCC's and Pepper's findings than the Department's. Plaintiffs merely reiterate that the observations by the Sanitarians, EHOs, and Feeney are unreliable, ostensibly because they are interested parties. *See, e.g.*, Boston Reply Decl. ¶¶ 11-15; Pls.' Reply at 3. In light of the paucity of OCC's and Pepper's inspections compared with the Department's, however, this explanation is not enough. OCC's Report is based on a few days of inspections in February

2008, and Pepper's July 2007 report, which is more than a year old, on a few days of inspections in May 2007.

This Court also considers the numerous steps that Defendants are taking to improve sanitation. *See Benjamin*, 343 F.3d at 57. For example, by September 7, 2007, all janitor closets that had dark floors or walls were repainted in light colors to enhance cleanliness. Feeney Decl. ¶ 6. (The Court recommends, but will not require, that Defendants paint wall-floor junctions a light color, as well.) In March 2008 the Department provided Sanitarians with kits to test cleaning solutions, as Pepper had recommended, even though Pepper had not cited any instances of an inadequate concentration of sanitizing solution. *See id.* ¶¶ 28-29. By the end of February 2008 the Department had installed new closet organizers, which will keep cleaning equipment clean, in all janitor closets in GMDC and AMKC. As of April 2008 manufacture and installation of the organizers were underway in RNDC, and the Department intends to install such organizers in all facilities as quickly as possible. *See id.* ¶¶ 6, 35, Ex. K. As of March 4, 2008, light fixtures had been installed in the few janitor closets that had lacked light. *Id.* ¶ 37.

In light of these and the other improvements described above, as well as the seven-year history of the Environmental Order, all subsections of paragraph 11, except (b), are terminated, along with the inspection and monitoring provisions in paragraphs 3 to 5, 6, and 8.

Paragraph 11(b), which required the Department to submit a complete list of shower replacement schedules by July 2, 2001, with completion dates for the work not extending beyond August 1, 2002, appears not to have been complied with. Defendants are ordered, again, to submit a complete list of shower replacement schedules to OCC and the Court by December 1, 2008, with completion dates for the work not extending beyond December 1, 2009.

### 2. *Paragraph 13*

Paragraph 13 is no longer *sub judice* because it concerns only the provision of food storage containers, which is the subject of a separate recent order, as described *supra*.

### 3. *Paragraph 14*

Paragraph 14 details how temperatures are to be monitored in AMKC, ARDC, BKHD, GMDC, GRVC, JATC, NIC, QHD, OBCC, and RMSC. If the ambient temperature in an area falls below 68 degrees or exceeds 85 degrees, the situation must be redressed "promptly." ¶ 14(b). Paragraph 14 does not explicitly require the Department to maintain any temperature range, but only to monitor temperatures and provide ameliorative measures.

In 2001, this Court found that detainees were "subject to unconstitutional extremes of temperature" at these facilities. *Benjamin*, 156 F. Supp. 2d at 347. Due to certain problems with the methodology employed by OCC's expert, this Court relied in large measure on the testimony of detainees. Detainees reported that they could see their breath in the freezing air, there was no heat at all for a three-day period, a cup of water would freeze if left on a cell floor, corrections officers kept winter coats on indoors, detainees would try to seal windows with any plastic they could find, and extra blankets were not available to everyone. 161 F. Supp. at 166-70.

OCC reported no such complaints between January and April 2008. During this period, OCC concluded that Defendants complied with the temperature monitoring provisions of the Environmental Order, except for a few days when the staff at NIC recorded temperatures after 9 a.m. instead of between 6 and 9 a.m. as required. OCC's Report at 22. OCC generated or reviewed temperature reports for 100 days and found that either the Department reported or OCC recorded temperatures ranging from 68 to 85 degrees inside all facilities on 75 of those days, or 75% as compared to 49% during the same period last year. *Id.* at 23. OCC reported only a few complaints by inmates of cold or hot temperatures, most of which OCC was unable to substantiate. *Id.* at 35-36.

However, on the days where OCC or the Department recorded temperatures that fell outside the 68- to 85-degree range, the housing area logbooks did not describe any ameliorative measures that might have been taken. *Id.* at 23. Nevertheless, the Department asserts that it takes remedial action promptly, and Feeney personally contacts facility administration or tour commanders to ensure that all necessary ameliorative measures are taken. Defendants have produced some documentation that the Department provides hot water and blankets to inmates when the temperature drops below 68 degrees. *See* Feeney Reply Decl. ¶ 33, Ex. A.

When the temperature in an entire housing area (*i.e.*, not in a single cell) is 60 degrees, the housing area is closed. Indeed, Feeney requested the closing of one housing area at RMSC on March 13, 2008 because a temperature of 64 to 65 degrees was not improving over a few hours, even though ultimately the heat was restored more promptly than expected and the area need not have been closed. *Id.* ¶ 34.

Because Plaintiffs have failed to show an ongoing constitutional violation with respect to temperatures inside the jails, paragraph 14 is terminated. This shall not affect this Court's recent opinion and order concerning high temperatures and heat-sensitive detainees.

*4.     Paragraph 19*

Paragraph 19 concerns the cleaning and sanitation of the clinic and infirmary areas at NIC, GMDC, and RMSC. OCC has found that, but for a few deficiencies, these areas are clean and has recommended that the provision be terminated. In his June 19, 2008 report, Powitz, a sanitation expert, found that "the facilities were generally clean in appearance, odor- and vermin-free, with exceptions." Powitz Report at 2. Nevertheless, he concluded that "a thorough cleaning of the facilities only occurs for official visits." *Id.* He proffers only two bases for such a conclusion, however, neither of which is convincing. First, he reports that in one of the dormitory toilet areas, a degreaser had been used full strength, without rinsing, to remove stains. Second, he found that a gloss finish had been applied to one section of the RMSC clinic floors without cleaning the area first, thereby sealing in dirt and stains. While these may evince slight errors in cleaning technique, this Court is not persuaded that any extraordinary effort was made to "cover up" systemic sanitation failures or that such errors are of constitutional dimensions.

Powitz's other observations of "unsanitary" conditions are scant. For example, he notes that mops in all but two utility closets that he inspected had new, dry mop heads and from this concluded that the mops were not being used. It is possible that the Department replaced the mop heads in anticipation of Powitz's visit, but this does not prove an ongoing constitutional violation. From the dryness of sinks and the absence of paper towels in the trash, Powitz concluded that medical staff were not washing their hands. Defendants explain, however, that medical staff use the hand sanitizer lotions provided throughout the medical areas, instead of washing their hands with soap and water. Neither Plaintiffs nor Powitz refutes this as an acceptable method of sanitizing one's hands.

Powitz's observations that "water carafes used in conjunction with the dispensing of pills, were soiled from handling, storage and lack of proper cleaning" and that "the medicine carts used to distribute medication . . . were visibly soiled" do not rise to the level of a constitutional violation, especially since OCC noted no such deficiencies. *See* Powitz Report at 4. Other criticisms have little or no bearing on the sanitation provisions of the Environmental Order, *e.g.*, "[o]ne half of all seats were missing from dining room tables," "[p]eeling and blistering paint on walls," and "[w]aiting area: poor repair of wainscoting."

As Plaintiffs rely solely on Powitz's report, which is insufficient to show any constitutional violation, paragraph 19 is terminated.

**B.    Plaintiffs' Requests for Additional Relief**

Courts have the discretion to modify injunctive orders depending on the circumstances. *See, e.g.*, *Benjamin v. Jacobson*, 172 F.3d 144, 161-62 (2d Cir. 1999). For example, modification may be appropriate to "ensure full compliance with the original decree." *Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994). However, the PLRA was enacted in part to prevent judicial micromanaging. *See Benjamin*, 343 F.3d at 53, 55 (vacating foot-candle lighting requirement because "the Constitution does not mandate any particular foot-candle standard; it only places outside limits on actual lighting conditions").

Plaintiffs' requests for additional relief relating to cleaning and sanitizing procedures; the testing of chemical sanitizer; the painting of janitor closets and wall-floor junctions; equipment storage, lighting, and ventilation in janitor closets; surface structure defects; lighting; and ventilation must be denied because, as explained *supra*, the conditions addressed by such measures do not violate detainees' constitutional rights. In the case of surface structure defects, in 2003 the Circuit affirmed this Court's decision to terminate a provision in the consent decrees that required Defendants to make such structural repairs. *See* 343 F.3d at 55. Conditions have not worsened since then such that the PLRA would support the reinstatement of the provision. In other cases, such as the painting of janitor closets and the provision of equipment storage facilities, the requests are moot because Defendants have already implemented, or are in the midst of implementing, such measures.

With respect to Plaintiffs' remaining request, that the Court grant prospective relief relating to the control of vermin, such as cockroaches, ants, bugs, drain flies, and mice, the Court has carefully reviewed all the evidence and concludes that detainees' constitutional rights are not being violated and the relief would not be narrowly drawn nor the least obtrusive. In 2003 the Circuit affirmed this Court's termination of the "vermin control" portion of the consent decrees. The Court terminated the provision in large part because Defendants had instituted an "Integrated Pest Management" program, which focuses on sealing cracks and crevices and adding door sweeps to keep vermin out.

Pepper reported that while mouse and cockroach control had significantly improved, he observed insect parts, mouse droppings, and drain fly and ant "infestations." Pepper 2007 at 3. Defendants claim that Pepper "grossly exaggerated" his observations, and that, for example, the mere sighting of "cockroach legs and wings" is not evidence of an "infestation." No cockroach

observed insect parts, mouse droppings, and drain fly and ant "infestations." Pepper 2007 at 3. Defendants claim that Pepper "grossly exaggerated" his observations, and that, for example, the mere sighting of "cockroach legs and wings" is not evidence of an "infestation." No cockroach or mouse is evident in any of Pepper's photos. Bugs and ants are visible in a few.[17] OCC has not noted any problem with vermin control.

Isolated problems do not constitute a constitutional violation. *See* 343 F.3d at 55 ("Since our review of the record supports the conclusion that such problems [with showers providing water that was either too hot or too cold] were isolated, we affirm the district court's finding that the plumbing conditions are not unconstitutional.".) The presence of some insects does not amount to an "infestation" or a constitutional violation. The Department continues to implement their Integrated Pest Management system, has installed door sweeps throughout the facilities, and recently instituted a program for dealing with drain flies that inhabit backed-up areas in the shower and toilet areas. *See* Tr. 19:1-7, 32:3. In light of these efforts to keep vermin at bay and Plaintiffs' failure to prove an ongoing constitutional violation, Plaintiffs' request is denied. While we certainly do not condone such conditions, the Court is concerned here with constitutional violations, not with how we might rid the jails of all discomforts.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for additional relief is DENIED, and Defendants' motion to terminate certain paragraphs of the Environmental Order is GRANTED, conditioned on a six-month review as set forth above.

**IT IS SO ORDERED.**
New York, New York
October _6_, 2008

_____
U.S.D.J.

---

[17] One photo shows numerous bugs on men's underwear that is evidently hanging up in a cell, another shows two flies on a wall, another with Pepper's caption, "[b]rown ant infestation," shows only a few ants, a photo with the caption "[r]odent infestation" shows a few bugs, another shows what Pepper labels "drain fly maggots," around the base of a toilet, and some bugs and possibly a worm appear to be present in a storage room.[17] Pepper indicates in the caption of another photo that blue powder on the floor is "sanitizer power being used to attempt to control brown ant infestation." Pepper 2007 at AMKC Photo 24. Another caption reads, "[d]rain fly infestation in the organic matter built up in the crack of the steel shower door frame," but while the door frame looks rusted, no flies are evident. *Id.* at OBCC Photo 3.

18