**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**JAMES BENJAMIN, et al.,**

**Plaintiffs,**

**-against-**

**DORA SHRIRO,[1] et al.,**

**Defendants.**

---

**75 Civ. 3073 (HB)**

**OPINION & ORDER**

**Hon. HAROLD BAER, JR., United States District Judge:**

This case, initially brought in 1975 as a class action lawsuit against the City of New York on behalf of pretrial detainees at Riker's Island, has necessitated numerous and detailed orders to regulate the conditions in the New York City jails and to assure that detainees' constitutional rights are maintained during their confinement. One aspect of these orders has as its goal the protection of the health and welfare of inmates who, by medical necessity, are designated as particularly sensitive to conditions of high heat ("Heat-Sensitive Inmates"). Specifically, three orders govern the treatment of Heat Sensitive Inmates: Transmission of Data Concerning Heat Sensitive Prisoners to the Office of Compliance Consultants and Housing of Heat Sensitive Prisoners During Air-Conditioning Failures, dated May 31, 2007 ("May 2007 Heat Order"); Repair of Air Conditioning Units, dated May 31, 2007 ("A/C Order"); and Heat Conditions, dated August 11, 2008 ("August 2008 Order") (collectively, "Heat Orders"). The Heat Orders govern the treatment of Heat-Sensitive Inmates during the summer's hottest days, when temperatures reach 85ºF and above.

Defendants claim that the Department of Corrections ("DOC") has achieved substantial compliance with its obligations under the Heat Orders and accordingly moves to terminate the Heat Orders pursuant to the Prison Rights Litigation Act ("PLRA"), 18 U.S.C. § 3626(b)(1)(i). Plaintiffs oppose Defendants' motion and request additional relief to remedy what it characterizes as continuing violations of constitutional rights. After having monitored DOC's compliance with the Heat Orders during the 2008 Heat Season, the Office of Compliance Consultants ("OCC") suggests that if terminated, certain aspects of DOC's obligations be clarified to further DOC's continued compliance going forward. For the reasons set forth below, Defendants' motion to

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the name of Defendant Commissioner of the Department of Correction ("DOC") in the caption of this matter has been replaced with Dr. Dora B. Schriro.

terminate the Heat Orders is granted, with the caveat that Defendants' compliance will be revisited one year hence. Depending on the findings at that time, the Court may reinstate any provision that meets the needs-narrowness-intrusiveness test of the PLRA. Further, this order clarifies DOC's obligations with respect to the transfer and housing of Heat-Sensitive Inmates. Plaintiffs' request for further relief is denied.

## I. BACKGROUND

The history of this case and of the *Benjamin* consent decrees has been thoroughly summarized in recent opinions of this Court and need not be reiterated in much detail here.[2] Suffice it to say that in 2000, following twenty-five years of Court oversight, Defendants moved to terminate the environmental health provisions of the consent decrees. After several days of evidentiary hearings, in 2001 the Court partially granted Defendants' termination motion. *See Benjamin v. Fraser*, 161 F. Supp. 2d 151 (S.D.N.Y. 2001); *Benjamin v. Fraser*, 75 Civ. 3073 (HB), 2001 WL 282705 (S.D.N.Y. Mar. 22, 2001). The Environmental Order, issued April 26, 2001, provided prospective relief for the constitutional violations that remained. Upon the parties' motions for reconsideration, this Court made additional, provision-by-provision determinations that each provision was necessary, narrowly drawn, and no more intrusive than necessary to correct the violation of a federal right, as required under the PLRA. *See Benjamin v. Fraser*, 156 F. Supp. 2d 333 (S.D.N.Y. 2001). The Second Circuit affirmed, except with regard to certain provisions that are not relevant here. *See Benjamin v. Fraser*, 343 F.3d 35 (2d Cir. 2003).

### A. <u>Predecessors to the Heat Orders</u>

On July 26, 2004, as a result of the expert report of Dr. Susi Vasallo and other information supplied by the parties and OCC, the Court entered its first heat order that addressed the potential risk to certain inmates from extreme temperature conditions and required DOC to take precautions when the outside temperature reached 85ºF. Although the July 2004 Order provided for automatic termination after the following heat season, at DOC's behest, the order subsequently was amended by an order dated December 22, 2004 that, among other things, listed the specific medical conditions and medications that would categorize an inmate as "heat-sensitive" and thus entitled to protection. The life of the Order was subsequently extended several times, and ultimately was

[2] For a detailed recount of this history, see *Benjamin v. Horn*, 75 Civ. 3073 (HB), 2008 WL 2462027 (S.D.N.Y. June 18, 2008) and The Honorable Harold Baer, Jr. with Arminda Bepko, *A Necessary and Proper Role for Federal Courts in Prison Reform: The* Benjamin v. Malcolm *Consent Decrees*, 52 N.Y. L. SCH. L. REV. 3 (2007-2008).

extended until such time as this Court decides that termination is appropriate. *Id.* at *3. On May 31, 2006, the Court issued an order (the "May 2006 Heat Order"), that found Defendants to be non-compliant with the December 2004 Order. The May 2006 Heat Order required, among other things, that DOC place any Heat-Sensitive Inmate in air-conditioned housing "immediately" when the air temperature exceeds 85ºF at the time of the inmate's medical intake exam or is forecast to do so within forty-eight hours thereafter. Otherwise, the Order required DOC to provide air-conditioned housing to detainees denominated Heat-Sensitive Inmates "as soon as possible" after the temperature reaches 85ºF, and defined the timeframes within which such transfer was required. *Benjamin*, No. 75 Civ. 3073, Order (S.D.N.Y. May 31, 2006) ¶ 2(a)-(b).

**B. <u>The Heat Orders</u>**

Following a report from OCC that found a failure on Defendants' part to provide necessary documentation in a timely manner, the Court issued the May 2007 Heat Order. This Order provided that on any day when the air temperature exceeds 85ºF or is forecast to do so within the following forty-eight hours, Defendants will immediately remove heat-sensitive inmates who had been placed in units where the air-conditioning failed and immediately relocate such heat-sensitive inmates to housing areas with working air-conditioning. The Order also imposes on Defendants fines for non-compliance.

The A/C Order was issued in response to Defendants' advice to the Court that some air-conditioning units were not in working order. Accordingly, the Court ordered Defendants to "inspect, test, repair and replace to working order all housing area air-conditioning units no later than June 16, 2007" and to "thereafter maintain all air-conditioning units in working order and commence repair or replacement efforts immediately upon the failure of a housing area air-conditioning unit that breaks down." The A/C Order also set forth a five-day timeline for the repair of failed air-conditioning units and provided for sanctions based on any failure by Defendants to repair units within five days of any malfunction.

After the 2007 Heat Season, OCC submitted a report that Defendants' compliance with the then-existing heat orders was 52%. Nonetheless, Defendants moved to terminate the Heat Orders, claiming substantial compliance based on their different calculations that they claimed showed better compliance. On June 18, 2008, based in part on OCC's reports, and in part on the parties' disagreements on fundamental aspects required to assess compliance such as the number of Heat-Sensitive Inmates and problems with reporting and miscommunications among the parties, the

Court found sufficient evidence of a current and ongoing violation of a federal right for which prospective relief in the form of the Heat Orders remained necessary. Moreover, the Court noted Defendants' assertions that on extreme high-heat days, certain of their air-conditioning units are too weak to cool the inside temperature below 80ºF. As a consequence, I denied Defendants' motion to terminate the Heat Orders "until this Court, hopefully not in the too distant future, finds termination proper." *Id.* at *14.

In furtherance of the June 18, 2008 Opinion, the Court entered the August 2008 Heat Order, which modified and replaced the May 2006 Heat Order and is one of the orders that is the subject of Defendants' instant motion. The most salient provisions of the August 2008 Heat Order are as follows:

- Where outside temperatures exceed 85ºF at the time of the intake exam or are forecast to do so within 48 hours thereafter, DOC is required immediately to place the Heat-Sensitive Inmate in air-conditioned housing, and otherwise DOC is to provide air-conditioned housing to Heat-Sensitive Inmates "as soon as possible" after the temperature reaches 85ºF. (¶ 2(a)-(b)).
- Mentally competent Heat-sensitive Inmates may refuse or waive placement in air-conditioned housing pursuant to a specified informed-consent procedure. (¶ 3).
- While DOC is not required to provide air-conditioned housing to punitive segregation detainees where it determines that security or safety precludes such placement, it is required, where it is unable to provide air-conditioned housing to such detainees, to increase monitoring, provide prompt medical attention when necessary, and provide extra water and ice to all detainees at every meal. (¶ 6).
- OCC is to monitor Defendants' compliance with the requirements of the Order, and certain procedures were set forth to regularize documentation and tracking of Heat-Sensitive Inmates and to relay such documentation to OCC. (¶ 9).
- The Order specified that it would not terminate automatically, but rather would continue "unless the OCC finds no evidence of current and ongoing constitutional violations of Plaintiffs' federal rights," which was to be assessed in a report from OCC by the beginning of 2009. (¶ 11).

## II. PROCEDURAL HISTORY

On April 1, 2009, OCC submitted its Report Re: 2008 Compliance with the Heat Orders ("April 2009 OCC Report"), in which it concluded that although Defendants had improved internal compliance monitoring, its efforts were undermined by what OCC characterized as DOC's poor documentation and recordkeeping that OCC claimed rendered it unable accurately to calculate the heat-sensitive population or identify properly air-conditioned housing areas. On May 5, 2009, Defendants made this motion to terminate, supported by the Declarations of Erik Berliner

("Berliner Decl.") and Patricia Feeney ("Feeney Decl."), based on their assessment of 96% compliance with their obligations under the Orders and the development of a sophisticated and accurate approach for internal monitoring and evaluation of air-conditioning malfunctions. On July 2, 2009, OCC submitted a Supplemental Report ("OCC Supplemental Report"), in which it undertook to perform a statistical survey to assess Defendants' compliance with the Heat Orders. The Supplemental OCC Report identified very few violations, the vast majority of which were considered violations based on OCC's reasonable interpretation that the housing of Heat-Sensitive Inmates in areas where the air-condition units were unable to cool to below 80ºF was in derogation of the Heat Orders. Nonetheless, OCC avoided recommending termination of the Heat Orders based on its position that it lacked sufficient information to make determinations as to the existence of violations as to the majority of its sample. On August 11, 2009, OCC submitted a final report on Defendants' compliance ("Final OCC Report"), which concluded that Defendants had not yet demonstrated substantial compliance with the Heat Orders, but based that conclusion on temperatures in air-conditioned housing areas and not on transfer or housing violations. Plaintiffs filed their opposition to Defendants' motion to terminate the Heat Orders on August 17, 2009, and Defendants filed their reply on August 21, 2009. Neither party requested oral argument. However, the Court held a conference on August 31, 2009 to discuss the status of all open items under the *Benjamin* consent decrees, including the Heat Orders. At that conference, the parties and OCC provided their positions, in brief, on the best resolution of the instant motion.

## III. STANDARD OF REVIEW

Under the PLRA, a federal court may approve prospective relief only if the relief (1) is narrowly drawn, (2) reaches no further than necessary to correct the infringement and (3) provides the least intrusive means to correct the violation. *See* 18 U.S.C. § 3626(a)(1)(A). The Court must give substantial weight to any adverse impact on public safety or on the operation of the criminal justice system. *Id.* Prospective relief is "terminable" upon the motion of any party two years after the date the Court granted the relief or one year after the date the Court denied a prior motion to terminate such relief. *Id.* § 3626(b)(1)(A). Here, the Heat Orders plainly are "terminable" under this timetable. However, termination of an order that grants prospective relief is appropriate only where the Court finds that the prospective relief is no longer "necessary to correct a current and ongoing violation of the Federal right," and no longer meets the needs-narrowness-intrusiveness test. *See id.* § 3626(b)(3). This Court previously has found that, upon a termination motion, the

burden is on the Plaintiffs to show that the relief meets this test. *See Benjamin v. Horn*, 75 Civ. 3073 (HB), 2008 WL 4500689, at *3 (S.D.N.Y. Oct. 7, 2008); *see also Guajardo v. Texas Dep't of Crim. Justice*, 363 F.3d 392, 395-96 (5th Cir. 2004) (finding once the defendant establishes an order is "terminable" under the one- or two-year timetable in the PLRA, "[a]s held by most courts, the burden of proof then shifts to the prisoners to demonstrate ongoing violations and that the relief is narrowly drawn").

## IV. DISCUSSION

### A. Parties' Positions on Defendants' Motion to Terminate Heat Orders

As is to be expected, the parties have drastically differing views of Defendants' compliance with the Heat Orders during the 2008 Heat Season. Ultimately, while there remain some issues with regard to Defendants' compliance, the record reflects that DOC has substantially complied with its obligations under the Heat Orders.

#### *1. OCC's Reports*

As already noted, OCC submitted three separate reports in connection with its monitoring of DOC's compliance with the Heat Orders during the 2008 Heat Season. Unlike the reports that OCC has submitted in this capacity in the past, the initial report submitted in April 2009 did not seek to undertake any statistical analysis to determine Defendants' level of compliance. Rather, the April 2009 OCC Report focused on problems that OCC had in obtaining and/or interpreting the requisite documentation from Defendants and as a consequence, OCC's inability to reach any conclusions as to compliance. Specifically, OCC's April 2009 Report bemoans the following inadequacies with Defendants' documentation and monitoring, among others: duplication and other inaccuracies in the list of Heat-Sensitive Inmates who were subject to protection under the Heat Orders (April 2009 OCC Report at 6-11); unreliable weekly delivery of hard copies of inmate designation forms (*id.* at 11-12); and failure reliably to record the time of heat-sensitive designation on CHS 205 forms (*id.* at 13-16). In spite of these cited deficiencies, OCC's April 2009 Report specifically commends Defendants for having been "quite proactive in monitoring their own compliance with the Heat Orders" by creating and implementing several sophisticated tracking mechanisms and holding facility management accountable for the treatment of Heat-Sensitive Inmates and investigation of any potential violations of the Heat Orders. *Id.* at 17-18.

OCC's April 2009 Report is most notable for what it does not conclude: that is, although the Report makes much of the unreliability of the tracking mechanisms and logbooks that DOC

uses to effectuate the timely transfer of Heat-Sensitive Inmates to air-conditioned housing areas, OCC did not identify any instances of violations of the transfer or housing provisions of the Heat Orders.[3] OCC does point out several instances in which temperatures in areas designated at air-conditioned exceeded 80ºF, and contends that Defendants' failure to transfer Heat-Sensitive Inmates out of such areas was a violation of the Heat Orders.[4] However, in its final analysis, OCC based its conclusion that Defendants had failed to show substantial compliance on their insufficient documentation and recordkeeping. *See id.* at 33.

In a Supplemental Report, OCC sought to remedy what the parties had protested was the fundamental weakness of its April 2009 Report: the lack of a statistical analysis of Defendants' compliance. In performing its analysis, OCC surveyed the housing and transfers of 85 Heat-Sensitive Inmates during the 2008 Heat Season.[5] *See* OCC Supp. Report at 2-3 & n.1. Based on this study, OCC found only 3 instances where DOC failed to transfer Heat-Sensitive Inmates to air-conditioned housing within the timeframes specified in the Heat Orders. *Id.* at 3. In addition, OCC found "violations" in 13 cases where inmates were housed in areas that were designated as air-conditioned but in which temperatures rose above 80ºF. *Id.* at 3. Taking these violations together, OCC calculated at least 19% non-compliance (i.e., 16 out of an 85-inmate sample), but also cited 54% of cases in which it claimed to have insufficient information to take an informed position as to compliance. *See id.* at 19. Based on these findings, OCC concluded that 19% of the inmates surveyed were not housed in the proper manner prescribed by the Heat Orders, and determined that it could not make a recommendation that the Court terminate the Heat Orders and recommended instead one more year of monitoring.

Finally, on August 11, 2009, in response to the Defendants' intervening submissions, OCC submitted its final report. In that Final Report, OCC took issue with Defendants' position that there were 3,369 Heat-Sensitive Inmates subject to the Heat Orders during the 2008 Heat Season, and rather made the point that it was unable to determine the heat-sensitive population as a result of duplication and other recordkeeping issues. *See* OCC Final Report at 1-5. With regard to the central issue of Defendants' compliance, OCC's Final Report focused once again on air-conditioning units that failed to cool areas to lower than 80ºF, which it characterized as "air-

---

[3] In fairness to the OCC, the departure of the last Deputy Director quite suddenly and due to funding problems contributed mightily to the failures in the report.

[4] This contention will be addressed in further detail below.

[5] In selecting its sample for the survey, OCC began with a random sample of 859 inmates and selected every tenth inmate to create a manageable sample size.

conditioning failures." *See id.* at 6. That is, OCC once again took exception to Defendants' policy only to consider air-conditioning units to be malfunctioning if a mechanical problem was found, instead of determining whether it was in "working condition" by using the ambient temperatures in areas designated as air-conditioned. *Id.* at 6-7. Thus, OCC's Final Report, as well as subsequent discussions between OCC and the Court, has made clear that OCC's primary contention in support of a finding of continued violations consists not of the failure to transfer of Heat-Sensitive Inmates to areas designated as air-conditioned during the requisite timeframes, but for failure of the designated air-conditioned areas to cool to 80ºF or below.

***2. Defendants' Evidence of Compliance***

During the 2008 Heat Season, DOC managed 2,589 new heat-sensitive designations, as well as 780 inmates who had been designated as heat-sensitive prior to April 1, 2008. Based in principal part on the detailed declarations of Erik Berliner, Assistant Commissioner for Health Affairs, Data Management and Forensic Services for DOC, Defendants contend that they met their obligations under the Heat Orders in all but 106 cases,[6] resulting in 96% compliance.[7] *See* Berliner Decl. ¶ 4. Specifically, of these 106 admitted violations, 22 were for housing violations while the remaining 84 violations represented failures to effectuate transfers of Heat-Sensitive Inmates within the two or eight-hour window set forth in the Heat Order. *Id.* ¶ 11.[8]

Defendants attribute this marked improvement in its proffered compliance level as compared to the 2007 Heat Season to its improvement at two facilities that historically were problematic (AMKC and RMSC),[9] as well as its internal monitoring procedure and protocol that it

---

[6] Pursuant to the May 2007 Heat Order, Defendants technically would be subject to fines for these violations, depending on how much time elapsed before the Heat-Sensitive Inmates were placed in appropriate housing. However, neither Plaintiffs nor OCC has requested that fines be levied for any documented violations – nor do they even address the issue of fines at all – and I therefore need not consider that issue at this juncture.

[7] This figure stands in stark contrast to OCC's estimated 19% non-compliance. However, Defendants note, among other issues, that OCC's survey could not be deemed statistically valid and therefore was unreliable. *See* Berliner Supp. Decl. at ¶ 3. Indeed, OCC conceded that its sample size of 85 inmates was merely one-tenth the size of a sample that would have garnered statistically significant results. *See* OCC Supp. Report at 2. Defendants also challenged OCC's complaints regarding its receipt of documentation and numerous of its specific findings of non-compliance in many instances. In challenging specific findings of non-compliance, Defendants have rebutted them in considerable detail, and have, in appropriate circumstances, admitted to violations and included such cases in their figure of 106 violations.

[8] Defendants also contend that, viewing their obligation under the Heat Orders as ensuring that Heat-Sensitive Inmates are not housed in areas in which the temperature exceeds 85ºF, they have attained sufficiently low temperatures in 2,890 out of 2,900 (or 99.6%) of all air-conditioned housing units. *See* Feeney Decl. at ¶ 10. However, as will be discussed in detail below, Defendants are mistaken that the threshold indoor temperature is 85ºF.

[9] During the 2007 Heat Season, DOC's compliance rate at AMKC was only 78%; by contrast, in 2008, DOC calculates a compliance rate at that facility of 96%. *See* Berliner Decl. at ¶ 8. Similarly, at RMSC, which accounts

has developed and to which it adheres strictly. That procedure provides that immediately upon receipt from the Medical staff, DOC facility staff processes new designations and the IIS system tracks inmates' heat-sensitive status and provides cautionary alerts before any errors in housing can occur. At any time, facility managers may consult a computer-generated report that includes an up-to-date roster of Heat-Sensitive Inmates. *Id.* at ¶ 5. Paperwork related to heat-sensitive designation is faxed 24 hours per day from movement offices to the Health Affairs Unit ("HAU") and is tracked and maintained in HAU's database. HAU conducts daily cross-checks to ensure that paperwork for each Heat-Sensitive Inmate has been received and forwarded to OCC. *Id.* In addition, HAU tracks movement of Heat-Sensitive Inmates from the time of designation through time of housing to ensure proper initial housing and timely transfers. *Id.* at ¶ 6. When processing or transfer times generate concern, the names of inmates to whom those concerns pertain are compiled and investigated, with only verifiable proof (*e.g.*, sequential logbook entries indicating that IIS was not updated accurately) accepted as mitigating a potential violation. *Id.* All of this information is transmitted to OCC by fax within one business day of its arrival at HAU and was then supplemented by weekly delivery of hard copies. *Id.* at ¶ 7. OCC received a third set of this data at the conclusion of the 2008 Heat Season. *Id.*[10] Accordingly, based on its level of compliance and strict adherence to protocol for monitoring and delivery of documentation on Heat-Sensitive Inmates, Defendants contend that they are in substantial compliance and that their established procedures will ensure that Heat-Sensitive Inmates will be housed safely in appropriate facilities, and moved when necessary, without further court oversight or intervention.

***3. Plaintiffs' Position***

Plaintiffs argue that the Heat Orders should be extended, and rely principally on two concerns: (1) OCC's reports recommend extension of the Heat Orders for another year, and (2) Defendants' "own admissions of violations." Essentially, Plaintiffs have accepted OCC's

---

for 19% of all heat-sensitive designations, Defendants achieved a compliance rate of 98%. *Id.* Indeed, even at RNDC, which had the lowest level of compliance during the 2008 Heat Season, Defendants have achieved a 91% compliance rate. *Id.* at ¶ 9.

[10] To be sure, OCC argues that it had trouble receiving the requisite paperwork from DOC in a timely or user-friendly manner. However, DOC expresses incredulity at OCC's difficulties, as it attests that all documents were sent not once or twice, but three times at varying intervals during the 2008 Heat Season. OCC's concerns with the documentation, if credited, are indeed troublesome, as its inability to receive or understand DOC's records with respect to Heat-Sensitive Inmates by extension hampers its ability to monitor DOC's compliance. However, it seems clear, based on Defendants' attestations, that OCC did in fact receive the requisite documentation at the latest a few weeks after the conclusion of the Heat Season, and instead its difficulties appear to arise out of its interpretation or processing of the information therein. In any event, as will be discussed in further detail below, these issues do not rise to the level of constitutional violations sufficient to extent the Heat Orders, and need not give us pause here.

statistical findings from its Supplemental Heat Report as their own. Adopting OCC's view that any instances of housing Heat-Sensitive Inmates in areas with temperatures above 80ºF are violations, Plaintiffs contend that 16 cases out of OCC's sample of 85 inmates, or 19% of the sample, experienced violations. From this, Plaintiffs extrapolate an astounding estimate of 88% *non*-compliance, based on their contention that in addition to these express findings of violations, the inmates for whom OCC claims not to have received adequate information and inmates to whom the Heat Orders do not apply should be excluded from the compliance calculation. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Terminate the Heat Orders ("Pls.' Opp.") at 4; *see also* Wilker Decl. at ¶ 4-5. It is clear from this analysis, as well as other aspects of Plaintiffs' opposition to the instant motion, that a central theme is air-conditioning units that fail to cool below 80ºF, which Plaintiffs characterize as "malfunctioning" units. While it is unclear whether Plaintiffs' include these units in their analysis of repairs, they also contend that Defendants failed to repair or replace air-conditioning units within the Court's five-day deadline. Further adopting OCC's reports, Plaintiffs echo OCC's references to Defendants' alleged failure to provide it with timely and reliable compliance data and documentation.

Further, Plaintiffs point to Defendants' admitted 106 violations, arguing that this is far in excess of Defendants' admission during the 2007 Heat Season of 56 violations in the OCC sample. *See* Pls.' Opp. at 5; Wilker Decl. at ¶ 6. However, the comparison is plainly inapposite. Last year, Defendants' admitted 56 violations that were cited in OCC's random sample survey**,** but the sample, by definition, represented only a small subset of the actual violations during the 2007 season. Here, by contrast, Defendants have cited and admitted to 106 violations out of the total heat-sensitive population of 2,589 inmates.

Based on these facts, Plaintiffs contend that Defendants have failed to comply consistently and reliably with the requirements of the Heat Orders and therefore Defendants are not entitled to termination of the Orders.

**B. <u>Heat Orders are Terminated</u>**

In its June 18, 2008 Opinion on DOC's compliance with the Heat Orders during the 2007 Heat Season, this Court found that although at that time there existed "sufficient evidence of noncompliance to warrant keeping the Heat Orders in place until this Court determines that termination is proper," it nonetheless acknowledged that "Defendants seem[ed] to have made

strides toward substantial compliance" and expressed the hope that termination would be appropriate following the 2008 Heat Season.

To be sure, OCC and Defendants themselves have documented some failures to house or transfer Heat-Sensitive Inmates as required under the Heating Orders. However, Plaintiffs have not carried their burden to show an ongoing violation of their constitutional rights. Indeed, the 106 admitted violations during the 2008 Heat Season signify a marked improvement for even the 2007 Heat Season analysis. Moreover, Plaintiffs have not provided any reasonable justification why this Court should give greater weight to OCC's conclusions than to Defendants' own evidence of compliance. In essence, Plaintiffs' position adopts OCC's findings in their entirety without criticism, and prays the Court do the same. With respect to housing and transfer violations, however, two observations are in order. First, in light of OCC's apparent difficulty understanding the documentation that Defendants contends it received, and Defendants' corresponding fluency in interpreting its own system of compliance, blind acceptance of OCC's analysis is insufficient. Second, even accepting OCC's findings in its Supplemental Report, only 3 housing or transfer violations were found – the remainder of OCC's cited "violations" concerned issues with under-performing air-conditioning units. And although housing areas with such units were subject to the housing and transfer provisions of the Heat Order, that aspect of Defendants' obligations was apparently unclear under the existing Heat Orders and Defendants will not be charged for these instances as violations; however, Defendants' obligation in this regard is clarified more fully below. Moreover, although the problems OCC encountered in receiving and/or interpreting Defendants' documentation relating to Heat-Sensitive Inmates may be troubling, in themselves they are insufficient to rise to the level of a constitutional violation, particularly where Defendants, using the very same documentation that it attests were sent three times over to OCC, were able to track and monitor compliance, identify specific cases of violations and calculate a precise level of compliance by facility and overall.

In addition to the evidence of Defendants' substantial compliance with the provisions of the Heat Orders, this Court may also take into consideration "bona fide steps that prison officials are taking to alleviate poor prison conditions." *Benjamin*, 343 F.3d at 57 (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982); citing *Helling v. McKinney*, 509 U.S. 25, 36-37 (1993)). For example, Defendants have developed a sophisticated internal monitoring procedure and protocol that is followed strictly to ensure that all Heat-Sensitive Inmates are identified and properly housed and/or transferred. *See* Berliner Decl. at ¶¶ 5-7. Additionally, Defendants have

created and adhere to a detailed protocol for the identification of mechanical malfunctions in air-conditioning units and for the repair of such units and transfer of Heat-Sensitive Inmates from areas that contain such units when temperatures reach unacceptable levels. *See* Feeney Decl. at ¶¶ 2-9. Indeed, even OCC has commended Defendants' initiatives and improvements with respect to prompt and accurate processing of housing and transfers of Heat-Sensitive Inmates. *See* April 2009 Heat Report at 16-17; OCC Final Report at 1.

In light of these and other improvements discussed in this Opinion, as well as the substantial compliance that Defendants have exhibited during the 2008 Heat Season, the Heat Orders are hereby terminated, subject to the clarifications and caveats in this Opinion regarding indoor temperatures in air-conditioned areas and the provision of adequate ventilation and cooling in CPSU, both discussed below. To be sure, with an admitted 106 housing and/or transfer violations, Defendants' compliance with the Heat Order has not been perfect; however, as this Court previously has found, "perfect compliance will not be necessary to terminate the Heat Orders." *Benjamin*, 2008 WL 2462027 at *8.[11] The OCC will revisit and report on this issue on or before November 1, 2010 to make certain that Defendants have continued to comply with their obligations with respect to Heat-Sensitive Inmates without Court supervision and, if OCC or Plaintiffs finds a failure of compliance with the Heat Orders or any provision thereof, then Plaintiffs may move to reinstate the Heat Orders. During this year – i.e., November 2009 to November 2010 – OCC may monitor as it had heretofore.

[11] Accordingly, Plaintiffs are mistaken in their contention that the Heat Orders require perfect compliance, or "zero tolerance." Pls' Opp. at 15. In support of this view, Plaintiffs cite to paragraph 11 of the August 2008 Heat Order, which provides that "this Order shall not automatically terminate on October 15, 2008, unless the OCC finds no evidence of current and ongoing violations of Plaintiffs' federal rights." However, at no time has this Court found that strict compliance with the provisions of the Heat Orders would be required. Indeed, the Court has found just the opposite. Thus, this case is distinguishable from *Halderman by Halderman v. Pennhurst State School and Hospital*, 901 F.2d 311 (3d Cir. 1990), cited by Plaintiffs, in which the court found insufficient an estimated level of 97% compliance with an obligation to provide a class of mentally retarded plaintiffs with adequate services. In that case, the court rejected the County's argument, finding that the County's obligation was, in effect, "to treat the class members as unique individuals." *Id.* at 324. Here, there is no doubt that the Heat Orders require individual medical assessment for each Heat-Sensitive Inmate and placement of each so-designated inmate in appropriate housing on high-heat days. However, unlike in *Halderman*, Plaintiffs have not shown any implication on the part of Defendants that they believed they were free "to treat a few [class members] in any fashion they want so long as they comply with the [consent decree] with regard to a substantial number of other . . . class members." *Id.* To the contrary, Defendants have shown substantial improvement and consistent efforts to provide all class members with the treatment required pursuant to the Heat Orders; that they have not achieved perfect compliance cannot be grounds to extend the Orders yet another year. Plaintiffs are correct in stating that the Heat Orders require "a very high standard of compliance," Pls.' Opp. at 14, but nowhere has any order of this court equated this "very high standard" with 100% compliance. Indeed, as discussed in detail above, Defendants' illustrated 96% compliance certainly meets this "very high standard."

**C. <u>Clarification re: Ineffective Air Conditioning Units</u>**

One additional point must be addressed in connection with the termination of the Heat Orders, and that is Defendants' contention that they were not aware that, as part of their obligations under the Heat Orders, they would be charged for violations if a Heat-Sensitive Inmate is housed in an area designated as air-conditioned but in which the air-conditioning units are unable to cool below 80ºF. That is, as noted above, the main source of violations found by OCC's monitoring efforts for the 2008 Heat Season centered upon Defendants' having housed Heat-Sensitive Inmates in areas designated as air-conditioned, but in which the ambient indoor temperatures exceeded 80ºF. Defendants contend that on days of extreme high heat, a certain limited number of air conditioning units are simply incapable of cooling below this threshold level, and that they were not aware that part and parcel of their obligations under the Heat Orders was to ensure that Heat-Sensitive Inmates are not housed in these areas. Indeed, Defendants expressly requested clarification in this regard. *See* Transcript of Aug. 31, 2009 Conference ("Tr.") at 13:7-14:7. I agree that clarification is in order.

In their moving papers, Defendants discuss at length their efforts with respect to the identification and reporting of "inoperable air-conditioners." *See* Defs' Mot. at 8. Specifically, the Department inspects all air-conditioning units daily and generates a Daily Air Conditioning Report to ensure that all inoperable units are identified expeditiously. *See* Feeney Decl. at ¶ 2, 5. The inspection is performed by a facility Stationary Engineer and/or Oiler who reports whether any unit has experienced a technical malfunction. *See id.* at ¶ 3. When units are reported inoperable, the Department takes temperature readings every two hours in the designated area until a repair is made. *Id.* at ¶ 6. To determine whether a Heat-Sensitive Inmate must be transferred from a designated air-conditioned area that has experienced such a malfunction, DOC in part relies on the temperature readings in those areas. To wit, instructions are issued to transfer inmates when the ambient temperature in such areas exceeds 80ºF, unless maintenance and engineering personnel advise that a repair of the malfunctioned air-conditioning unit is imminent. *Id.* at ¶ 8. The two-hour temperature monitoring remains in effect until the Department is satisfied that sufficient air-conditioning units are operable and the temperatures are acceptable. *Id.* at ¶ 9.

While all of these measures are important, the one critical oversight is this Court's direction, on several occasions, that the placement of Heat-Sensitive Inmates in supposedly air-conditioned areas that do not cool below 80ºF is in itself a violation of the Heat Order. *See Benjamin v. Horn*, 75 Civ. 3073 (HB), 2006 WL 1370970, at *5 (S.D.N.Y. May 18, 2006)

(finding that "the purpose of heat-sensitive housing is rendered moot if the temperatures in heat-sensitive units exceed 80ºF and inmates at risk for heat-related illness are placed in these facilities" and suggesting air-conditioning units that cannot cool below this level "may not have functioned properly"); *Benjamin*, 2008 WL 2462027 at *8 ("While this Court recognizes that it may therefore be impossible in limited circumstances to bring ambient temperatures down to a safe level for heat-sensitive inmates, this is nevertheless a violation."). Based on these two excerpts alone, the Court finds it farfetched that Defendants failed to understand their obligations with respect to these areas. However, notice of this requirement never found its way into any of the Heat Orders that implemented the various opinions on the treatment of Heat-Sensitive Inmates, and in an abundance of caution, the Court has not premised any failure of substantial compliance on this particular aspect of the Heat Orders.

However, for the avoidance of all doubt, so that Defendants shall know explicitly their obligations with respect to the Heat-Sensitive population going forward, the Court now clarifies its earlier direction that any area designated as air-conditioned, but in which indoor temperatures fail to fall to 80ºF or lower are to be considered *inoperable* (*i.e.*, not "working" air-conditioning) insofar as the Department's housing and transfer obligations are concerned. That is, no Heat-Sensitive Inmate shall be housed in any area, air-conditioned or not, in which the temperature exceeds 80ºF, and all of the timeframe requirements for transfers to *working* air-conditioning apply to inmates housed in such areas. Further, the Court insists upon strict compliance with this requirement; any failure to transfer a Heat-Sensitive Inmate from a housing area where the indoor ambient temperature is even 80.1ºF will be charged as a violation and will be counted in favor of a reinstitution of the Heat Orders.[12] As Defendants have now voluntarily undertaken to take daily temperature readings in all air-conditioned areas, this task should not be onerous and should coincide with their already implemented daily monitoring functions. The Court trusts that Defendants will comply with this obligation going forward, given their exemplary compliance thus far. However, in accordance with the one-year review period discussed above, at the conclusion of the 2010 Heat Season (*i.e.*, by November 1, 2010), or before if reasonable, OCC

[12] The Court's view in this regard is bolstered by the opinion of Dr. Vasallo, who has explained to the Court that, according to her research and the relevant sources and guidelines available in the field, even indoor ambient temperatures of up to 82ºF are medically acceptable for Heat-Sensitive Inmates.

and/or Plaintiffs shall report to the Court whether Defendants have not complied with this, newly clarified, obligation.[13]

**D. <u>Plaintiffs' Requests for Additional Relief</u>**

In addition to its opposition to Defendants' Motion to Terminate the Heat Orders, Plaintiffs also request certain additional relief including, but not limited to, orders that would: (1) direct Defendants to take certain additional steps with respect to delivery of heat-sensitive documentation to OCC; (2) require Defendants to share the final results of their internal monitoring with OCC; (3) require DOC to take and include on its Daily Air Conditioning Report daily temperature readings and updates every two hours for all housing areas with air-conditioning in which the indoor temperature reaches or exceeds 80ºF; (4) order DOC immediately to transfer Heat-Sensitive Inmates during air-conditioning failures, including when temperatures in any area equipped with air-conditioning exceeds 80ºF; and (5) order OCC to engage the services of a professional accounting or government auditing firm to audit DOC's compliance pursuant to generally accepted public auditing principles. As the Heat Orders have now been terminated going forward, these requests are denied. However, three areas of Plaintiffs' requests warrant some discussion:

***1. Plaintiffs' Request for the Record to be Supplemented***

In their opposition to Defendants' instant motion, Plaintiffs pointed out what they considered to be omissions in the record, such as failure to provide OCC with complete records of temperature measurements, which Plaintiffs contend made it impossible to ascertain the extent of Defendants' compliance. *See* Pls.' Opp. at 16. Thus, Plaintiffs requested that the Court direct this information to be produced and that Plaintiffs be allowed to make a supplemental submission on this point. However, in their reply memorandum as well as at the conference held August 31, 2009, Defendants made clear that the requested documentation had been available for review for some time. *See* Defs.' Mot. at 14; Orsland Supp. Decl. Ex. A; Tr. at 22:4-8. After having been given the opportunity to review the additional materials and to submit any supplemental briefing in the event their review changed their position in any way on the instant motion, Plaintiffs chose to forgo that opportunity and to stand on its existing papers. Accordingly, Plaintiffs' request to supplement the record is denied as moot.

---

[13] The Court also recommends, though does not require, that Defendants undertake their best efforts to repair or refurbish any air-conditioning units that are currently unable to cool to adequate temperatures.

***2. Reconsideration of Termination of Paragraph 6 of the Heat Order***

Plaintiffs request reconsideration of the Court's previous termination, on May 20, 2009, of paragraph 6 of the Heat Order, which requires, among other things, increased monitoring and delivery of ice and water to Heat-Sensitive Inmates in punitive segregation areas when it is impossible to place these inmates in air-conditioned housing areas. Plaintiffs' principal contention in support of their request is that the termination was premature inasmuch as OCC only provided limited information as to delivery of ice and water at CPSU, but did not provide the same information for other punitive segregation areas (such as GRVC and RMSC). Plaintiffs' request is denied. Although the only monitoring information that OCC provided pertained to CPSU, the information is irrelevant as to the punitive segregation areas of the other two facilities, as they are actually air-conditioned.[14] That is, the monitoring and ice/water delivery requirements of paragraph 6 are applicable only where it is impossible to place punitive segregation inmates in air-conditioned facility. Accordingly, because OCC's observations pertained to the only relevant punitive segregation area, the Court's termination of paragraph 6's monitoring provisions was not error or premature. Moreover, although it is OCC's obligation to monitor compliance with the various provisions of the Heat Orders, it is Plaintiff's burden to prove that there is a continuing and ongoing constitutional violation that warrants the continuation of prospective relief. As Plaintiffs have failed to shoulder that burden with regard to paragraph 6 of the Heat Order, that provision was properly terminated and Plaintiff's request to reconsider, if it is even procedurally proper, is denied.

However, Plaintiff's argument also seems to conflate its concern as to the termination of paragraph 6 with the requirement under paragraph 7 that Defendants provide adequate ventilation and cooling in punitive segregation areas pursuant to the Order re: Plaintiffs' Motion to Enforce the Court's Prior Heat Orders re: Adequate Cooling in Punitive Segregation, dated December 12, 2007. That is, Plaintiffs argue that termination of the Heat Orders is premature because there has not, as yet, been any survey performed on whether the ventilation modifications, which Defendants represent have now been completed and await evaluation, have been effective in ameliorating the extremely high temperatures in punitive segregation areas. *See* Pls.' Opp. at 3; Tr. at 49:14-20. However, the December 12, 2007 Order remains in place, and the termination of paragraph 7 of the 2008 Heat Order does not affect that order's efficacy in any event. Moreover,

---

[14] As OCC noted in its April 2009 Report, the female punitive segregation area of RMSC Building 12 was equipped with air-conditioning by May 31, 2008. *See* April 2009 Report at 28; Berliner Decl. at ¶ 16. Accordingly, after that date, those areas of RMSC were no longer subject to the requirements of paragraph 6.

the termination of paragraph 7 remains subject to reexamination upon a review period of one year, so any issues that are identified upon inspection of CPSU's ventilation system with regard to its ability to sufficiently cool cell block areas may be revisited at that time. Accordingly, Plaintiffs' request that the Court refrain from terminating this aspect of the Heat Orders is denied.

***3. Retention of Government Auditing Firm***

With respect to Plaintiffs' request that OCC be directed to retain a professional auditing firm to assist with, or perform, an audit of DOC's compliance with the Heat Orders during the 2008 Heat Season, I must express doubt as to whether this move is necessary or will be effective at this juncture. Indeed, as Defendants have pointed out, the retention of such an auditing expert could very well be a superfluous and extremely expensive undertaking. However, as OCC is currently looking into various alternatives for the efficacious and cost-conscious retention of such an expert, I will deny Plaintiffs' request for the time being, but will revisit the issue if and when the parties can express their views more fully on OCC's proposed auditor, if any.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' requests for additional relief are DENIED, and Defendants' motion to terminate the Heat Order is GRANTED, subject to review one year hence following the 2010 Heat Season. As the Defendants were not specifically required under my previous orders to monitor allegedly air-conditioned dormitories at 80°F or less, I am constrained to look forward with respect to this unfortunate happenstance. Accordingly, OCC will not be required to submit a report on Defendants' compliance following the 2009 Heat Season, as originally discussed at the August 31, 2009 conference. Instead, OCC shall submit a report on, or if reasonable, before November 1, 2010 as to Defendants' compliance with all aspects of the newly clarified Heat Orders during the 2010 Heat Season. Any motion to reinstate the Heat Orders based on OCC's 2010 report shall be fully briefed by December 15, 2010. The Clerk of this Court is instructed to close this motion (Docket No. 520).

**IT IS SO ORDERED.**

**New York, New York**
**October 26, 2009**

U.S.D.J.