

199 Water Street
New York, NY 10038
(212) 577-3300
www.legal-aid.org

Janet E. Sabel
*Attorney-in-Chief*
*Chief Executive Officer*

Tina Luongo
*Attorney-in-Charge*
Criminal Defense Practice

Mary Lynne Werlwas
*Director*
Prisoners' Rights Project

July 22, 2019

**VIA ECF**
The Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *Benjamin v. Brann et al.*, 75 Civ. 3073 (LAP)

Your Honor:

Plaintiffs write to supplement briefing on the pending cross-motions regarding enforcement of the Court's orders requiring cooling for individuals in segregation areas of the City jails on high heat days. (See Dkt. No. 668 (indexing outstanding motion paper)). The Mayor of New York City declared a Heat Emergency this past weekend when heat indexes were projected up to 110 degrees. *See* "Mayor de Blasio, NYC Emergency Management and Health Department Update New Yorkers on Heat Emergency, July 19, 2019, *available online at shorturl.at/DPTY1* (last visited July 22, 2019). Yet the Department of Correction (DOC) continued its practice of locking individuals into non-air-conditioned segregation cells *for up to 25 hours straight* – from Saturday mid-day until Sunday mid-day. This is dangerous and intolerable, and violates the Court's orders. We respectfully request that the Court tour the affected facilities; deny defendants' termination motion; and grant plaintiffs' motion for enforcement.

We attach the most significant prior submissions on the topic. To summarize, at Judge Baer's hearing on the plaintiffs' motion for enforcement, evidence showed the dangerous health conditions on hot days in the punitive segregation areas of the Otis Bantum Correctional Center (OBCC), where individuals were locked into non-air-conditioned cells most of the time. Subsequently, in response to policy reforms disfavoring "punitive segregation," these cellblocks were re-named "Enhanced Supervision Housing" (ESH), but the conditions posing the heat dangers were materially unchanged. Individuals in ESH are locked in solitary confinement behind solid doors for periods *averaging* 17 hours per day, but extending up to *25 or more hours* every other day. *See* Dkt. 653-1. Some are shackled to a "restraint desk" during their seven hours outside of the cell, and thus cannot take a cool shower freely. Meanwhile, defendants opened a 100-bed air-conditioned area in another building it called "punitive segregation," with no plan for air-conditioning should that population exceed 100. Plaintiffs contend that defendants must provide a plan for cooling on high heat days, and it must include air-conditioning for individuals held in isolated confinement.

In its recent public reporting about ESH, DOC has made clear that it continues its policy of alternating "lock-out" times in ESH so that individuals can more than an entire day without coming out of a cell. *See* New York City Department of Correction Young Adult ESH Compliance Audit – June 2019, at 2, *available online at shorturl.at/DJOS2* (last visited July 22, 2019) ("The specific

**Justice in Every Borough.**

time that he locks out depends on his tier's lock-out schedule. For example, one (1) day the lower tier locks out in the am and the upper tier locks out in the pm. The following day the upper tier locks out in the am and the lower tier locks out in the pm.").  To our understanding, during last weekend's heat emergency, they did not alter the lock-out times for this group, or any other restrictive housing group, such as to escort people to multiple showers or place them in air-conditioned housing.  We know of no plan to do so during the next heat wave.  While DOC informed us that there were at least two fans in each housing "unit" – which does nothing for those locked behind solid cell doors – at least one elected official reports that upon his inspection, at least 10 such fans were *unopened in their boxes* in the housing areas. *See* Brad Lander (@bradlander), TWITTER (July 21, 2019, 6:57 p.m.), https://twitter.com/bradlander/status/1153076617218023427 (last visited July 22, 2019) ("10 new fans had arrived on Friday. But they needed to be assembled, and because the maintenance staff don't work weekends, well, they spent the weekend in boxes. As for something 'criminal' in this justice system, that seemed like it today.").

In addition, we see no abatement in defendants' practice of creating *de facto* segregation units by locking down entire housing areas or jails for extended periods of time, thus creating the same risks of heat illness going undetected that persist in the punitive segregation areas.  *See, e.g.,* New York City Board of Correction Annual Lockdown Report, May 2019, at 8-9, *available online at* shorturl.at/qxO03 (last visited July 22, 2019) (average lockdown in 2018 lasted 11 hours; longest lockdown in 2018 lasted 51 hours; OBCC had the longest average lock-in duration).  One report states DOC had such a lockdown during the heat emergency of this past weekend.  Anna Quinn, *Brooklyn Jail Was "Cruelly Hot" During Weekend Heatwave, Pols Say*, Patch (July 22, 2019), *available online at* shorturl.at/wAIS2 (last visited July 22, 2019).

We are gravely concerned about the safety of class members during hot days, which undoubtedly will recur.  We therefore ask the Court to tour the non-air-conditioned restrictive housing areas such as the ESH or Secure Unit; deny defendants' motion; and grant plaintiffs' motion and relief requested.

Respectfully submitted,

/s/

Robert M. Quackenbush
Veronica Vela
Mary Lynne Werlwas
Dale Wilker

Counsel for plaintiff class

Cc:    All counsel (via ECF)

**Justice in Every Borough.**



Prisoners' Rights Project
199 Water Street
New York, NY 10038
T (212) 577-3530
F (212) 509-8433
www.legal-aid.org

Blaine (Fin) V. Fogg
*President*

Seymour W. James, Jr.
*Attorney-in-Chief*

Justine M. Luongo
*Attorney–in–Charge*
Criminal Defense Practice

Mary Lynne Werlwas
*Project Director*
Prisoners' Rights Project

May 31, 2017

Hon. Loretta A. Preska
United States District Court for the Southern District of New York
500 Pearl Street
New York, N.Y. 10038

Re:   *Benjamin v. Ponte*, 75 Civ. 3073

Dear Judge Preska:

We write in response to the Defendant's letter dated May 5, 2017 describing various restrictive housing statuses within the Department of Correction, in connection with resolution of the pending motion regarding protection of prisoners from heat-related illness. The parties have conferred since we received that letter to clarify issues it raised. We write to supplement Defendants' letter with facts we believe have bearing on the nature and scope of a necessary plan for the upcoming heat season. We further question Defendants' assertions that the information in their submission should be filed confidentially.

<u>Restrictive Housing Areas and Protection from Heat-Related Illness</u>

As Defendants note, when the hearing on enforcement of the Heat Orders was held in 2014, DOC's principal restrictive housing status (i.e., in which prisoners are locked into cells for more than the 10 hours permitted by Board of Correction standards) was punitive segregation, which was primarily located at OBCC with smaller "bings" in other facilities. With the subsequent policy changes limiting the use and terms of punitive segregation generally, a plethora of new restrictive areas were created in its stead. Their locations, populations, and lock-in hours have been in considerable flux. Despite the changing landscape, we think the fundamental conclusion to be drawn from the 2014 hearing was that individuals held in segregation conditions, where they do not have free access to cooling showers, should be housed in air-conditioned units for their own safety.

We appreciate Defendants' narrative and chart identifying the current restrictive housing areas, and think it helps to clarify the new landscape. However, we believe some additional facts are necessary to describe more accurately the relevant areas.

***Punitive Segregation populations and capacity.*** The Defendants' chart notes that the housing areas in GRVC and RMSC that presently hold men and women, respectively, in 23-hour lock-in in Punitive Segregation 1 and the RHU are air-conditioned. A central dispute among the parties has been whether the Department will commit to continue this

practice if the census of individuals serving punitive segregation sentences rises above the capacity of these current housing areas. Given that the current census is historically extremely low, and that the political changes that brought this reduction are of recent vintage and subject to enormous debate, it is not a theoretical concern to ask Defendants to confirm their plan should the census rise above the current capacity. We do not know their position on this topic, and find it central to resolution of the pending motion.

**West Facility.** The chart omits the unnamed cohort of prisoners currently housed in restrictive lock-in conditions at West Facility. *See attached* Board of Correction, Notice of Violation of Minimum Standards at West Facility, September 29, 2016, at 2 (identifying 26 "Inmates currently housed at West Facility – not for medical isolation purposes or as punishment for an infraction—are locked in their cells 23 hours per day in violation of [the BOC] Standard"). While the precise conditions of this group's confinement have changed frequently—and are not defined in any written policy-- they remain one of the most restricted populations within DOC, and therefore should be included in any identification of restricted housing units.

DOC has publicly announced it intends to transfer this population to the North Infirmary Command (NIC) by the end of June. Defendants have confirmed to us that both West and NIC are air-conditioned. However, should those conditions were to change, then cooling measures would need to be addressed.

**Enhanced Supervision Housing (ESH).** The ESH was developed as part of the plan to reduce reliance on formal punitive segregation. The Board of Correction last month assessed the ESH, making several findings that are relevant to the Defendants' submission. *See* Board of Correction, An Assessment of Enhanced Supervision Housing (April 2017) ("BOC Assessment"), *available at* http://www1.nyc.gov/assets/boc/downloads/pdf/ Reports/BOC-Reports/FINAL-BOC-ESH_Assessment-Adults-2017.04.26.pdf. [1]

First, the presumptive lockout hours identified in Defendants' chart – seven hours per day for the 84 prisoners in ESH Levels 1 and 2, 10 and 14 hours for the higher levels – are not granted in practice. The high number of facility or unit-wide lockdowns reduced lockout hours by 12% in the aggregate, and more during specific periods of time. BOC Assessment, at 25-26. Many lockdowns occurred consecutively. *Id.* Moreover, the daily lockouts sometimes do not begin until 15 to 45 minutes after the designated start time. *Id.*

Second, by design, the lockout hours mean half the prisoners are always confined to their cells for the hottest period of the day – and every other day, they are locked in for a *full 24 hours.* The first 7 hour lockout period for levels 1 and 2 begins at 5 a.m. and ends at noon – the start of the hottest part of the day. *Id.* More disturbingly, because these prisoners are split into two separate lockout groups, and alternate morning and afternoon

---

[1] While we disagree emphatically with defendants' characterization at the court conference of the ESH and many of its other new units as "therapeutic" instead of "punitive," their intended *purpose* was never the dispositive feature of the pending motion. Rather, the *conditions*, most notably lockout hours, that persisted then in punitive segregation—and now in varying degrees in other restrictive units—create risks of heat-related illness whose mitigation is the subject of the current dispute.

lockout periods, half of them will be locked *in* their cells from noon until 1:00 p.m. *the following day.*

Third, Defendants' note that medical staff perform "rounds" in the ESH. However, as the 2014 hearing testimony demonstrated, infrequent rounds are not sufficient to detect heat-related illness, which can have a rapid onset. Moreover, the BOC found that there is usually only one round per day, around the time of the noon lock-in. *Id.* at 23. Furthermore, only 66% of all medical encounters scheduled in the ESH, and 63% of mental health encounters, are ever completed. *Id.* at 23. Given that 66% of the ESH population was receiving mental health services prior to placement in the ESH (*id.* at 9), the presence of medical staff is critical.

Fourth, the BOC did not evaluate the use of restraint desks, as that change was too new to be included in their assessment. They noted that there are no written or formal policies governing their use. *Id.* at iii-iv. Being chained to restraint desks during the 7-hour lockout period prevents prisoners from freely accessing showers. As the testimony adduced in the hearing before Judge Baer indicated, ready access to showers during the heat of the day is a necessary (though not always sufficient) form of protection from heat-related illness in areas that are not air-conditioned. Their use thus re-creates 23-hour lock-in conditions of punitive segregation—that is, the inability to access cooling showers.

Finally, the BOC found that few if any prisoners advance from the most restrictive ESH Levels 1 and 2 to the upper tiers that provide more lockout time. *Id.* at vii. This is reflected in the much larger numbers of individuals in Levels 1 and 2 (84 persons) compared with Levels 3 and 4 (15 persons). We thus can expect that a persistent and significant number of prisoners will continue to be housed in ESH Level 1 and 2 conditions for the foreseeable future.

### *Effect of Prolonged Lockdown Conditions*

As the BOC noted above with respect to ESH, frequent or prolonged facility-wide lockdowns curtail prisoners' out-of-cell time, and thus their access to cooling showers, in many areas of the jail. While sporadic or brief lockdowns are inevitable, recent changes in Departmental policy—such that an entire facility is locked down after an incident in a discrete location—now mean that lockdowns are a routine occurrence, and can last for several days.[2] When the City chooses to lock-in populations for such excessive lengths of time in non-air-conditioned areas, the risk of heat-related illness soars. These changed circumstances, brought about by the Defendants' changed practices with respect to lockdowns, increase the risks to prisoners who previously were reasonably safe and allowed

---

[2] As recently as April 7, 2017 the Department placed the OBCC jail under lockdown for three days. On March 24, 2017 the Department placed the Manhattan jail (MDC) under lockdown for three days. On March 23, 2017 the Department placed the Brooklyn jail (BKDC) under lockdown for five days. *See* Board of Correction Website at http://www1.nyc.gov/site/boc/news/2017.page (last visited April 18, 2017). We have learned from Legal Aid Society staff stationed within the jails that the Department has placed other jails under lockdowns within the past year, including AMKC, BKDC (7), GRVC (2), MDC (4), OBCC (5) and RNDC.

to protect themselves with free access to cool showers in hot weather.  A plan regarding safety from heat-related illness must address this population as well.

Confidentiality Assertion

Defendants' letter declares that the information it provides in Appendix A is "sensitive and confidential," and therefore cannot be made public.  When we questioned Defendants about the basis for this this assertion, counsel stated in relevant part, "Given that many of the most challenging inmates are housed in the areas described in Exhibit A, many of whom are gang affiliated, the Department believes safety and security is best served by maintaining Exhibit A as sensitive and confidential."  While we appreciate their willingness to discuss this matter, we do not believe this is an adequate basis for keeping such factual information about the conditions in the City jails under seal.

The information provided in Appendix A consists of names of restrictive housing units such as Enhanced Supervision Housing; the facilities in which such units are located; their capacity and current census; whether they are air-conditioned; and the number of hours people held therein are permitted out of their individual cells.  We cannot identify any information on this list that is not already publicly reported--and in most cases, *required* to be reported—to the New York City Board of Correction, and is thus available on their website, *except* for the identification of which areas are and are not air-conditioned.[3]

Defendants stated to us that the information in Appendix A is not the same as that published by BOC.  However, other than possibly the full capacity of these areas as presently configured, and the facts as to whether they are air-conditioned, we cannot identify anything in that submission that is not already reported, albeit in a much less coherent form for present purposes, to the Board.  We therefore think there is no basis for such information that affects the health and safety of a large number of individuals the City incarcerates to be deemed confidential.

---

[3] BOC publishes a semi-monthly "60 Day Report on Punitive Segregation," identifying the census therein, the offenses for which people are sentenced, their length of stay, and hours out of cell, see, e.g., http://www1.nyc.gov/assets/boc/downloads/pdf/BOC-Rules-60-Day-Report-PSEG-Report-2017-04-13.pdf; a "60 Day Report on Enhanced Supervision Housing," with similar data as the reports on punitive segregation, see, e.g., http://www1.nyc.gov/assets/boc/downloads/pdf/Reports/DOC-Reports/BOC-ESH-60-day-Report-4-2017.pdf; a monthly roster of number of young adults in each level of the Secure Unit and their length of stay, see e.g., http://www1.nyc.gov/assets/boc/downloads/pdf/BOC-Secure-Unit-Report-May-2017.pdf; a monthly Yung Adult Census identifying by jail and specific housing area (e.g., "GRVC 17A") the location of ever prisoner aged 19-21 in the system, see, e.g., http://www1.nyc.gov/assets/boc/downloads/pdf/Reports/DOC-Reports/Young-Adult-Monthly-Progress-Report/May%202017%20Young%20Adult%20Monthly%20Census%20%28Facility-Housing%20Unit%29.pdf; and a monthly "Young Adult Restrictive Housing Monthly Report," identifying the census and other information about TRU, SCHU and other young adult housing areas, see, e.g., http://www1.nyc.gov/site/boc/reports/department-of-correction-reports.page.

Page 5

<u>Conclusion</u>

The 2014 hearing before Judge Baer was held on Plaintiff's motion to enforce the Court's repeated orders directing defendants to develop a plan to provide adequate ventilation and cooling in punitive segregation areas.  There is little doubt that cooling is a necessary measure to protect individuals incarcerated in segregation conditions from heat-related illness.  Defendants have not provided a plan, and we would ask that they do so.  Further, we believe that for the reasons cited above, any plan for cooling must include areas, in addition to PSEG 1, where individuals are held in segregation for extended time periods.

Very truly yours,

/s/

MARY LYNNE WERLWAS
VERONICA VELA
DALE A. WILKER

Attorneys for Plaintiffs

cc.:    Chlarens Orsland, Esq.
        Heidi Grossman, Esq.
        John H. Doyle, III



Stanley Brezenoff, Chair
Derrick D. Cephas, Vice Chair
Jennifer Jones Austin
Gerard W. Bryant, Ph.D.
Robert L. Cohen, M.D.
Hon. Bryanne Hamill
Michael J. Regan
Stanley Richards
Steven M. Safyer, M.D.

Martha W. King
*Executive Director*

**BOARD OF CORRECTION
CITY OF NEW YORK**
1 CENTRE STREET, RM 2213
NEW YORK, NY 10007
212 669-7900 (Office)
212 669-7980 (Fax)

September 29, 2016

<u>Via E-Mail</u>
Joseph Ponte
Commissioner
NYC Department of Correction
75-20 Astoria Boulevard
East Elmhurst, NY 11370

Re:     <u>**Notice of Violation of Minimum Standards at West Facility**</u>

Dear Commissioner Ponte:

Please find attached a letter from our General Counsel to your General Counsel, which notifies the Department of the multiple violations of the Board's Minimum Standards associated with the current and proposed operation of the West Facility. I would like to note our particular concerns regarding the lack of timely explanation or requests for variances to the Board for the creation of this restrictive unit, the lack of procedural due process for placement in such a unit, and the placement of, and quality of mental health care available to, individuals with serious mental illness in this unit.

The Board looks forward to your swift response on the recommended action laid out in the attached letter. Should your proposed plan include variance requests, the Board will evaluate those when received.

Sincerely,

Stanley Brezenoff

cc:     **BOC**
        Derrick D. Cephas
        Jennifer Jones Austin
        Gerard Bryant
        Robert L. Cohen

Bryanne Hamill
Michael J. Regan
Stanley Richards
Steven M. Safyer
Martha W. King
Michele M. Ovesey

**<u>DOC</u>**
Heidi Grossman
Jeff Thamkittikasem



Stanley Brezenoff, Chair
Derrick D. Cephas, Vice Chair
Jennifer Jones Austin
Gerard W. Bryant, Ph.D.
Robert L. Cohen, M.D.
Hon. Bryanne Hamill
Michael J. Regan
Stanley Richards
Steven M. Safyer, M.D.

Martha W. King
*Executive Director*

**BOARD OF CORRECTION**
**CITY OF NEW YORK**
1 CENTRE STREET, RM 2213
NEW YORK, NY 10007
212 669-7900 (Office)
212 669-7980 (Fax)

September 29, 2016

<u>Via E-Mail</u>
Heidi Grossman
Deputy Commissioner for Legal Affairs/General Counsel
NYC Department of Correction
75-20 Astoria Boulevard
East Elmhurst, NY 11370

**Re:**     **Notice of Violation of Minimum Standards at West Facility**

Dear Deputy Commissioner Grossman:

This letter serves as notice that the Department of Correction ("DOC") is in violation of several of the Board of Correction's Minimum Standards by operating West Facility ("West" or "Facility") as a restrictive administrative segregation unit. We respect the Department's concern that the jails' most violent and assaultive inmates must be housed in a setting that ensures the safety and security of both staff and other inmates. However, in establishing this new housing unit, DOC has not sought a variance from any of the Board's Standards. We thank the Department for its submission to the Board on September 23 of a "proposed approach" (hereinafter "Proposal") for operating West in compliance with our Standards; however, this approach does not overcome all of the current violations.

Below we articulate violations associated with the Department's current operation of the Facility as well as violations implicit in DOC's Proposal, and then recommend next steps.

**Minimum Standards Violations**

Currently, 26 inmates are confined at West. According to the Proposal, the Facility is designed both physically and operationally to house some of the Department's most violent inmates who are primarily of enhanced restraint or administrative segregation status and who were previously housed in numerous other housing settings that proved inadequate to prevent them from engaging in further violence. The Facility also houses certain protective custody inmates for their own protection and separation from other inmates, where the threat to them is particularly violent. Although not addressed in your Proposal, it appears that a few individuals

with serious mental illness ("SMI"), and perhaps also meeting the criteria above, are housed at West.

The Department's current and proposed operation of the Facility violate the following Minimum Standards.

**§ 1-05 (10-hour daily lock-in time)**. Section 1-05(a) and (b) limit lock-in time to 10 hours per day, except for inmates confined in punitive segregation units, enhanced supervision housing, or for medical reasons in contagious disease units. Inmates currently housed at West Facility — not for medical isolation purposes or as punishment for an infraction — are locked in their cells 23 hours per day in violation of this Standard. We further note that the current operation of West Facility is akin to DOC's former operation of "close custody" housing for inmates who required protective custody as well as inmates who posed a serious threat to security. In *Jackson v. Horn*, 27 Misc.3d 463, 474 (Sup. Ct., NY Co., 2010), the court held that DOC's closed custody housing program violated § 1-05 because inmates confined to these units were confined to their cells for up to 23 hours per day. Following this decision, the Department shut down the program.

DOC's Proposal does not state the maximum lock-in time for the 26 inmates currently confined at West. Rather, the Proposal calls for (1) two day rooms to be established in each sprung; (2) time in the day room will be offered 4 times per day; and (3) on occasion, inmates may be in the day room by themselves if safe comingling combinations cannot be made. Absent a variance based on demonstrable reasons why full compliance with § 1-05 cannot be achieved, continued operation of the Facility that limits inmates to less than 14 hours of daily lock-out time would constitute a violation of this Standard.

**§ 1-07 (Congregate religious services).** Section 1-07(c)(1) states that "all prisoners shall be permitted to congregate for the purpose of religious worship and other religious activities, except for prisoners confined for medical reasons in the contagious disease units." Section 1-07(c)(2) requires DOC to "provide all prisoners access to an appropriate area for congregate religious worship and other religious activities" that is "consistent with" the requirements of § 1-07(b)(1). Subsection (b)(1) states that inmates "are entitled to exercise their religious beliefs in any manner that does not constitute a clear and present danger to the safety or security of a facility." Section 1-07(j)(1) requires that any determination to limit the exercise of any inmate's religious beliefs be "in writing" and "state the specific facts and reasons underlying the limitation." Moreover, the inmate must be afforded "an opportunity to respond" (1-07(j)(2)). This Standard codifies inmates' constitutional right to the free exercise of their religion subject to limitations that are reasonably related to legitimate penological interests.

The Proposal states that religious services will be provided via rounds by various religious providers, and congregate religious services, like day room, will be offered when safe co-mingling can be provided. The denial of congregate services to inmates at West in this uniform manner violates § 1-07. Absent a variance based upon a sufficient showing that full compliance with §1-107 cannot not be achieved, denial of congregate religious services without any written basis for, or opportunity to respond to, the decision would constitute a violation of this Standard.

**§ 1-08(f) (Access to law library).** Section 1-08 provides, among other things that (1) "Each facility shall maintain a properly equipped and staffed law library" (§ 1-08(f)); (2) "[t]he law library shall be located in a separate area sufficiently free of noise and activity and with sufficient space and lighting to permit sustained research" (§ 1-08(f)(1)); (3) "Each law library

2

shall be open for a minimum of five days per week including at least one weekend day" and on each day a library is open "in facilities with 600 or fewer prisoners, each law library shall be operated for a minimum of eight and a half hours, of which at least six and a half shall be during lock-out hours" (§ 1-08(f)(2)(ii)); (4) "[t]he law library schedule shall be arranged to provide access to prisoners during times of the day when other activities such as recreation, commissary, meals, school, sick call, etc., are not scheduled. Where such considerations cannot be made, prisoners shall be afforded another opportunity to attend the law library at a later time during the day" (§ 1-08(f)(3)); and (5) "Legal research classes for general population prisoners shall be conducted at each facility on at least a quarterly basis. Legal research training materials shall be made available upon request to prisoners in special housing" (§ 1-08(f)(7)).

Currently, inmates housed at West are unable to access a law library, which violates various provisions of this Standard, as outlined above. The Proposal states that law library kiosks will be placed in one of the day rooms for each sprung, and law library will be afforded daily through kiosks. Requests for assistance from a library aide/coordinator can be made daily, and the Department will schedule such assistance for that day or the following day. Absent a variance based on demonstrable reasons why DOC cannot achieve full compliance with § 1-08(f), DOC would be in violation of this Minimum Standard.

**§ 2-04 (Special housing for SMI inmates); § 2-06 (Restraints and Seclusion).** Section 2-04(c)(1) of the Board's Mental Health Standards requires that "special housing" be "provided to those inmates in need of close supervision due to mental or emotional disorders, and to those inmates in the process of being evaluated for such disorders." In addition, "correction officers who have received not less than [35] hours of special training within the first year of their assignment shall be assigned to steady posts within these areas" (*Id.*).

Section 2-06(a) states that, consistent with the NYS Mental Hygiene Law, use of physical restraints or seclusion of inmates being observed or treated for mental or emotional disorders "shall not be used as punishment, for the convenience of staff, or as a substitute for treatment programs." Section 2-06(c)(1) states that such use of physical restraints or seclusion "shall be permitted only where there is on-duty psychiatric coverage," while § 2-06(c)(2) states that "[p]hysical restraint or seclusion may be used only upon the direct written order of a psychiatrist which includes the reasons for taking such action." Such restraint or seclusion may be used only when the psychiatrist has examined the inmate and determined that it is appropriate after consideration of various enumerated factors (§ 2-06(c)(3)(i)-(iv)). Finally, inmates who have been placed in restraints or seclusion must be kept under constant observation and their need for continued restrictive measures must be assessed by nursing or mental health staff (§ 2-06(c)(4)).

The placement of even a few SMI inmates in a setting such as West violates these various Mental Health Standards. We appreciate the Department's and Correctional Health Services' current action and attention on this issue. Absent, a variance based on a sufficient showing that full compliance with these Standards cannot be achieved with respect to certain SMI inmates, these Standards would be violated.

**§ 1-102 (Due process in connection with security classification).** Section 1-02(f)(2) states that the Department's security classification system shall, among other things "provide for involvement of the prisoner at every stage with *adequate due process*" (§102(f)(2)(iv); emphasis added); and "provide mechanisms for review of prisoners placed in the most restrictive security status at intervals, not to exceed four weeks for detainees and eight weeks for sentenced prisoners" (§ 102(f)(2)(vi)). Moreover, "[p]risoners placed in the most restrictive security status shall only be denied those rights, privileges and opportunities that are directly related to their

status and which cannot be provided to them at a different time or place than provided to other prisoners" (§ 1-02(f)(2)(v)). This Standard essentially codifies pre-trial detainees' constitutional right to procedural due process when confined to a housing unit that is more restrictive and isolating than housing afforded to general population inmates.

Currently and as far as we are aware, inmates are placed in the Facility without *any* due process such as written notice of the placement including the reasons therefor or an opportunity to challenge the placement. Inmates at West are currently confined behind double cell doors and in their cells 23 hours a day or, as proposed, may have the ability to commingle with other inmates in another cell, which will serve as a day room. Inmates are denied access to a full-serviced law library, may be denied the right to practice their religion in a congregate setting, receive their meals through food slots on their inner cell door, and are confined to individual cages for recreation.

### Recommended Action

In response to these violations, the Board recommends that the Department take the following immediate action:

**Establishment of due process for West Facility inmates**. Due process protections should include: (i) written notification specifying reasons for the placement in this unit; (ii) an opportunity to challenge the placement at a hearing at which the inmate may call witnesses and present documents; (iii) the assignment of a hearing facilitator if necessary; (iv) a written decision; and (v) periodic placement reviews.

**Completion of a review of each West Facility inmate**. This includes (i) a review of the security risks posed by providing these individuals with full and equal access to programs and services as required by the Minimum Standards; (ii) a review of each inmate's housing history; (iii) a review of each inmate's mental health care and health care history; and (iv) a comparative review of the security risks posed by incarcerated individuals at the West Facility versus those individuals who are also in protective custody and enhanced restraint status but who are housed in less restrictive settings.

In addition to the immediate steps outlined above, the Board will evaluate any additional proposal you provide for achieving compliance or a variance request detailing the reasons it is not possible to meet safety and security concerns while also maintaining compliance with the Board's Minimum Standards at the West Facility. We note that, in the long term, the Board intends to address issues raised by establishment of this unit in its upcoming rulemaking on restrictive housing.

Sincerely,

*Michele M. Ovesey*

Michele M. Ovesey

cc:     **BOC**
        Stanley Brezenoff
        Derrick D. Cephas
        Jennifer Jones Austin
        Gerard Bryant

4

Robert L. Cohen
Bryanne Hamill
Michael J. Regan
Stanley Richards
Steven M. Safyer
Martha W. King

**<u>DOC</u>**
Joseph Ponte
Jeff Thamkittikasem

 **THE LEGAL AID SOCIETY**

Prisoners' Rights Project
199 Water Street
New York, NY 10038
F (212) 509-8433
www.legal-aid.org

Blaine (Fin) V. Fogg
*President*

Seymour W. James, Jr.
*Attorney-in-Chief*

Justine M. Luongo
*Attorney-in-Charge*
Criminal Defense Practice

Mary Lynne Werlwas
*Project Director*
Prisoners' Rights Project

September 11, 2017

The Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *Benjamin v. Brann et al.*, 75 Civ. 3073 (LAP)

Dear Judge Preska:

We write in reply to Defendants' June 22, 2017 letter, treated as a motion to terminate the orders to provide cooling in punitive segregation housing in the New York City jails (the "Heat Orders"[1]). Plaintiffs strongly oppose this motion. Ongoing violations exist in Defendants' practices regarding extreme temperature conditions in some of the restricted housing areas, most notably Enhanced Supervision Housing and possibly Punitive Segregation I and II. As a result Plaintiff's motion to enforce the orders is not moot, as Defendants argue, and the orders cannot be terminated before Plaintiff is provided the opportunity to conduct discovery verifying and updating the census information provided in Defendants' June 22 letter and as Exhibit A to their May 4th, 2017 letter ("Exhibit A"), and allowing for expert evaluation of the heat conditions in the Enhanced Supervision Housing areas.

Defendants have failed to put forth a plan for cooling individuals in segregation conditions, as required by the Heat Orders since 2004. Defendants now assert that all individuals under punitive segregation are currently in air-conditioned housing. However, Plaintiffs need

[1] On April 26, 2001, the Court issued an Order on Environmental Conditions in which "some of the Defendants' practices concerning environmental health in various correctional facilities were held unconstitutional, among them the extreme temperature conditions encountered in some facilities from time to time." *Benjamin v. Fraser*, 161 F. Supp. 2d 151, 166-69, 171 (S.D.N.Y. 2001). For the purposes of this letter, "Heat Orders" refers to: the Order issued on July 26, 2004 with the original directive to provide ventilation and cooling in punitive segregation areas and subsequent orders reiterating this obligation, including the orders of December 22, 2004; May 18, 2006; May 31, 2006 and the Order re: Plaintiffs' Motion to Enforce the Court's Prior Heat Orders, dated December 12, 2007. *See Benjamin v. Horn*, No. 75 Civ. 3073, 2006 U.S. Dist. LEXIS 30211, at *2 (S.D.N.Y. May 18, 2006)(setting forth the history of the heat orders prior to the 2007 order.) Subsequently, the Court generally terminated the Heat Orders, but explicitly preserved the punitive segregation order, stating "the December 12, 2007 Order remains in place and the termination of paragraph 7 of the 2008 Heat Order does not affect that order's efficacy in any event." *Benjamin v. Schriro*, No. 75Civ3073(HB), 2009 WL 3464286, at *12 (S.D.N.Y. Oct. 26, 2009).

discovery to confirm this fact and evaluate punitive segregation conditions generally. Further, as set forth in Exhibit A, the capacity of air-conditioned housing for 23-hour punitive segregation ("PSegI") is 100 persons, and Defendants have proffered no plan for air-conditioned housing should that number exceed 100. Finally, despite Defendants' arguments to the contrary, the conditions of the "new" restrictive housing units are equivalent to those of "punitive segregation" as it has been historically defined in this action, individuals living in these areas are thus also at elevated risk for heat-related illness and must be included in a plan for cooling under the Heat Orders.

History of the Heat Orders and Summary of Hearing Record

In their June 22 letter, Defendants set forth an overview of the Heat Orders and summarized the testimony from the May 20, 2014 hearing ("May 20th hearing") held on Plaintiffs' Motion for Enforcement of the Court's Orders to Defendants to provide a plan to cool punitive segregation areas in New York City jails. Defendants' description is generally accurate, but fails to convey the amount of delay and obfuscation that has plagued the effort to protect individuals incarcerated in segregation areas in DOC facilities from the effects of high temperatures.

The initial July 26, 2004 Heat Order (and not the later amended December 22, 2004 Order, as Defendants stated) ordered DOC to present to OCC, the plaintiff and [the] Court, a plan, which would "provide adequate ventilation and cooling in punitive segregation areas." (Order of July 26, 2004, ¶ 7(d).) At that time, the punitive segregation areas were located in Otis Bantum Correctional Center ("OBCC"), where individuals were locked in their cells for 23 hours a day.

The July 2004 Heat Order concluded that DOC must take precautions to reduce health risks for inmates believed to be particularly vulnerable to heat-related illness. It based this on the testimony of Dr. Susi Vassallo, an expert in toxicology and heat-related illness retained by the Office of Compliance Consultants ("OCC"). Dr. Vassallo found individuals then confined in the Central Punitive Segregation Unit ("CPSU") in OBCC among those particularly vulnerable because "being confined or socially isolated" is a risk factor for increased morbidity and mortality during heat waves, and in the OBCC CPSU "inmates are locked in their cells for most all of the day." (*Riker's Island Jails and Heat Conditions: Consultant's Report,* Susi Vassallo, M.D., July 23, 2004 ("2004 Vassallo Report")). Exacerbating the risk was that, during the time in their cells, individuals in the OBCC CPSU were behind solid doors, eliminating the usefulness of fans in the common areas, were without unlimited access to showers, and had limited access to ice. (*Id.*)

The obligation to provide a plan to cool segregation was subsequently restated in multiple orders. None of these orders was appealed. In June 2007, Plaintiffs moved to require prompt submission of the long overdue plan. Though it has long been clear from the testimony of Dr. Vassallo and others that the Heat Orders mandated cooling in the form of air-conditioning, Defendants submitted a ventilation plan in September 2007 that failed to make provision for cooling in segregation units. The Court gave Defendants until September 1, 2008 to provide adequate ventilation and cooling in punitive segregation

units. Not only did Defendants again fail to make provision for cooling in segregation units, but Plaintiffs discovered that Defendants misrepresented their compliance with their separately ordered obligation to maintain their ventilation systems generally in "working order." (*See Benjamin v. Schriro*, 370 Fed. Appx. 168 (2d Cir. 2010) for a description of these events).

Defendants did not complete the ventilation renovations that were to have been done by September 2008 until mid-2010. Dr. Vassallo was to submit a report promptly upon the plan's completion (Order re: Plaintiffs' Motion to Enforce the Court's Prior Heat Orders (Dec 12, 2007)), but largely because Defendants refused to provide access to certain information, Dr. Vassallo was unable to complete the report until August 23, 2011. Dr. Vassallo subsequently amended the report in July 2012. In her report issued after the completion of Defendants' ventilation renovations she stated "the temperatures were hot in the cells. There was no appreciable airflow at the level of the bed or the level of our hand held thermometers. ... The ventilation system did not provide any breeze or perceptibly stir the air at the level at which we were standing." (*Expert Opinion: Heat Conditions and Ventilation,* Susi Vassallo, M.D., August 23, 2011, at 3.) Almost ten years since the July 2004 Heat Order, with no plan by the Defendants to cool segregation areas, in June 2013, Plaintiffs' counsel filed a motion for the court to enforce its repeated orders to Defendants to submit a plan.

At the May 20, 2014 hearing, Dr. Vassallo testified to her now long-held conclusion that segregation areas on Rikers Island place individuals at "grave risk" during high temperatures, and that "it is difficult to conceive of an adequate solution short of air conditioning." As before, she attributed this risk to "the physical structure of the building, the time confined to the cells, that is 23 out of 24 hours a day; the construction materials, that is ... that concrete holds in heat; that the heat in the building is – that the temperature in the building does not cool adequately at night in the nighttime because the heat is held in these walls and in the outside walls; the lack of cross-ventilation; the presence of fans that are aimed either at the officers or not aimed into the cells." (Hr'g Tr. at 33-34). Part of the physical structure of the building was the solid doors which hold heat and block cross ventilation (Hr'g Tr. at 41). Further, Dr. Vassallo said: "The major consequence is the inability to communicate well with an individual ... the inability for other inmates to communicate freely…[T]he isolation in and of itself lends to the danger that the inmate is in that setting." (Hr'g Tr. at 34).

Dr. Vassallo did not detail what number of hours in one's cell would trigger the health risks she identified. Neither did she explain what was meant by "most all of the day." At the time, the only form of restrictive housing that locked individuals in their cells beyond the 10 hours permitted by the Board of Correction Minimum Standards was the punitive segregation area, with its 23 hours locked-in. As 23 hours would inarguably be considered "most all of the day," this was not evaluated further during the decade-plus that the Heat Order's term was repeatedly extended.

At the time of these comments the CPSU was located in OBCC, in the same housing areas that now are called Enhanced Supervision Housing ("ESH").[2]

Dr. Vassallo also testified at the May 20th hearing about the nature of heat-related illness and the particular risk faced by those are incarcerated. Heat stroke may cause brain damage, and even death. (Hr'g Tr. at 27). Heat stroke can develop very fast and without warning or obvious progression of symptoms (Hr'g Tr. at 27-28) and its effects on mental status may impair ability to talk, interact, make decisions, and ask for help. This alteration of abilities may occur "[e]xtremely early" in the development of heat stroke. (Hr'g Tr. 30). The risk is particularly acute for those in segregation "during the environmental conditions of the summertime temperatures." (Hr'g Tr. 33, quoting 2004 Vassallo Report, at 14). Of the data most recently taken at the time of the hearing, 2012-2013, Dr. Vassallo stated "I think there's an extreme risk for someone <u>healthy or not</u> to be held in these conditions for 23 hours a day behind a solid door." (Hr'g Tr. at 39 (emphasis added)).

<u>Defendants Have Not Complied with Court Orders to Provide Cooling in Punitive Segregation</u>

The motion that was the subject of the May 2014 hearing, which is still pending before this Court, was brought in June 2013 after Defendants were repeatedly ordered, and repeatedly failed, to provide a plan to cool punitive segregation areas, originally mandated by the Court in 2004. Although the parties exchanged draft settlement proposals in April 2016, in which cooling plans were contemplated, we did not reach agreement.

During that time, the Department changed many of its housing designations. Among those changes, the former OBCC CPSU was now named Enhanced Supervision Housing, an area intended for individuals with particularly violent histories. The punitive segregation unit, where individuals would serve disciplinary sentences, was moved to air-conditioned areas of the George R. Vierno Center (GRVC). Settlement between the parties was not reached in large part because Defendants sought to limit their obligation to cooling only the 150 beds they had allotted to punitive segregation at GRVC – regardless of whether the actual population in punitive segregation exceeded that number. This did not adequately implement the Heat Orders. Plaintiffs feared that without a plan to provide cooling for any and all inmates that the Department might choose to hold in punitive segregation, there was no guarantee that all such individuals would be appropriately placed in air-conditioned housing. Yet, since that time, Defendants have walked back even that original proposal. Not only have they reduced the number of available air-conditioned beds at GRVC to 100, but they will not commit in any stipulation to continuing to provide *any* number of beds in air-conditioned housing for those in punitive segregation.

Instead, Defendants simply assert that that they are *currently* housing all inmates in twenty three hour lock-in punitive segregation (PSegI) in air-conditioned housing and essentially

---

[2] Dr. Vassallo further testified that there may be a greater risk of heat related illness in other non-air-conditioned segregation units other than the CPSU because they receive less attention and scrutiny than the CPSU (Hr'g Tr. 56-57).

ask us and the Court to trust that they will continue to do so. (Defs.' June 22 letter at 1,4). First, this is entirely premised on the assumption that the population of PsegI will not rise above 100 persons. According to Defendants' assertions this should be a rare problem, as the PSegI population recently has been fewer than 100 persons.[3] (Defs.' June 22 letter at 6). However, this reduced population is a recent and controversial phenomenon. The population of people in punitive segregation began to drop in 2015 after provisions amending the New York City Board of Correction Minimum Standards to limit the use of punitive segregation took effect. After this change, the number of people in punitive segregation dropped from 414, in December 2014, to 181 one year later. See http://www1.nyc.gov/site/boc/reports/BOC-Reports/punitive-segregation-reports.page (last visited on September 3, 2017).[4]

However, the Department is able to seek overrides to the time limits keeping the population low, by representing that the circumstances present "exceptional safety and security concerns." There is no limit to the number of overrides the Department can seek. And as violence increases throughout Rikers Island,[5] and with ever-increasing pushback from the correctional officers unions against the limits on segregation and use of force,[6] the department will be seeking housing solutions for the perpetrators of violence, including alternative housing like West Facility or ESH, or by seeking waivers to time limits for punitive segregation.

---

[3] In Exhibit A to Defendants' May 4, 2017 letter, the population of men in PSegI housing was reported as 80 persons. As of July 24, 2017, the population had risen to 88 persons.

[4] The Department also stopped sentencing 18 year olds to punitive segregation in June 2016 and stopped sentencing 19-21 year olds in October 2016.

[5] *See e.g. Comptroller Stringer: Violence in City Jails Continued to Soar, as Costs Climbed and the Inmate Population Dropped*, November 28, 2016, at https://comptroller.nyc.gov/newsroom/comptroller-stringer-violence-in-city-jails-continued-to-soar-as-costs-climbed-and-the-inmate-population-dropped/ ("While the number of inmates has decreased, the share of the population that are at a higher risk of violence has grown. The portion of inmates designated as "security risks" has increased from 8.2 percent in Fiscal Year 2014 to 13.3 percent in Fiscal Year 2016. Similarly, the share of inmates with a mental health diagnosis has grown steadily from 27 percent in Fiscal Year 2009 to 42 percent in Fiscal Year 2016"); *A Closer Look at Violence at Rikers Island Under Joe Ponte*, Courtney Gross, May 11, 2017, at: http://www.ny1.com/nyc/all-boroughs/politics/2017/05/11/rikers-island-violence-joe-ponte-time.html (" ...stabbings and slashings on the island have skyrocketed, increasing 32 percent when you compare the first nine months of this fiscal year to the same time period the year before. The same can be said about inmate fights, which increased 19 percent.")(last visited September 4, 2017); *NYC jails failing on slashings, stabbings despite millions spent to curb violence,* Reuven Blau, July 25, 2017, at: http://www.nydailynews.com/new-york/nyc-jails-failing-slashings-stabbings-millions-spent-article-1.3353445 ("The key metric used to measure jail safety has gone up for seven consecutive years. The majority of bloody battles were triggered by gang feuds, jail records show. Agency insiders blame the spike in violence on poor leadership, ineffective scanners and the lack of punishment for inmates")(last visited September 4, 2017).

[6] *Rikers Island Guards Sue NYC, Saying Policy Changes Have Led To Uptick In Violence*, April 21, 2017, at http://newyork.cbslocal.com/2017/04/21/rikers-guards-sue-nyc/ (last visited September 4, 2017); *Officers Blame De Blasio's Rikers Reforms for Increase in Violence*, Kaja Whitehouse, at: https://www.cobanyc.org/news/officers-blame-de-blasio%E2%80%99s-rikers-reforms-increase-violence (last visited September 4, 2017).

Defendants have an inherent interest in judging themselves to be compliant. But, Defendants do not have the track record of providing accurate information or meeting their obligations. With regards to cooling, Defendants have spent over a decade failing to bring forth a cooling plan, despite repeated orders from the Court to do so. At various times, Defendants have asserted that air conditioning in segregation units (specifically the CPSU) was not feasible. (*See e.g.* Tr. Conference May 17, 2007, at 14). This claim was subsequently tested by OCC's ventilation consultants and found to be untrue. (Lawless & Mangione, *Ventilation and Air Conditioning Study at Rikers Island*, New York, New York (Sept. 28, 2006) at 13). The consultant's report described how such a renovation could be feasibly accomplished for the estimated cost of $1.4 million. (*Id.*) On multiple occasions, when Defendants have been required to keep records and report on their own compliance, Defendants have been found to have falsified their reports to the Court, OCC and Plaintiffs. When the Defendants claimed that they were in compliance with the Court's orders to keep the jails clean and sanitary, OCCs' sanitation expert inspected the jails, along with Plaintiff's expert, and both testified to massive non-compliance. As mentioned above, in 2010 they misrepresented their compliance with an order to maintain their ventilation systems in working order. *See Benjamin v. Schriro*, 370 Fed. Appx. 168, 170 ("Since the 2001 Order was entered, the record shows a troubling pattern of noncompliance and misrepresentations on the part of the Department.") Most recently, DOC presented Plaintiff with an extensive fire safety proposal, which upon inquiry, turned out not to be an actual proposal approved by the agency. Their history of false reporting belie the claim that the agency can self-report with any degree of reliability.

As Judge Baer stated during the hearing "it really seems to me that these orders were relatively clear in 2004, and I don't think the city has actually complied with them." (Hr'g Tr. at 311). Defendants continue to provide no plan that ensures all individuals in punitive segregation will be housed in safe, air-conditioned housing. Defendants' motion to dismiss should be denied, and the Department should be ordered to make provisions for all individuals in punitive segregation, including if and when the population of "PSegI" prisoners exceeds the number of beds available during hot weather. In the alternative, the parties should be allowed to conduct limited discovery to confirm and evaluate the conditions as they have been represented by Defendants, and the status of any plans for expansion of locked-in housing areas to address the significant violence.

## Newly Minted Restrictive Housing Units Require Cooling

The Heat Orders mandated the provision of cooling and ventilation in punitive segregation housing. There was no definition of "punitive segregation units" in these orders as it was clear at the time that this referred to the Central Punitive Segregation Unit in OBCC, where individuals were locked into their cells for 23 hours a day. As Defendants state in their June 22 letter, it is only in the years since the evidentiary hearing that the Department has changed the manner in which inmates are held in punitive segregation. The first Enhanced Supervision Housing unit opened in February 2015. (*An Assessment of (Adult) Enhanced Supervision Housing* ("BOC Adult Assessment"), New York City Board of Correction, April 2017, at 3, available at http://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-

Reports/FINAL-BOC-ESH_Assessment-Adults-2017.04.26.pdf). Plaintiffs argue that the
cooling requirement for those in punitive segregation should apply to newly established
ESH housing, because the conditions in ESH, which is located in exactly the same building
as the former CPSU, are exactly those which placed individuals in the OBCC CPSU at
increased risk for heat-related illness. Failure to provide cooling for these areas constitutes
an ongoing violation that precludes the termination of the Heat Orders.

It can hardly be disputed that the conditions of the Enhanced Supervision Housing Units are
almost exactly those found in the CPSU as it existed at the time of the Heat Orders and the
May 20th hearing. The ESH is located in the same areas of OBCC that used to house the
CPSU, which was established through hearing testimony to place inmates at risk of heat-
related illness. These risks stemmed primarily from being isolated behind solid doors, with
little to no ventilation. Defendants argue the ESH is considerably different and not germane
to the motion, because inmates in the ESH are allowed out of cell for seven hours each day.
Plaintiffs believe that reliance on this statement is misplaced and misleading. Seven hours
out is still seventeen hours locked *in* a cell, often at the hottest hours of the day.[7] And
because heat-related illnesses can develop and progress quickly, the exact number of hours
that one is isolated behind the doors should not the defining measure of whether not
individuals are at risk.[8]

But in any event, ESH residents *are* in fact locked in their cells for 23 hours at a time—just
as they were when the area was called the CPSU.[9] As we noted in our May 31, 2017 letter,
the alternating lockout times in the ESH result in persons in ESH entry levels[10] spending **25**
consecutive hours locked in their cells every other day. (*See* chart, attached as Ex. 1).
Further, this 25 hour confinement occurs from noon until 1 p.m. the following day. This
means that every other day the people in ESH are in their cell for 25 hours in a row, two
hours more than those in punitive segregation, including the hottest hours of the day. (*See*

---

[7] Dr. Vassallo's expert testimony seems clear that isolation for less than 23 hours could still be considered a
risk of heat-related illness. In her 2004 Report, she wrote "it is difficult to conceive of an adequate solution
short of air-conditioning given the current physical structure of this part of the jail and the security concerns
generated by these inmates. Currently, these inmates are at grave risk during the environmental conditions of
the summertime temperatures. Further steps must be taken." *Riker's Island Jails and Heat Conditions:
Consultant's Report,* Susi Vassallo, M.D. July 23, 2004, at 14.

[8] Defendants' June 22 letter motion makes only passing mention of "PSegII", a punitive segregation unit also
in GRVC, which is not air-conditioned and where individuals receive 7 hours out of cell. According to
communications with the Board of Correction, as of July 25, 2017, there were 9 people in PSII. There are no
alternating shifts of lock out time in PSegII: all of the men are locked out from 5am -7 am and from 8am -
1pm. Defendants assert that the "directive [to provide cooling] applies only to "punitive segregation areas"
however, those in PSegII are, even by the most narrow definition, in punitive segregation.

[9] This seems to be the criteria that Defendants support as they state that the Heat Orders that Plaintiffs seek to
enforce were based on "the specific setting in which inmates in punitive segregation were then held" and "the
risk of high heat temperatures to inmates held in those specific conditions", namely "where prisoners are
locked in their cells 23 hours a day without air-conditioning." (Defs.' June 22 letter at 4.)

[10] For the purposes of this letter we have used the levels as described by the New York City Board of
Correction in its ESH Assessment Reports. Individuals in ESH levels 1, 2 and the Entry Unit for young adults
receive 7 hours out of cell, during which individuals in the Entry Unit and Level 1 are kept in restraints. *BOC
Youth Assessment* at 6; *BOC Adult Assessment* at 25, 27, 31. As Exhibit A to Defendants' May 4th letter
reflects, the majority of the individuals in ESH are in ESH Level 1 and Level 2.

Ex. 2, Nyquan English Aff. ¶20; *Id.*, Ismail Feddaoui Aff. ¶16 ("Due to the alternating nature of lockout hours, I often spend 25 continuous hours (from 12pm one day to 1pm the next) in my cell."); *Id.*, Manny Paulino Aff. ¶14 ("I find it extremely difficult to be in my cell for the 24 hour period in the cell between the 1pm lock out periods."); *Id.*, Shakeel Joseph Aff. ¶9.)

Exacerbating matters, "it is very unlikely that [those in ESH entry and Level 1] are provided or receive the full 7 hours of daily lock-out time."[11] (*An Assessment of Enhanced Supervision Housing for Young Adults*, ("*BOC Youth Assessment*"), New York City Board of Correction, July 2017, at 26, available at http://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2017.07.24%20-%20FINAL%20YA%20ESH%20Report%207.24.2017.pdf (last visited September 11, 2017)). Reductions in out of cell time occur due to frequent facility lockdowns and the fact that lock-out time often does not begin until 15-45 minutes after the designated start time, due primarily to staffing issues. (*BOC Adult Assessment* at 26; *BOC Youth Assessment* at 25). And these delays are more likely to occur in the mornings, at which time inmates have already spent 25 hours in their cell. Individuals we have spoken with report that the beginning of lockout periods are frequently delayed by an hour to ninety minutes. Quavon Harris said "lockout hours are supposed to be from 1pm to 8pm daily. However, most often we lockout after 2:30pm and lock-in at 8pm." (Ex. 2, Quavon Harris Aff. ¶12). Jahi Toussaint reported "We never lock-out on time. Every single day we lock-out at least thirty minutes late." (*Id.* Jahi Toussaint Aff. ¶19). Dante Hunter reported that staffing problems "often interfere with [their] lockout time, and it is rare that we receive the entitled 7 hours of lockout each day." Further, he said that a significant portion of the uses of force in ESH stem from staff attempts to reduce lockout time. (*Id.,* Dante Hunter Aff. ¶21.)

The likelihood of spending even more than 25 hours in cell increases even further due to facility-wide and ESH area lockdowns. During a lockdown, all incarcerated persons must be in their cell and all movement and programming cease. According to the Board of Correction (the "Board"), there is an average of 19 lockdowns in ESH per month, lasting an average of over 4.5 hours.[12] (*BOC Youth Assessment* at 26.) The individuals in ESH lose almost three hours a day of out-of-cell time due to lockdowns. *Id.*[13]

The Department says that though there is not air-conditioning in ESH, "other ameliorative measures" protect inmates from illness. Though they do not provide information on what

---

[11] The Board of Correction has found that "[f]or a variety of reasons, the lockout schedule, operational issues related to staffing and management, safety concerns and a general lack of engagement -- most young adults are spending nearly all day locked in their cells rather than the minimum 7 hours provided for under the ESH Standards." *BOC Youth Assessment* at iii.

[12] From September 2016 through March 2017, there was an average of 15 housing area lockdowns per month at 5 hours each. There was an average of four facility-wide lockdowns over the same period, averaging three hours each. *BOC Youth Assessment* at 26.

[13] Defendants' argument (June 22d Letter at 5) that ESH is a "far cry" from the CPSU environment because in the CPSU inmates could be "locked in 23 hours a day for months at a time", is without merit. Because of the rapid onset of heat related illness, being locked in for 25 or more hours every other day is not significantly different from being locked in for 23 hours every day.

they mean by "other ameliorative measures" it is likely that they are referring to those which were ordered by the Heat Orders to protect inmates from high temperatures. These included encouraging inmates to drink fluids liberally, encouraging inmates to take cool showers periodically, and, on high heat days (when the ambient temperature exceeds 85 degrees Fahrenheit), there was to be increased monitoring of inmates in the CPSU by staff, extra water and ice provided at every meal and prompt medical attention at any signs of heat exhaustion. (Order, July 26, 2004 ¶¶ 1, 7).

By all accounts, individuals in ESH are not receiving these ameliorative measures on high heat days and, even if they were to receive them consistently, they would be insufficiently protective against heat-related illness. For instance, Defendants note that although individuals in the ESH are shackled to a desk during their out-of-cell hours, the restraint desk allows persons in ESH to be "in full view of others" and that those restrained to a desk "get a daily shower." This does not adequately address Plaintiff's observation that the restraint desks prevent individuals from freely accessing showers; a daily shower, which requires the consent of a staff person who must unshackle the individual from the restraint desk, is not the same as free access. Further, there is evidence that individuals are not consistently receiving even one cool shower daily.[14] Nor are they consistently receiving ice. (*See, e.g.* Ex. 2, Vincent Hill Aff. ¶19 ("There is no air conditioning, and no cold water in the showers... Staff do not provide us with ice when it is hot.")). Defendants further note that medical staff perform "rounds" in ESH. But, it has become abundantly clear that individuals in ESH are not being adequately monitored. According to BOC findings, "most young adults [in ESH] are spending nearly all day locked in their cells rather than the minimum 7 hours provided for under the ESH standards." According to the BOC, there is usually only one round per day, around the time of the noon lock-in. (*BOC Adult Assessment* at 23). And these rounds may now be occurring less frequently because medical staff is reluctant to enter ESH units.[15] We also know that failure to take individuals to scheduled medical appointments is an increasing problem, due in part to staff shortages and court delays. (*Id.* at 23; *See also BOC Youth Assessment* at x.)

Even if individuals were receiving showers, ice and frequent medical rounds, it would be insufficient to reduce individuals' risk of heat-related illness. One daily shower simply will not protect ESH inmates from heat-related illness. Dr. Vassallo testified at the May 20th hearing that "it has never been proven - - and there has never been any article from the CDC or anybody else ... that said that ... when people get a shower every day, that is shown to be protective for heat stroke." (Hr'g Tr. at 35). And when Defendants speak of providing individuals with ice, they are usually referencing a cup of ice with meals. Dr. Vassallo has said that "the delivery of a cup of ice several times a day -- two, four or five --

---

[14] Included in Plaintiff's Reply Declaration in Support of Plaintiffs' Motion for Enforcement, filed April 14, 2014, were several statements from inmates in the CPSU stating that they frequently did not get a daily shower, and that the showers sometimes did not have cold water. One individual said that "Sometimes the guard will not take me or others because they don't want to. They just sit by the fan with towels over their heads trying to keep cool." John Boston Decl. at 3, n.1,3.

[15] *Medical staff afraid to treat Rikers Island's worst inmates; 'It's scary as hell,* Reuven Blau, March 14, 2017, at:http://www.nydailynews.com/new-york/medical-staff-afraid-treat-rikers-island-worst-inmates-article-1.2998118 (last visited on September 4, 2017).

is not going to prevent a heat stroke death or heat illness or worsening of other medical problems." (Hr'g Tr. at 45). She testified that when medical professionals use ice to treat heat stroke, they "put the ice all over your clothes … We pour the ice on them. … But simply having a cup with ice at lunchtime, that --- common sense tells me that is not enough to prevent heat stroke." (Hr'g Tr. at 36). The May 20th hearing testimony by Dr. Vassallo also established that infrequent rounds are not sufficient to detect heat-related illness, which can have a rapid onset. (Hr'g Tr. at 45-46). Similarly, while electric fans may provide comfort, they will not prevent heat-related illness when the temperature is in the high 90s. *See Tips for Preventing Heat Related Illness*, Center for Disease Control and Prevention, available at https://www.cdc.gov/disasters/extremeheat/heattips.html (last visited September 10, 2017); *see also Extreme Heat and Your Health, How Can You Prevent Heat Illness?,* New York City Department of Health ("In extreme heat, a fan alone may not provide enough cooling. If you use a fan, use it ONLY when the air conditioner is on or when the windows are open."), at http://www1.nyc.gov/site/doh/health/emergency-preparedness/emergencies-extreme-weather-heat.page (last visited September 10, 2017). And any relief fans might offer will not affect individuals from outside the solid doors in the CPSU cells. (Hr'g Tr. at 34).

It seems clear from the record that the conditions in OBCC's segregation units mandate cooling in the form of air-conditioning. Dr. Vassallo testified that the lack of access to an air- conditioned environment is "probably the most serious risk factor" for developing heat related illness. (Hr'g Tr. at 41.) "The lack of air conditioning is a very consistent cause or relationship with death from heat in this city." (*Id.*) Other ameliorative measures are simply not effective in preventing heat-related illness.

It is clear that individuals housed in ESH at OBCC are subject to the same risks as those who were housed in the CPSU at OBCC. They are housed in the same physical conditions, (cement blocks, heavy doors) and subject to long periods of isolation (25 consecutive hours every other day, and often more if there are lockdowns or other delays) that experts say place individuals at heightened risk for heat related illness. Ameliorative measures such as ice and showers are erratically provided and insufficient to reduce the risk of heat-related illness. The conditions of ESH are absolutely germane to a motion seeking to enforce orders intended to protect vulnerable individuals from the dangers posed by high temperatures in DOC facilities. Failure to protect these persons is a constitutional issue.

<u>The Heat Orders Should Not Be Terminated</u>

Plaintiff' Motion for Enforcement is not moot. Defendants have, over a 13 year period, repeatedly failed to comply with orders to cool segregation areas and have in fact created new housing that places inmates at particular risk for heat-related illness. There exists an ongoing violation of the rights of individuals in ESH housing. As for Defendants' assertion that "all inmates held in 23 hour punitive segregation lock in are in air conditioned housing during high heat days", the Court should not rely on the word of Defendants' counsel. The remaining portion of the Heat Orders intended to protect inmates in DOC custody from the dangers of high temperatures should not be terminated before a complete factual record can be presented to the Court. As such, limited discovery is necessary. Plaintiffs respectfully

request leave to engage in such discovery regarding the conditions in PsegI, PSeg II, and ESH, and the number of individuals held in these conditions, and to obtain an expert opinion on the risk posed to the individuals living under these conditions.

Very truly yours,

MARY LYNNE WERLWAS
VERONICA VELA
DALE WILKER

Attorneys for Plaintiffs

cc: Chlarens Orsland, Esq.
    Heidi Grossman, Esq.
    John H. Doyle, III, Esq.

# EXHIBIT 1

**Enhanced Supervision Housing Time Out of Cell (Lock-Out/Lock-In)**
Exhibit 1

