

Prisoners' Rights Project
199 Water Street
New York, NY 10038
T (212) 577-3530
www.legal-aid.org


Blaine (Fin) V. Fogg
*President*


Janet E. Sabel
*Attorney-in-Chief*
*Chief Executive Officer*


Mary Lynne Werlwas
*Director*
Prisoners' Rights Project

<u>**VIA ECF ONLY**</u>

October 2, 2019


Hon. Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007


Re:     *Benjamin v. Brann*, No. 75-CV-3073 (LAP)
        Supplementing evidentiary record regarding pending cross-motions


Your Honor:


      Plaintiffs write to supplement the evidentiary record on the pending cross-motions regarding enforcement of Court orders that require cooling for persons confined in segregation areas of the City jails on high-heat days. (*See* ECF No. 668 (indexing outstanding motion papers)). We specifically write to follow up on plaintiffs' letter dated July 22, 2019 (ECF No. 673), which concerned the Heat Emergency of July 19-21, 2019.


      The cross-motions concern conditions for class members held in the Otis Bantum Correctional Facility's so-called Enhanced Supervision Housing ("ESH"). As the Court is aware, the Department confines individuals in ESH in solitary confinement behind solid doors for periods averaging 17 hours per day, but extending up to 25 or more hours every other day. Evidence adduced during the hearing before Judge Baer showed that solid cell doors hold heat, block cross-ventilation, and prevent meaningful monitoring of persons languishing behind them, making it unlikely that a person in distress will be noticed. (Hr'g 34-36, 41). For those reasons, even healthy individuals are at "extreme risk" of heat stroke and other heat-related illnesses if they are confined "behind a solid door" for hours on end. (Hr'g. Tr. 39).


      Against this backdrop, on September 9, 2019, the New York City Board of Correction ("BOC") issued its Final Report about the operation of the City jails during the Heat Emergency. In important respects relevant to the cross-motions, the BOC report confirmed our fears about conditions in ESH. The BOC's report shows that during the Heat Emergency, ***temperatures in ESH housing units reached 97.8 degrees***. *See* New York City Board of Correction Final Report and Recommendation, NYC Jail Conditions and Operations during July 2019 Heat Emergency, at 3,


**Justice in Every Borough.**

available online at https://on.nyc.gov/2nGgmE2 (last visited Oct. 2, 2019) and attached as Exhibit 1.[1]
When coupled with the evidence adduced at the hearing, this evidence confirms that during high-heat days, the Department subjects persons confined in ESH to unacceptably high risk of heat-related illness, in violation of their rights under the Fourteenth Amendment.

Weather reports indicate that even today, in early October, temperatures are expected to reach 90 degrees. We are therefore gravely concerned about the health of class members who the Department has chosen to confine in ESH, behind solid cell doors without access to air-conditioning or meaningful ameliorative measures. These class members require relief. We therefore ask the Court to grant plaintiffs' motion for enforcement, which has been pending since 2014, as soon as possible.

We thank the Court for its prompt attention to this most serious matter.

Respectfully submitted,

/s/

Mary Lynne Werlwas
Veronica Vela
Dale Wilker
Robert M. Quackenbush

*Counsel for plaintiff class*

cc:     All counsel (via ECF)

---

[1] We note that the information contained in the BOC report is admissible under Rule 803(8) of the Federal Rules of Evidence, the hearsay exception applicable to public records. *See Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991) (noting that government investigatory reports are "presumed to be admissible in the first instance" under F.R.E. 803(8)).

**Justice in Every Borough.**

# Exhibit 1

September 2019



**NYC Board of Correction**

## NYC Jail Conditions and Operations during July 2019 Heat Emergency
## <u>Final Report and Recommendations</u>

On July 18, 2019, Mayor de Blasio declared a heat emergency commencing Friday, July 19 at 9 AM through Sunday, July 21 at 11:59 PM ("heat emergency"). To monitor conditions and operations in the jails during this period, the Board of Correction ("BOC" or "Board"), New York City's independent jail oversight agency, conducted unannounced tours of three jails on July 20 and July 21[1] and released a public statement of its findings and preliminary recommendations on July 22 ("Public Statement").[2] During its tours, BOC spoke with people in custody, Correction Officers, and facility leadership. Board staff followed up with document and information requests directed to the Department of Correction ("DOC" or "Department") and Correctional Health Services ("CHS"). Based on its first-hand observations and document/information review, the Board makes the following recommendations in four key areas: (i) daily temperature monitoring; (ii) heat-sensitive people in custody; (iii) restrictive housing areas such as Punitive Segregation and Enhanced Supervision Housing (ESH)[3]; and (iv) short- and long-term action to mitigate heat risks.

## I.      <u>Daily Temperature Monitoring</u>

Department policy dictates that when a housing area reaches temperatures above 80 Fahrenheit — regardless of the outdoor temperature — DOC facilities must take "prompt remedial measures." These measures, designed to minimize heat risks, are: (i) unlimited access to cool showers; (ii) ice

---

[1] BOC staff toured six (6) housing areas: two non-air-conditioned housing areas at the Otis Bantum Correctional Center (OBCC) (on Rikers Island) and Brooklyn Detention Center (BKDC) (a borough jail), and one non-air-conditioned and one air-conditioned housing area at the Anna M. Kross Center (AMKC) (on Rikers Island). BOC also toured the clinic in each of the three jails.

[2] New York City Jail Conditions and Operations During Heat Emergency July 19-21, 2019, https://www1.nyc.gov/assets/boc/downloads/pdf/News/Final%20Public%20Statement%20re%20Heat%20Emergency%20-%20Released%207.22.19.pdf

[3] PSEG is a housing unit for adult people in custody (i.e., age 22 or older) who have been adjudicated guilty of a DOC rule violation. According to a recently enacted rule of the New York State Commission of Correction (SCOC), people housed in PSEG must be afforded four (4) hours of daily lock-out (subject to a safety/security exception). The Restrictive Housing Unit ("RHU") is a punitive segregation unit for some adult people in custody with mental health needs (but not diagnosed with a serious mental illness). Enhanced Supervision Housing ("ESH") houses adult and young adult people in custody who pose a significant threat to the safety and security of the facility if housed elsewhere. People housed in ESH are afforded seven (7) hours of daily lock-out and can earn additional lock-out time upon their progression to less restrictive housing levels within ESH. The Secure Unit ("Secure") is a housing area for young adults in custody (ages 18-21), who pose a significant threat to the safety and security of the facility if housed elsewhere. Young adults in Secure have the opportunity to progress through three phases, each of which provides for incremental increases in daily out-of-cell time from ten (10) hours in Phase I, to twelve (12) hours in Phase II, to fourteen (14) hours in Phase III.

deliveries in the afternoons (extra ice must be provided to restrictive housing units (e.g., PSEG and ESH,)); (iii) two fans per housing area; and (iv) heat alert posters advising what precautions to take to prevent heat-related illness. DOC must also maintain housing areas for heat-sensitive people at temperatures below 80 Fahrenheit.

DOC policy further requires that each jail take daily temperature readings in all medical and mental health areas, all occupied air-conditioned housing (except Manhattan Detention Center, Vernon C. Bain Center, and the 800-bed addition at the Rose M. Singer Center where temperatures must be taken in 20% of housing areas), and Rose M. Singer Nursery (when occupied). Each facility is required to document daily temperature readings in several locations in each sample area (e.g., the front, middle, and back of a dormitory housing area) and document the housing area type (e.g., General Population, Mental Observation, etc.), whether the area has air conditioning, and the number of heat-sensitive people housed in the sample area. Each jail must collect this information daily regardless of the outdoor temperature and report this information in a Daily Temperature Monitoring Report ("Report").

While the Department does not collect temperatures in most non-air-conditioned housing areas throughout the jail system, DOC advises that it takes temperatures in air conditioned housing areas to ensure that the air conditioning is working properly and maintaining temperatures below 80 Fahrenheit.  The Department does not take temperatures in non-air conditioning because it automatically implements cooling procedures based on outdoor temperatures for those units. Thus, the Reports do not include a full sample of housing areas, but do reflect the most comprehensive reporting of temperatures.   The highest temperatures recorded over the heat emergency are reflected below:

| Facility[4] | Highest Temperature (Fahrenheit)[5] | Date[6] | Housing Area Sample Type[7] | Whether Sample Area Has A/C[8] | Number of Heat-Sensitive People Housed in Sample Area[9] |
|---|---|---|---|---|---|
| Anna M. Kross Center (AMKC) | 85.9 | 21-Jul | Mental Observation | Yes | 0 |
| Brooklyn Detention Center (BKDC)[10] | 74.5 | 20-July and 21-July | Clinic | Yes | N/A |

---

[4] The high temperature reading at Horizon Juvenile Center was 82 Fahrenheit on July 19 in the Main Clinic. The NYC Administration for Children's Services (ACS) manages Horizon's building operations.

[5] The "Highest Temperature" is the highest temperature recorded over the three-day heat emergency.

[6] The "Date" is the day on which the highest temperature was recorded.

[7] "Housing Area Type" is the type of housing area sampled with the highest recorded temperature.

[8] "Whether Housing Area Has A/C" indicates whether the sampled area has air-conditioning.

[9] "Number of Heat-Sensitive People Housed in Sample Area" refers to the number of heat-sensitive people in custody housed in the sample area.

[10] BKDC does not have any air-conditioned housing areas nor any mental health or medical housing areas so the only temperature monitoring required is of the main and mental health clinics.

| Facility | Highest Temperature (Fahrenheit) | Date | Housing Area Sample Type | Whether Sample Area Has A/C | Number of Heat-Sensitive People Housed in Sample Area |
|---|---|---|---|---|---|
| Eric M. Taylor Center (EMTC) | 91.4 | 21-Jul | Not Reported | No | Not Reported |
| George R. Vierno Center (GRVC) | 90 | 20-Jul | Punitive Segregation | Yes | Not Reported |
| North Infirmary Center (NIC) | 81.9 | 20-Jul | General Population | Yes | Not Reported |
| Manhattan Detention Center (MDC) | 78.1 | July 21 | General Population | Yes | 0 |
| Otis Bantum Correctional Center (OBCC) | 97.8 | 21-Jul | ESH | No | 0 |
| Rose M. Singer Center (RMSC) | 92.5 | 21-Jul | General Population | No | 0 |
| Robert N. Davoren Center (RNDC) | 95.8 | 21-Jul | General Population | No | 1 |
| Vernon C. Bain Center (VCBC) | 83.5 | 21-Jul | General Population | Yes | Not Reported |
| West Facility (WF) | 78.1 | 20-Jul | Urgicare | Yes | N/A |

BOC also discovered a significant inconsistency in how DOC and CHS define a "heat-sensitive" housing area. As noted above, DOC defines a "heat-sensitive" area as one where the temperature is below 80 Fahrenheit. CHS policy, however, defines heat-sensitive housing as areas that do not exceed 88 Fahrenheit, and requires that medical staff monitor patients for signs and symptoms of heat disorders when the outdoor temperature reaches 85 Fahrenheit.[11]

## Recommendations

- During high heat days, the Department should collect temperatures in a sample of non-air-conditioned housing areas in each jail. The Department should monitor these temperatures to identify housing areas or cells that are particularly hot as to be uninhabitable such that no person should be housed in the cell.
- The Department should develop an electronic data-tracking system for the systematic collection of the important heat-related information recorded in the Daily Temperature Monitoring Reports. The electronic system would go a long way toward ensuring comprehensive and accurate reporting and that DOC and CHS take appropriate action in response to a heat emergency.
- Pending development and implementation of an electronic tracking system, DOC should train its staff to monitor jail temperatures and produce comprehensive and accurate Reports.
- DOC and CHS should work together to create a shared definition of the temperature at which action is taken to mitigate heat risks.

## II.     Heat-Sensitive People in Custody

On July 19, DOC leadership reported to the Board that, in advance of the heat emergency, they had undertaken significant efforts to house as many heat-sensitive people as possible in air-conditioned housing units. These are people who medical staff have deemed particularly at risk for heat-related illness (e.g., older adults, people on particular medications, people with severe asthma). While the Board appreciates the Department's efforts to move some heat-sensitive people prior to the heat emergency, BOC staff received complaints from heat-sensitive people in custody who were not offered the opportunity to move to air-conditioned housing.

Prior to the heat emergency, the Board requested a list of all heat-sensitive people in custody who were not housed in air-conditioned housing. Due to technical difficulties, the Department did not produce this list to the Board. The Department subsequently provided the Legal Aid Society Prisoners' Rights Project with notice that, as of July 30, 2019, there were 505 heat-sensitive people not housed in air-conditioned housing. This includes 163 people who refused to move to air-conditioned housing, 192 who received "authorized security overrides" to be housed in non-air-conditioned housing, and 150 people who neither refused to move nor received overrides.

On July 19 and 21, 2019, instead of the requested lists, the Department did provide BOC with daily lists of heat-sensitive people in each facility — i.e., 140 individuals system-wide — who were *not* housed in heat-sensitive housing and had not signed refusals or received "authorized security overrides" ("daily list").[12] In the three jails toured on July 19-21, BOC found that facility

---

[11] In this Report, the term "high-heat days" refers to when the temperature in a housing area is above 80 Fahrenheit.

[12] System-wide, there were 1858 heat-sensitive people in custody on August 17. As of August 17, this list totaled 414 heat-sensitive people in custody who were not in air-conditioned housing. Of the 414 heat-sensitive people not in air-

4

leadership did not have the daily list for their facility and, thus, were unaware of heat-sensitive people in non-air conditioned housing areas. Upon Board staff providing a list, facility leadership reviewed it to see if any of these individuals could be moved.

According to DOC, some heat-sensitive people cannot be moved to air-conditioned housing for safety/security reasons, while others voluntarily refuse to move. The Department reports it is developing a process to document and track DOC determinations that a heat-sensitive person cannot be moved due to safety/security concerns. The process calls for facility leadership to prepare a Heat-Sensitive Override Request Form ("Override Form") stating the reasons why the person cannot be transferred to an air-conditioned housing area. The process further calls for DOC to forward the Override Form to DOC's Health Affairs Division ("Health Affairs"), which in turn must notify CHS.

If a heat-sensitive person refuses to move to an air-conditioned housing area, CHS policy requires that the person undergo consultation with a clinic doctor, who explains the potential health risks of refusing heat-sensitive housing. If the person still declines a transfer, they are required to sign a Patient Refusal of Treatment form, and CHS notifies DOC of the patient's refusal.

**Recommendations**
- The Department should immediately move every heat-sensitive person in custody to air-conditioned housing, unless the person voluntarily refuses to move. In what should be a rare exception — when DOC cannot immediately move a heat-sensitive person due to safety/security concerns — facility leadership should fill out the Override Form and review re-housing options daily.
- Additionally, DOC Health Affairs should provide facility leadership with a daily list of all heat-sensitive people in their respective facilities who are subject to a heat-sensitive override. During high-heat days, the Department should assign one staff person per facility to tour and monitor heat-sensitive people housed in non-air-conditioned units, consider re-housing options for them, ensure they are monitored for heat-related illness, and are given ice and access to cold showers. The Department should also provide this daily override list to CHS and the Board.
- Heat-sensitive people housed in non-air-conditioned units should have access to CHS at least two times each high-heat day. This may include CHS staff rounds to the housing area or DOC escorting people to the clinic.
- Heat-sensitive employees of DOC should have the option of working in air-conditioned housing areas on high-heat days.

### III.   People in Restrictive Housing
People in restrictive housing, such as PSEG and ESH, are allowed significantly fewer hours out-of-cell each day than people housed in general population (see note 3, above). As a result, they have significantly fewer opportunities to cool off by, e.g., sitting near a fan in the dayroom or taking a cool shower. Moreover, cells are generally hotter than dayrooms or other common areas, and fans do not circulate air into cells with solid doors, as in PSEG and ESH.

---

conditioned housing, DOC reports that 247 refused to be moved (refusal signed in front of CHS physician) and 143 had a security override for housing.

As reported in the Board's public statement and in the above table, during the heat emergency, ESH units were some of the hottest housing areas in the jail system — the temperature of an ESH cell on July 22 reached 97.8 Fahrenheit. There are eight ESH housing areas and none are air-conditioned. People in ESH were allowed unlimited showers during their seven (7) hours of daily lock-out; however, they were not allowed showers during their 17 hours of daily lock-in due to DOC safety concerns. Although PSEG housing units at GRVC and RMSC are air-conditioned, a PSEG cell at GRVC on July 20 reached 90 Fahrenheit. People in PSEG are allowed one shower per day, regardless of outside or cell temperatures.

**Recommendations**
- The Department should move all ESH units to air-conditioned housing areas or install air conditioning in the current ESH units. Until then, DOC should move all heat-sensitive people in ESH to air-conditioned units during high-heat days.
- If a cell in PSEG, ESH, or other restrictive housing is above 80 Fahrenheit, the Department should immediately cease using this cell until the temperature drops below 80 degrees.

## IV.    Remedial Action

### ►Immediate Steps
During its jail tours on July 20-21, BOC staff found housing areas with warm-to-hot showers and housing areas that had run out of ice. While all housing areas toured had at least two fans, the fans in some areas were ineffective at circulating air. In response, DOC placed additional fans in a number of units that weekend and BOC staff reported noticeable differences in comfort levels in those units on Monday, July 22. Additionally, the Department cancelled the afternoon lock-in count for all housing areas on Sunday, July 21, which allowed people to remain out-of-cell (where it was cooler) for an additional hour during the day.

Throughout the weekend, DOC communicated its extreme heat protocol and remedial measures to the public and to the Board. This included regular communication with BOC staff, public messages via Twitter, and phone calls with advocacy organizations. The Department has since published its heat protocol on its website.[13]

**Recommendations**

DOC should:
- Install additional fans throughout all non-air-conditioned units. When two fans are not sufficient to circulate air throughout the entire housing area, DOC should install more than two fans. If more fans cannot be installed due to a shortage of electrical outlets, DOC should install additional outlets. The Department should ensure this work is completed before next summer.
- Take temperature readings of the showers immediately prior to anticipated high-heat days and during high-heat days.
- Increase ice deliveries so that ice is delivered to housing areas (and directly to people in their cells, as necessary) consistently throughout the day and evening hours. To the

---

[13] DOC Extreme Heat Protocol, posted on the Department's website on July 27, 2019, https://www1.nyc.gov/site/doc/media/second-heat.page

extent ice deliveries are limited by the capacity of jail ice machines to generate enough ice to meet demand, DOC should ensure backup ice is available in the NIC storage freezer and staff and vehicles are available to transport ice, as needed. If NIC back-up ice cannot meet jail demands, particularly at borough jails, DOC should consider a contract with a vendor who could provide ice delivery, as needed, in an emergency.

- Ensure maintenance staff is on-site or on-call during weather emergencies to support remedial efforts (e.g. install additional fans or change shower temperature).
- Formalize the suspension of daytime lock-in for count during high-heat days except when security concerns militate otherwise.
- Prior to anticipated high-heat days, post information in each housing area to educate people in custody and staff about precautions to prevent heat-related illness. DOC should also formalize its public communication process during heat emergencies (e.g. social media, website, phone calls with advocates, etc.) for consistent communication during emergencies in the future.

►**Longer-Term Measures**

While the Board recommends that DOC take immediate action outlined above to mitigate heat-related risks, the ultimate problem is inadequate infrastructure: there are not enough air-conditioned housing areas for the number of people currently detained. Jail areas without air conditioning are too hot and the mitigating responses are too limited, despite concerted efforts by DOC leadership, Correction Officers, and other staff who work in the jails. People should not be detained or required to work under these conditions, which are inhumane, pose health risks, and make DOC's violence prevention efforts more challenging.

On July 26, 2019, DOC reported 288 open housing units that hold 10,687 beds.[14] Forty-two (42) percent of these beds (n=4,450) are in air-conditioned housing areas. Even in units with air conditioning, the temperature was not always below 80 Fahrenheit. For example, at AMKC (the largest jail and the one with the most mental health units) over July 19-21, 19% of sampled cells had temperatures above 80 Fahrenheit (24 of 146 cells sampled). The air conditioning in dormitory-style housing fared better, as only one housing area (of 78 sampled) during this period reported temperatures above 80 Fahrenheit.

**Recommendations**

- The City should intensify efforts to decrease the jail population, as July's heat emergency (and extreme temperatures in the jails over summers and winters throughout prior decades[15]) makes clear the lack of capacity to ensure humane conditions for all people in custody and all people who work in the jails.
- The Board urges the City to consider capital spending now to expand air conditioning in the jails. A cost analysis for such expansion should be completed as soon as possible.

---

[14] The DOC unit and bed population numbers were taken from the 07-26-2019 DOC Master Bed Utilization Plan. The Department provided BOC with the number of air-conditioned units referenced above.

[15] See Board of Correction discussion of cold and hot jail temperatures in, e.g., January 1982, October 1988, January 1990, July 1994, June 1999, December 2003, September 2004, September 2005, July 2008, July 2012, July 2013, July 2014, and September 2016. The Board has received additional comments from people in custody and advocates in e.g. April 2007, July 2014, July 2017, and November 2017,

- People in custody and staff reported cold temperatures in the jails this past winter and in previous winters.[16] The Department should review and test its cold-weather emergency and storm plans sufficiently in advance of the winter months to ensure preparedness.

**Acknowledgments**

The Board of Correction thanks DOC and CHS staff in the jails for their commitment and professionalism during the July 19-21 heat emergency. The Board appreciates that DOC leadership was responsive to the Board's findings and concerns in advance of and throughout the weekend. The Board also thanks our monitoring staff for their contributions to this report and their continued vigilance monitoring conditions in the jails on behalf of people in custody and those who work in the jails.

---

[16] See, e.g., Christmas in Rikers Is Extremely Cold, December 21, 2017, The Brian Lehrer Show, https://www.wnyc.org/story/christmas-rikers-extremely-cold/.