UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES BENJAMIN, et al.,

   Plaintiffs,

- against -

WILLIAM J. FRASER, et al.,

   Defendants.

---

75 Civ. 3073 (HB)

ORDER ON:
ENVIRONMENTAL
CONDITIONS

Hon. HAROLD BAER, JR., District Judge:

## INTRODUCTION

In 1975, pretrial detainees in certain New York City jails brought seven related class actions alleging that the conditions of their confinement violated their constitutional rights. Unlike convicted and sentenced prisoners, pre-trial detainees have not been found guilty of any crime. In 1978-79, the City of New York ("City") and plaintiffs' counsel entered into consent decrees to address and remedy those conditions of confinement. The consent decrees spanned more than 30 discrete areas of prison administration. In 1982, the consent decrees were consolidated for enforcement before the Honorable Morris E. Lasker who ordered, pursuant to the agreement between the parties, the creation of a monitoring agency called the Office of Compliance Consultants ("OCC"). Since 1982, OCC has continuously monitored compliance with the consent decrees.

As of May 2000, 25 years after the plaintiffs class brought suit and 18 years after the creation of OCC, the City has failed to comply with significant aspects of the consent decrees, and conditions at New York City jails continue in certain respects to violate basic constitutional standards. That fact notwithstanding, since the signing into law of the Prison Litigation Reform

Act ("PLRA") in 1996, the City has vigorously maintained that it is capable of, and alone responsible for, ensuring that the conditions in the jails comply with minimal constitutional standards. Pursuant to the PLRA, on May 8-10 and May 15-17, 2000, the Court held hearings sought by the plaintiffs on environmental conditions – one of the discrete areas of prison administration addressed by the consent decrees – to determine if the conditions present in time gone by remain "current and ongoing" constitutional violations today.

On January 9, 2001, this Court found that 25 years had not been time enough, and that while certain conditions for pre-trial detainees had improved, the Court could only partially grant the motion of the City and the Department of Correction (the "Department"), et al (collectively, the "defendants"), to terminate the environmental health provisions of the consent decrees. On March 22, 2001, this Court issued a supplemental opinion in response to plaintiffs' and defendants' motions for reconsideration. Sadly, in both the January 2001 and the March 2001 opinions, this Court found that New York City jails did in fact continue to have numerous "current and ongoing" environmental violations. Specifically, this Court found violations at: the Adolescent Reception and Detention Center ("ARDC"), the Anna M. Kross Center ("AMKC"), the George Motchan Detention Center ("GMDC") and the Rose M. Singer Center ("RMSC"); the James A. Thomas Center ("JATC"); the George R. Vierno Center ("GRVC"); the North Infirmary Command ("NIC"); Otis Bantum Correctional Center ("OBCC"); the Manhattan Detention Center ("MDC"); the Brooklyn House of Detention ("BKHD") and the Queens Detention Center ("QHD").

In connection with the January 9, 2001 opinion, the Court requested recommendations from the parties on how to remedy the "current and ongoing" violations identified in the opinion.

2

The Court made a similar request in connection with the March 22, 2001 opinion. In an effort to close the gaping chasm between the parties' recommendations, the Court held a conference in Chambers, and later solicited jointly agreed upon text for the remedial order. While the parties were able to find some common ground, the City's objection to the continuation of OCC and its insistence that existing or proposed Department initiatives obviate the need for any additional relief, prompted this Order. Given this 25 year history of inattention and at least partial failure, defendants' proposal that this Court dismiss the external monitor and entrust defendants with the restoration of constitutionally permissible environmental conditions cannot be credited.

Therefore, it is hereby

**ORDERED** that:

*Monitoring, Inspections & Implementation Framework Under OCC*

1. The OCC will oversee the establishment and monitoring of environmental conditions in the City's jails as specified in this Order.

2. The OCC staff shall include, at a minimum, a director ("OCC Director") and a Deputy OCC Director. The Court must approve the selection of the new OCC Director, and will independently select the OCC Director if the parties fail to promptly agree upon a mutually acceptable candidate. The OCC Director shall select his/her Deputy. The OCC Deputy Director will be responsible only to the OCC Director, and the OCC Director will determine what functions the Deputy OCC Director will perform as well as the qualifications of such person. The OCC Director and the Deputy OCC Director shall be provided with reasonable compensation by the City that is commensurate with the responsibilities and time requirements of the positions. As provided in ¶13d of this Order, the OCC Director may, subject to Court approval, enhance its

3

staff to fulfill OCC's temperature monitoring obligations. Defendants shall promptly provide the OCC Director with necessary secretarial and clerical help, office space of adequate size and privacy preferably on Rikers Island, and sufficient equipment and supplies. Should OCC find that it requires additional resources, it will submit requests in writing to the parties and the Court.

3. Under the direct supervision of the OCC Director, defendants shall continue to employ in each affected jail one or more persons, who shall be either civilians or correction officers of the rank of captain or above (who shall for purposes of this Order be referred to as an "<u>environmental health officer</u>" ("OCC-EHO")) and who shall have direct responsibility for maintaining environmental conditions in compliance with the terms of this Order.

    a. The environmental health officers shall have had or shall be provided with appropriate training and experience in environmental health and maintenance, and shall have completed the EHO certification course referred to in Directive 3900. The OCC-EHO officers responsible for medical areas will receive training regarding the special sanitation and infection control requirements of these medical areas by August 1, 2001. The Department will present the curriculum for this training to the Court and to plaintiffs' and defendants' counsel by July 2, 2001.

    b. The environmental health officer shall make a thorough inspection of the entire institution in the course of each week and shall make more frequent inspections when necessary to respond to particular problems -- e.g., inmate complaints. The OCC-EHO will accompany the Department of Health representative during that representative's inspection of medical facilities. (See ¶5c.)

    c. The environmental health officer shall submit to the warden and to the OCC Director reports of all such inspections, including a description of any ameliorative actions taken,

4

planned or recommended. The records shall be preserved and provided to plaintiffs' and defendants' counsel and to the Court on a quarterly basis, or more frequently if requested by the Court.

4. The Department of Correction shall employ sufficient numbers of <u>Public Health Sanitarians</u> to ensure of weekly inspections all facilities as well as weekly reports of deficiencies, in accordance with the requirements of Directive 3900.[1] The OCC Director and Department of Correction shall jointly determine the number of public health sanitarians within 45 days of the hiring of the OCC Director, any impasse to be resolved by the Court. The Public Health Sanitarians shall serve under the direct supervision of the Department's Director of Environmental Health, but shall also provide reports on a regular basis to the OCC Director with respect to environmental conditions that are the subject of this Order.[2]

   a. Department of Correction public health sanitarians, with training in the inspection of inspecting medical facilities, shall inspect the medical areas weekly. These inspections shall ensure that the clinics are maintained consistent with infection control guidelines promulgated or adopted by the New York City and/or State Department(s) of Health. The deficiencies noted by the sanitarians shall be abated or reported.

---

[1] Although the job description and qualification requirements vary to some degree among employers, a public health sanitarian for purposes of this Order is a college educated professional, with a substantial number of credits in the biological and/or physical sciences, who has undergone significant additional job-specific training. By contrast, OCC-EHO's, required by ¶3 of this Order, shall be Department of Corrections' employees who have completed a shorter EHO training course, as provided in Directive 3900. Inspectors of the Department of Health, discussed in ¶7 of this Order, are public health sanitarians employed by the City Department of Health, as opposed to the City Department of Corrections.

[2] Thus, the public health sanitarians shall report to the OCC Director on sanitation, temperature, ventilation, heating, lighting, and the conditions of the clinics and medical areas at those jails where this Court found "current and ongoing" violations.

5. The commanding officer of each facility shall ensure that all Area Captains[3] receive copies of the weekly Public Health Sanitarian reports for their areas of responsibility. Each Area Captain shall be responsible for ensuring that all sanitation violations cited on the Public Health Sanitarian reports are abated during the tour on which they are reported and that work orders are written for all maintenance related violations.

6. The Department of Health of the City of New York ("DOH") shall continue to thoroughly inspect each jail at least once every month and at more frequent intervals when required by the OCC Director.

   a. The Department of Health shall submit to the OCC Director reports of all such inspections, and the Department of Corrections shall provide the OCC Director with a description of any ameliorative actions taken, planned or recommended. Said reports shall be preserved and provided to plaintiffs' and defendants' counsel and to the Court on a quarterly basis, or more frequently if requested.

   b. The DOH representative may order the immediate abatement of conditions that he/she finds pose immediate and significant threats to the health of detainees or staff. All other violations that the DOH inspector identifies and makes known to the facility at the time of the inspection shall be brought to the attention of the Area Captain who will ensure that the conditions are abated or reported consistent with the requirements of ¶5 of this Order.

   c. DOH inspectors who inspect medical areas will have training in the sanitation and infection control requirements for medical facilities. The OCC-EHO will accompany the DOH

---

[3] An "Area Captain" is a Department employee under the supervision of the Department who is responsible for a specific geographical portion of a jail. The responsibilities of an Area Captain include environmental conditions in his/her assigned area. An Area Captain is not an OCC-EHO officer, though OCC-EHO officers often have the rank of captain.

6

representative during this inspection. The DOH representative will perform the inspection in accordance with the DOH inspection guidelines for medical facilities in effect at the time of the inspections.

p.29

7. To facilitate monitoring compliance with the terms of this Order and other orders in this litigation governing jail conditions, attorney visits and red ID status: (1) plaintiffs' and defendants' counsel shall be permitted to confer in confidence with any individual detainee and with the inmate council; plaintiffs' and defendants' counsel shall also be permitted to confer in confidence with other groups of detainees, subject to security concerns, and (2) plaintiffs' and defendants' counsel and/or experts, upon further order of this Court, and subject to security concerns, may have access to any area of the institution for the purpose of observing compliance with this Order.

8. The OCC Director will provide reports to the Court, with copies to plaintiffs' and defendants' counsel, concerning environmental conditions at the facilities subject to this Order, on the first business day of January, May, September of each year.

9. The Court is agreeable to any directive not inconsistent with this Order and believed by the Department to advance continuing compliance with this Order. Any such directive shall not delay or interfere with the timetables set forth herein.

10. Modulars: The modulars, aside from those aspects addressed herein will be the subject of a supplemental hearing to be held as soon as conveniently possible. A pre-trial conference is scheduled for May 3, 2001; call Chambers for a time.

*Sanitation* p. 14, p. 30

11. Defendants shall provide for the following at AMKC (except for the medical areas), ARDC, GMDC, RMSC, JATC, GRVC, NIC, OBCC, MDC, BKHD, QHD:

a. Shower facilities, janitors' closets, laundry areas, and toilets, washbasins, sinks and other personal hygiene and sanitation facilities, such as urinals and infant changing tables, in common areas throughout the institution, shall be thoroughly cleaned and sanitized at least once daily and more often if necessary. Showers shall be power washed with a bleach solution quarterly.

b. The Defendants shall submit a complete list of the shower replacement schedules to OCC and the Court by July 2, 2001, with completion dates for the work, which dates shall not extend beyond August 1, 2002.

c. Every living area (cells, dormitory and modular sleeping areas, and showers/bathrooms and dayrooms in each of these units) shall be thoroughly cleaned and sanitized each week. Defendants shall modify their directive on housekeeping to require these weekly cleanings and the plan for ensuring that they occur.

d. Every cell shall be thoroughly cleaned and sanitized upon becoming vacant, shall be kept clean of garbage and debris while vacant, and shall be inspected prior to reoccupancy to ensure that it is cleaned and sanitized. "Cleaning and sanitizing" shall include: promptly replacing damaged mattresses (and in any case before the bed or cell is occupied by another prisoner); sanitizing mattresses before a new inmate is placed in the cell or on a bed in a dormitory; repairing or replacing damaged or obscured light shields; cleaning of ventilation registers; and repairing or replacing damaged radiators and radiator covers.

e. Defendants shall provide each detainee with a mattress that has been cleaned

8

and sanitized after use by another inmate. Mattresses shall not be used if their covers are missing or have rips, holes, or tears.

  f. Each housing area shall have an adequately ventilated janitor closet equipped with a sink, or accessible to a sink, and shall have an adequate supply of cleaning implements and supplies, accessible to all detainees, so that each detainee can clean his cell daily and so that common areas of the housing blocks can also be cleaned.

  g. All cleaning implements shall be cleaned thoroughly after each use and stored in a clean, adequately ventilated place.

13. Each inmate shall be provided with a suitable food storage container, with tight-fitting cover.

## Temperature and Temperature Monitoring

14. The following monitoring program shall be implemented at AMKC, ARDC, BKHD, GMDC, GRVC, JATC, NIC, QHD, OBCC, and RMSC:

  a. Staffing: The OCC Director shall supervise the following monitoring program. The responsibilities of the OCC-EHOs shall include temperature testing; however, if the OCC Director determines that the OCC-EHOs are not able to conduct all of the testing described below without assistance, OCC shall develop a plan, subject to the Court's approval, to enhance its staff to that end. This staff enhancement may be accomplished by designating and training Department staff members to serve as OCC's designees to take temperatures as directed in the jails to which they are assigned. For purposes of this Order, the testing personnel under the OCC's supervision shall

9

be referred to as "OCC-testers."

a. <u>Frequency</u>: OCC-testers shall monitor the inside temperature in each jail on each day when the outside temperature as measured at LaGuardia Airport by the National Climatic Data Center (U.S. Dept. of Commerce) drops below 55 degrees F, from October 1 until May 31, or exceeds 85 degrees F, on any day of the year ("testing days"). On testing days, the temperature shall be recorded in medical areas, mental health areas, the punitive segregation areas, 15% of the housing areas in the jail (sleeping areas and dayrooms), and in 40% of the modular and Sprung housing units (the "testing locations"). On testing days where the temperature falls below 55 F, inside temperatures shall be recorded at testing locations between 6:00 and 9:00 a.m. On testing days when the outside temperature exceeds 85 degrees, inside temperatures shall be recorded at the testing locations between 1:00 p.m. and 4:00 p.m. in the afternoon. In addition, notices shall be posted in all housing areas and program areas used by inmates (e.g., clinics, social services, chapel, recreation) notifying them of the mechanism for contacting OCC in the event that they experience extreme temperatures. OCC shall monitor temperatures in areas where there have been recent temperature or ventilation complaints or reports of malfunctions.

b. <u>Method</u>: The ambient temperature shall be measured in the center and at opposite ends of any measured location. If different, all three temperatures shall be noted on the temperature report. In cell areas, such measurements shall be recorded in one cell at or near the front of the area, one cell at or near the middle, and one cell at or near the rear, on each side of each tier of cells. Place or hold the probe to ensure that the probe does not come into contact with any solid objects. Allow time for the temperature display to equilibrate (until the display stops changing). This takes approximately two minutes. If the ambient temperature falls below

10

68 degrees F or exceeds 85 degrees F, the OCC staff member or designee shall inform the Warden or the Warden's designee and the Director of Environmental Health who shall redress the situation promptly.

c. <u>Equipment and Training</u>: OCC-testers shall use an Atkins Series Thermometer with the following specifications:

Range: -40 to 600 degrees F
Probe length: 4 inches
Accurate to 0.9 degrees F over entire range
Either the Atkins #39032 Hand Held Air probe, Straight Cable, or the Atkins #50332 Hand Held Air Probe, Coiled Cable, is acceptable.

The thermometer shall be validated monthly. The OCC-testers shall perform the testing shall receive training in the use and storage of the equipment from the vendor or from an approved trainer. The Court and parties shall be provided with documentation of such training.

*Ventilation*

15. Defendants shall implement the following at ARDC, GMDC, GRVC, JATC, MDC, NIC, OBCC, the mental observations units at AMKC, and the intake areas at RMSC, QHD and BKHD:

a. Prior to May 15 of each year, defendants shall inspect, test, and repair or replace to working order all ventilation systems in ARDC, GMDC, JATC, RMSC, GRVC, NIC, OBCC, MDC, AMKC mental observation areas, and the intake areas of BKHD and QHD, and shall certify to the Court, with copies to OCC and plaintiffs' and defendants' counsel, that these tasks have been completed. Defendants shall thereafter maintain these systems in working order. Defendants shall establish a schedule for balancing the mechanical ventilation systems annually,

11

unless the manufacturer's specifications dictate a different schedule for a particular ventilation system, and shall follow that schedule, reporting annually to the Court, with copies to OCC and plaintiffs' and defendants' counsel, on their compliance with the schedule during the preceding year. For year 2001, defendants shall make the above certification by August 15, 2001.

b. Defendants shall complete all necessary mechanical repairs to the roof fans at ARDC by June 29, 2001, and shall complete all necessary electrical repairs to those fans by July 31, 2001. By May 15, 2001, defendants shall also provide an inventory of other ventilation repairs that are required in the facilities listed in section (a) above to restore functional ventilation to those buildings, along with a schedule for repairs. The schedule shall provide, and defendants shall ensure, that all ventilation repairs are completed before August 1, 2001.

c. Defendants shall ensure that all bathroom and shower areas are provided with functioning mechanical ventilation at all times.

d. Defendants shall ensure that inmate beds are placed so that prisoners' heads are at least 6 feet apart from each other while the prisoners are sleeping. The Defendants shall certify to the Court by July 2, 2001 that this provision has been complied with. In some areas, such as the modulars, complying with this Order may require reducing the number of prisoners in sleeping areas.

e. Defendants shall ensure that all windows which are designed to be opened are operational. Checking for operational windows shall be part of the cell inspections required pursuant to ¶12(d) above. A cell window that is designed to open and close shall not be considered operational unless it can be opened and closed by a detainee without the assistance of a staff member. Detainees shall not be housed in cells without operational windows. The only

12

exception to this requirement shall be in mental health areas in which medical or mental health authorities have directed that window cranks be removed because of the risk of suicide. In such areas, window cranks shall be readily available to open and close windows.

 f. The defendants shall provide OCC and the Court with information about the frequency and causes of malfunctioning or non-functioning mechanical ventilation in intake areas, as well as the amount of time it takes to restore fully functioning ventilation in various foreseeable circumstances.

### Heating

16. With respect to AMKC, ARDC, BKHD, GMDC, GRVC, JATC, NIC, QHD, OBCC, and RMSC:

 a. Prior to October 15 of each year, defendants shall inspect, test, and repair or replace to working order all heating systems and shall certify to the Court with copies to OCC and to plaintiffs' and defendants' counsel that these tasks have been completed. Defendants shall thereafter maintain these systems in working order.

 b. Defendants shall maintain radiators and radiator covers in good repair to ensure the appropriate distribution of heat. Defendants shall incorporate into their cell inspection program, the inspection of radiators.

 c. Prior to October 15, 2001, defendants shall ensure that all windows are fully operational so that they can be closed during the winter months. The cell inspection program to be developed and implemented by defendants shall ensure that broken windows are repaired promptly. Inmates shall not be housed in cells or dormitory areas during the winter months where

13

the windows cannot be closed or sealed or where windowpanes are broken.

*Lighting:*

p. 24

17. Defendants shall ensure the following at GMDC, RMSC, JATC, GRVC, NIC, OBCC, MDC, BKHD, QHD:

a. Defendants shall ensure that in all cells and dormitory housing areas, no less than 20 foot-candles of light is provided at bed or desk level for each prisoner. Light bulbs incapable of providing this amount of light shall not be used in cells or dormitory housing areas.

b. Defendants shall ensure that in the medical areas at GMDC, NIC and RMSC, no less than 30 foot-candles of general lighting and 100 foot-candles of task lighting are provided in any room or area in which patients are examined or medication is stored, prepared, dispensed or otherwise handled.

d. Defendants shall implement the standards set forth in ¶17 (a) and (b) by August 1, 2001 except to the extent that capital renovations are required to achieve that end. To the extent that capital renovations are required, Defendants shall submit a schedule of renovations on or before August 1, 2001. The renovations specified in the schedule shall be completed as quickly as practicable, and in any event before January 3, 2002.

e. Defendants shall by August 1, 2001 identify and clean all light shields -- in all cells, dormitory housing areas and medical areas subject to this Order -- that are discolored, painted over, or obscured with paper or other substances, and shall replace all shields which cannot be restored to a fully usable state by cleaning. Subsequently, defendants shall promptly clean or replace all light shields that are observed to be discolored, painted over, or obscured with paper or

14

other substances.

 f. Prisoners shall not be housed in cells with lights that do not work.

*Noise*

18. Defendants shall certify to the Court within 10 days of the date of this Order that the permanent power conversion project is complete and that diesel-powered generators at RMSC and ARDC are used as emergency back-up only.

*Clinics and Medical Areas*

19. The Department shall maintain the clinic and infirmary areas at NIC, GMDC and RMSC in a clean and sanitary condition. Specifically, the Department shall ensure that medical areas are cleaned regularly and kept clean and sanitary. Regular cleaning includes, but is not limited to:

 1. dusting chairs, desks, tables and window sills;

 2. sanitizing sinks once daily and more often if need is indicated by Departmental staff, health care staff or public health sanitarians;

 3. washing floors once daily;

 4. high dusting areas every three days, or as the need is indicated by Departmental staff, health care staff or public health sanitarians, and dusting ceiling vents at least once weekly, or more often if need is indicated by departmental staff, health care staff or public health sanitarians;

 5. spray buffing floors with machine three times weekly;

15

6. spot washing walls, wall vents, railings, doors, and fixtures as needed;

7. damp washing and sanitizing patient bedside tables and overbed tables daily and individually after each patient's discharge (infirmary only);

8. ensuring that infirmary beds, mattresses, and pillows are sanitized before each new patient is assigned to the bed, in addition to compliance with the general provisions concerning mattresses set out in ¶12(d) and (e) of this Order;

9. maintaining sufficient and sanitary place(s) for storage of sterile supplies;

10. maintaining clean and sanitary medical equipment, examination tables, medication rooms and treatment or examination areas.

b. Cleaning crews that do not include infirmary patients shall be assigned to clean the NIC, GMDC and RMSC infirmaries twice each day, or more often if need is indicated by Departmental staff, health care staff or public health sanitarians. At NIC, the cleaning crew shall continue to consist of civilians. The infirmary cleaning crew shall clean all living and common areas. Cleaning crews shall also be assigned to all mental health housing areas. Residents of the mental observation units may be assigned to these crews, if they meet all requirements for the job and then only if they have been cleared in writing by their primary mental health provider as mentally fit for such work. The mental health provider shall certify that such work will not adversely affect the inmate's mental health and shall ensure that the inmate is removed from the crew if it is not therapeutic for the particular inmate. These crews shall clean all common areas twice daily and any cells or living areas occupied by inmates who cannot clean these personal

areas adequately by themselves. The correctional and mental health staff assigned to mental health housing areas will identify in writing those prisoners whose cells or living areas shall be cleaned by the cleaning crews.

**SO ORDERED**

New York, NY
Dated: April 26, 2001



U.S.D.J.