

**THE LEGAL AID SOCIETY CRIMINAL DEFENSE**

Prisoners' Rights Project
199 Water Street
New York, NY 10038
T (212) 577-3530
www.legal-aid.org

John K. Carroll
*President*

Janet E. Sabel
*Attorney-in-Chief*
*Chief Executive Officer*

Mary Lynne Werlwas
*Director*
Prisoners' Rights Project

**VIA ECF**

April 16, 2021

Hon. Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *Benjamin v. Brann*, No. 75-CV-3073 (LAP)
    Joint letter setting forth parties' views of the May 2014 bench trial before Judge Baer

Your Honor:

On behalf of all parties, we respectfully submit this letter in response to the Court's order dated March 26, 2021 (ECF No. 691), which directed the parties to "confer and inform the Court . . . of their views on the bench trial conduct by Judge Baer in May 2014 on which he did not rule." We first briefly explain the procedural background, followed by the parties' view on the appropriate disposition.

We direct the Court to the docket entries associated with plaintiffs' motion for enforcement of the Court's Heat Orders[1], the subject of the 2014 bench trial, directing defendants to "provide adequate ventilation and cooling in punitive segregation areas, including, but not limited to, CPSU at OBCC and MHAV II [sic: refers to MHAUII] at GRVC. . . ," and defendants' cross-motion to terminate that order. The relevant documents can be found at ECF Nos. 578-587, 591, 593, 596, 605-607, 609, 611, 614, 646-650, 653-654, 668, 673-675, 677, and 683-684. The parties agree that these docket entries represent the complete record for the bench trial and motion practice.

By way of background, in June 2013, plaintiffs moved for enforcement of the Court's order regarding cooling and ventilation in the punitive segregation units (the "Central Punitive Segregation Unit" or "CPSU"), which were then located in the Otis Bantum Correctional Center ("OBCC"). Specifically, plaintiffs proposed that the Court enter the following order:

---

[1] The Court ordered defendants to submit a plan to provide adequate ventilation and cooling in its Order of July 26, 2004. (ECF No. 388). Numerous subsequent orders and judgments restated and reinforced this obligation, including the Amended Order of December 22, 2004 (ECF No. 395); *Benjamin v. Horn*, 2006 WL 1370970 (S.D.N.Y. May 18, 2006); Implementing Order re: Heat Conditions (May 31, 2006)(ECF No. 418); and Order re: Plaintiffs' Motion to Enforce the Court's Prior Heat Orders re: Adequate Cooling in Punitive Segregation (December 12, 2007)(ECF No. 451).

> Within 60 days from the date hereof, DOC will present to OCC, the plaintiffs, and this Court, a plan, which, while taking the needs for security into consideration, will provide adequate cooling in punitive segregation areas, including, but not limited to, CPSU at OBCC and MHAUII at GRVC.

*See* Memorandum of Law in Support of Plaintiffs' Motion for Enforcement, ECF No. 579. Defendants opposed, an evidentiary hearing was held in 2014 before the late Judge Harold Baer, Jr., and post-trial briefs were submitted. The case was transferred to Your Honor's docket when Judge Baer died shortly after the hearing.

On March 15, 2015, this Court denied the enforcement motion, subject to reinstatement by letter, while the parties attempted to reach a settlement agreement. After settlement negotiations failed, defendants submitted several letters describing changes made to the Department of Correction's punitive segregation practices. By letter dated June 22, 2017, defendants argued that the heat order at issue in plaintiffs' enforcement motion should be terminated. Letter from Chlarens Orsland and Omar H. Tuffaha, ECF No. 649. Plaintiffs opposed termination. On August 16, 2018, the Court construed defendants' submissions as "DOC's motion to end the Heat Orders issued by the late Judge Harold Baer, Jr., and close the case." (ECF No. 650.) The parties then submitted supplemental letter briefs (ECF Nos. 653-54), one of which contained, among other things, plaintiffs' demand for leave to seek discovery about conditions in punitive segregation (ECF No. 653, at 1-2). The parties agree that documents 653 and 654 present the most thorough summaries of the parties' positions about the appropriate disposition in light of the changed factual circumstances since the cross-motions were made. We nevertheless separately address certain additional changed circumstances.

**The Commissioner's Views:**

As the Court is aware, Defendants have asserted that the challenged order requiring ventilation and cooling in punitive segregation areas no longer implicates a 'case or controversy,' in light of the changes to the old CPSU policies. That is even truer today, as further institutional reforms since our last correspondence with the Court have been implemented--with more on the horizon, as explained below--resulting in a historic transformation from punitive segregation to a system based on restorative justice principles.

As the Court may recall, shortly after the trial concluded in 2014, the Department, as part of its reform agenda, developed alternatives to punitive segregation, alternative ways to reduce violence in the jails, and alternative strategies to manage its adolescent and young adult populations. Indeed, in the years following the 2014 trial, the jail system underwent groundbreaking reforms. Most significant, the Department substantially reduced its reliance on punitive segregation between 2014, when the average number of individuals serving punitive segregation in CPSU on any given day exceeded approximately 500, and now, where the average is no more than approximately 100 (with 100 cells air-conditioned).

2

Following initiation of the Department's reform agenda, in or about December 2014, the Department eliminated punitive segregation for adolescents aged 16 and 17 years old. In January 2015, the Board of Correction ("BOC") amended its Minimum Standards to codify this practice, achieve additional limitations on the use of punitive segregation ("PSEG")[2], and permit the creation of Enhanced Supervision Housing ("ESH")[3] for adults. Specifically, the rules codified the elimination of PSEG not only for 16 to 21-year-olds, but for individuals with serious mental or serious physical disabilities or conditions.[4] The rules also limited punitive segregation to 30 days (Min. Std. § 1-17(d)(1) and (2)), with the exception of serious assaults on staff (up to 60 days) (Min. Std. § 1-17(d)(4)), limited punitive segregation to a total of 60 days over a 6 month period of time, absent exceptional circumstances (Min. Std. § 1-17(d)(3)), and essentially required a 7 day break from punitive segregation after serving 30 consecutive days (Min. Std. § 1-17(d)(2)). After the elimination of punitive segregation for adolescents in 2014, as noted above, the Department implemented the elimination of PSEG for young adults (*i.e.,* people ages 18 through 21) in or about October 2016.[5]

The process of eliminating punitive segregation for young people led the Department to establish alternative restrictive housing, Secure Unit ("Secure") and Young Adult ESH ("YA-ESH").[6] Both of these units have different phases or levels, with lockout periods ranging from 7 to 14 hours, a far cry from the one hour minimum out of cell time previously afforded those in CPSU. The Secure Unit is an environment with enhanced programming, and ESH offers programming and behavioral incentives. Both types of units utilize behavioral incentives to encourage individual progression through the phases or levels and eventual transfer out of the unit to the general population.

With respect to housing, as noted above, in or about August 2015, the Department completed conversion of two 50-bed air-conditioned housing units in GRVC for the purpose of housing individuals who had committed violent Grade I infractions in Punitive Segregation I ("PSEG I"). As of August 3, 2015, incarcerated individuals previously held in OBCC CPSU who had committed violent Grade I infractions were housed in the new air-conditioned punitive segregation units with up to a 23 hour lock-in. The Department has contended that this alone satisfied Judge Baer's original order, and warranted termination. *See* Dkt. No. 649 at p. 6.

Subsequently, in 2019, the New York State Commission of Correction ("SCOC") promulgated new rules that mandated a minimum of four hours out-of-cell time for all individuals in

---

[2] Minimum Standard ("Min. Std.") § 1-17 ("Limitations on the Use of Punitive Segregation").
[3] Min. Std. § 1-16 ("Enhanced Supervision Housing").
[4] Min. Std. § 1-17(b)(iii) ("Exclusions").
[5] Two years later, in October 2018, DOC transferred adolescents off Rikers Island to the Horizon Juvenile Center in the Bronx, where they now reside (as of October 1, 2020) in the custody of the New York City Administration for Children's Services ("ACS"), rather than DOC.
[6] In addition, two types of alternative housing for young adults, with heightened programming, individual engagement, and staffing ratios, were established, Second Chance Housing Unit ("Second Chance") and Transitional Restorative Unit ("TRU"). These housing areas adhere to the minimum standard of 14 hours out-of-cell time.

restrictive housing units, with exceptions relating to safety and security concerns (Title 9 NYCRR § 7075). Accordingly, as of June 5, 2019, individuals in these restrictive housing units, including PSEG I, are afforded a minimum of four hours out-of-cell time per day consistent with the SCOC minimum standards.

Also, in 2015, the Department established Enhanced Supervision Housing (ESH), an alternative to punitive segregation to house individuals who present a significant threat to the safety and security of the facility if housed elsewhere, while also promoting rehabilitation, good behavior, and the psychological and physical well-being of incarcerated individuals. As of April 15, 2021, ESH for adults consists of three levels[7] with an out-of-cell time of 7 hours for Levels 1 and 2, and 10 hours for Level 3.

Further Changes Proposed

In June of 2020, the BOC announced a new Rule to *eliminate* punitive segregation and certain other forms of restrictive housing. If promulgated next month, the new Rule replaces prior restrictive housing units with the Risk Management Accountability System ("RMAS"), an alternative disciplinary model that separates people from general population in response to their commission of an offense and holds them accountable through a three-level progression model.[8] The three levels of RMAS housing will have out-of-cell time ranging from 10 to 14 hours. We note that individuals who commit a serious grade 1 infraction, who will have out of cell time for a minimum of 10 hours a day, are expected to be housed in air-conditioned individual cells that are made with bar stock, not solid doors. RMAS Level 1 cells will have individual dayrooms adjacent to the individual cells. RMAS Level 2 will have four-person dayrooms, and RMAS Level 3 will have one dayroom per housing area, as does general population. RMAS is intended to promote prosocial behavior and progression back to general population through utilization of positive incentives, case management services and behavior support plans, individual evidence-based programming, and will provide people in custody with meaningful opportunities to socially engage with others and pursue productive activities in the safest way possible. *See* proposed Rule § 6-08.

This new model features intensive services, provides opportunities for socialization, and is far removed from the concerns attendant to the former CPSU.[9] And in any event, the post-trial changes discussed above, that are now in effect, fully address the original concerns.

---

[7] Prior to April 15, 2021, ESH Level 1 provided 7 hours of out-of-cell time for individuals while placed in restraint desks. Pursuant to a variance approved by the New York City Board of Correction on March 17, 2021, as of April 16, 2021, the Department discontinued the use of restraint desks for Young Adults, and all Young Adults in this category were transferred to housing areas with individual dayrooms and are afforded 14 hours of out-of-cell time. See Record of Variance Action for March 17, Public Meeting,
https://www1.nyc.gov/assets/boc/downloads/pdf/Meetings/2021/March/2021.03.17%20-%20YA%20ESH%20Record%20of%20Variance.pdf

[8] If promulgated, the Board's rules contemplate implementation of the RMAS model in or about November 2021.

[9] The doors to the single room occupancy cells in the NIC are made of bars, not solid doors

**Plaintiffs' Views:**

Evidence at the 2014 hearing established that the risk of heat illness largely arose from hours spent in confinement in non-air-conditioned cells with solid doors, out of view from other incarcerated persons and staff. Hr'g Tr. At 27-30 (ECF No. 607); *see* generally Plaintiffs' Post Trial Brief at 4-13 (ECF No. 605). The construction of these cells prevents cross-ventilation and traps in heat such that these cells were often actually hotter than the outside temperature. Hr'g Tr. at 39, 41. In addition, they obstruct airflow from installed fans, if any, and hinder medical and correctional staff in the proper monitoring of the condition of those confined in their cells. Id. at 34-36. This last factor is especially important because deadly heat illness can progress quickly, in a matter of minutes, and a person may be unable to report their own symptoms until it is too late. Id.

While the Commissioner represents that there are no longer any un-cooled CPSU units following the move of "punitive segregation" to GRVC, purportedly rendering the 2014 motion, hearing and subsequent proceedings moot, our position is that there remain many people subject to similarly dangerous conditions of confinement that expose them to unconstitutional heat risk. These at-risk individuals include those confined in the OBCC housing area that previously housed the CPSU. The 2014 trial testimony established that conditions in this housing area place individuals at risk of heat-related illness on high heat days – including the composition of the cell doors and the purported difficulty of installing air conditioning. Further, until very recently, OBCC housed individuals in Enhanced Supervision Housing. Persons in ESH are subjected to up to 17 hours per day locked in a solid-door cell without cooling, by design, and in practice even longer due to facility lockdowns or failures to adhere to policy by staff. *See* Plaintiffs' Letter dated May 31, 2017 (ECF No. 648), at 2-4; *see also* Restrictive Housing Chart, submitted by email to chambers pursuant to Part 1(A) of this Court's Individual Practices. These conditions present substantially the same unconstitutional risks of illness or death as those in "punitive segregation" because heat stroke can occur within minutes, and the cell construction obstructs airflow and hinders monitoring of conditions.

The same is true not only of ESH but of also of the other restrictive housing units created since 2014. The Commissioner represents that as of April 21, there are 112 individuals in un-air-conditioned restrictive housing units, including ESH, with capacity for over 200. *See* Restrictive Housing Chart. Even should BOC promulgate the proposed rule, making further changes to restrictive housing, the rulemaking process is not complete[10] and there may continue to be numerous individuals locked into extremely hot cells with solid doors for many consecutive hours at a time. Further, the Heat Orders required the Department to present a plan for housing vulnerable individuals in cooled (air-conditioned) housing. The fact that the Board of Correction may require

---

[10] The Board's rulemaking process follows the City Administrative Procedure Act (CAPA). There has been strong opposition to the proposed rule by advocates and community members and the Board has extended the public comment period twice. The public comment period for the Restrictive Housing Rule will end at close of business on April 23, 2021. *See* https://www1.nyc.gov/site/boc/jail-regulations/restrictive-housing-rulemaking-2021.page. In addition, the structural changes contemplated in the proposed rules will require significant capital budget outlays that have not been finalized or approved.

the Department to place some portion of those in restricted housing in air-conditioned housing does not equal a plan. During the 2014 trial, there was extensive discussion of the limited feasibility of retrofitting current facilities to accommodate all of those individuals who the Department characterized as requiring more secure, more restrictive housing. The Commissioner's position as stated herein contains no information on which facilities are planned to house the new RMAS, the current capacity to house the RMAS in air conditioning, or the plans to expand this capacity where necessary. The mere existence of the new rule does not guarantee compliance; the Department has long relied on the Board of Correction's variance process to get around compliance with Minimum Standards, and the Board of Correction has proven disappointingly tolerant of this method.[11]

For these reasons, Plaintiffs' position remains that the cooling requirement for those in punitive segregation should apply to all levels of ESH housing wherever it is located for the duration of its existence. In the years since the hearing, The Legal Aid Society has received continual reports from incarcerated people of extended periods of lockdown in un-cooled facilities. Plaintiffs continue to oppose termination of the Heat Orders and demand leave to seek discovery to determine whether ongoing constitutional violations exist. *See* Plaintiffs' Letter dated Sept. 11, 2017 (ECF No. 653).

Plaintiffs further maintain that the Court can and should modify the heat order to apply to any housing unit that features similarly dangerous conditions on high-heat days. This *Benjamin* court has long recognized that "[t]he power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *Benjamin v. Jacobson,* 923 F. Supp. 517, 521 (S.D.N.Y. 1996) (quoting *New York State Assn. for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 967 (2d Cir. 1983)). A party seeking such a modification must establish that a "that a significant change in circumstances warrants revision of the decree." *Id*. (relying on *Rufo v. Inmates of Suffolk Cty. Jail,* 502 U.S. 367 (1992)). This applies to changed factual circumstances that were not contemplated at that time the remedial order was entered. *See, e.g., Benjamin v. Horn*, 2006 WL 1370970, at *6-7; *Benjamin v. Horn*, 2008 WL 2462027, at *12-14 (S.D.N.Y. June 18, 2008).

The changed circumstances here are the Commissioner's creation of new restrictive housing units, substantially similar to CPSU in unconstitutional and dangerous heat conditions on high-heat days, but which may not be subject to the Heat Orders as originally written. ESH, for example, was created in 2015, well after the completion of the hearing and briefing, and many years after the Heat Orders were entered. Moreover, to not modify the Heat Orders allows the Commissioner to relocate, rename or create other units where constitutional violations could occur because they are technically not covered by the orders.

---

[11] *See, e.g.,* history of variances granted to Minimum Standard 1-16(c)(1)(iii), which have allowed the Department to house people in custody ages 18-21 in ESH. This variance was most recently granted on March 17, 2021, and previously granted on October 11, 2016; February 14, 2017; July 11, 2017; August 15, 2017; November 16, 2017; May 8, 2018; November 13, 2018; February 12, 2019; July 9, 2019; February 11, 2020; July 14, 2020; and November 2020. The variance lapsed from February 22, 2021 to March 9, 2021, when it was renewed for one week. This information along with that regarding other existing variances, can be found at https://www1.nyc.gov/site/boc/jail-regulations/variances.page.

To remedy these problems, Plaintiffs seek modification of the order such that it is "suitably tailored" to properly protect all *Benjamin* subject facilities from unconstitutional heat-illness risk. *Benjamin*, 923 F. Supp. at 521. A modified order should require the Commissioner to submit a cooling plan for any housing unit that A) lacks air-conditioning; B) features a solid-cell door construction that inhibits airflow; and C) locks individuals in the cell for a period of at least 10 consecutive hours per day, whether by policy or actual practice. Ten hours is minimum period of lock-in under all varieties of restrictive housing currently in effect, and under the proposed BOC rule that would create RMAS.

Respectfully submitted,

/s/

Robert M. Quackenbush
David Billingsley
Veronica Vela
The Legal Aid Society
*Counsel for Plaintiffs*


Chlarens Orsland
Brian Krist
NYC Law Department, Office of the Corporation Counsel (NYC)
*Counsel for Defendants*